JOHN T. AFFELDT (SBN 154430)
JENNY PEARLMAN (SBN 224879)
TARA KINI (SBN 239093)
PUBLIC ADVOCATES, INC.
131 Steuart Street, Suite 300
San Francisco, California 94105
Tel. (415) 431-7430
Fax (415) 431-1048
Email: jaffeldt@publicadvocates.org
       jpearlman@publicadvocates.org
       tkini@publicadvocates.org

JEFFREY SIMES (NY SRN 2813533), appearing *pro hac vice*
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 813-8879
Fax: (212) 355-3333
Email: jsimes@goodwinprocter.com

Attorneys for PLAINTIFFS
(Additional attorneys listed on following page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONYA RENEE *et al.*,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>MARGARET SPELLINGS, in her official capacity; UNITED STATES DEPARTMENT OF EDUCATION,<br><br>　　　　Defendants. | Case No. 07-04299 PJH<br><br>**DECLARATION OF ALLISON DAVENPORT IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO PROCEED USING FICTITIOUS NAMES AND TO FILE DECLARATIONS UNDER SEAL**<br><br>Time: 9:00AM<br>Date: January 30, 2008 |

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

PATRICK THOMPSON (SBN 160804)
NICOLE E. PERROTON (SBN 233121)
ELIZABETH F. STONE (SBN 239285)
GOODWIN PROCTER LLP
101 California Street # 1850
San Francisco, California 94111
Tel: (415) 733-6000
Fax: (415) 677-9041
Email: pthompson@goodwinprocter.com

DAVID B. COOK (DC BN 113522), appearing *pro hac vice*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 346-4000
Fax: (202) 346-4444
Email: dcook@goodwinprocter.com

Attorneys for PLAINTIFFS

## DECLARATION OF ALLISON DAVENPORT

I, Allison Davenport, hereby declare:

1. The matters set forth herein are based upon my own personal knowledge, except where stated to be based upon information and belief, and if called to testify, I could and would do so competently as follows:

2. I submit this declaration in support of Plaintiffs' Motion for Leave to Proceed Using Fictitious Names And To Submit Declarations Under Seal.

3. I am a staff attorney at Centro Legal de la Raza in Oakland, California.

    a. Centro Legal de la Raza is located at 2501 International Blvd. Oakland, California 94601. Centro Legal de la Raza was established in 1969 and its mission is to protect and advance the rights of immigrant, low-income and Latino communities through bilingual legal representation, education, community organizing and advocacy. Centro Legal de la Raza currently represents predominantly immigrant clients in various legal matters, including housing, employment, immigration, consumer protection, and family law among other areas. Last year Centro Legal de la Raza served over 6,000 individuals and families. Centro Legal de la Raza's immigration unit provides legal consultations and representation of individuals before the Department of Homeland Security and the Department of Justice's Executive Office for Immigration Review.

    b. I am Staff Attorney specializing in immigration law at Centro Legal de la Raza. I provide individual consultations to clients as well as community presentations regarding immigration law and the rights of non-citizens. In addition, I represent individual clients and families in a wide array of immigration matters ranging from asylum, family-based immigration, Violence Against Women Act, U Visas, temporary protected status, removal defense, citizenship, and naturalization.

4. In May 2006, the Bureau of Immigration and Customs Enforcement (ICE) began an intensive immigration enforcement action known as "Operation Return to Sender." Operation Return to Sender targets undocumented immigrants who have ignored deportation orders, including convicted

1

criminals. However, in the process of conducting immigration raids to arrest the targets of Operation Return to Sender, ICE agents often interrogate and arrest individuals not named in warrants. Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, ICE agents have the authority to interrogate anyone "believed to be an alien" about his or her right to be in the country. In practice, this broad legal mandate often means that ICE agents interrogate people they encounter who look Latino and have an accent, and arrest them if they do not possess proof of lawful status in the United States. These types of arrests, precipitated by a chance encounter with the individual rather than an outstanding warrant, are known in the field as "collateral" arrests. On information and belief, based on news accounts I have read in the *San Francisco Chronicle* citing ICE data (a true and correct copy of which is attached hereto as Exhibit 1), I understand that between May 26, 2006 and February 23, 2007, ICE arrested 1,423 individuals in the Bay Area as part of Operation Return to Sender; 45% of these (638 total) were "collateral" arrests.

    5. Since we first became aware of Operation Return to Sender last year, Centro Legal de la Raza has seen a dramatic increase in intake calls and requests for legal assistance precipitated by ICE raids. Often the family member or close friend of a detained person contacts our office once a person has been taken into ICE custody. Our office's response is to contact ICE's Deportation and Removal Office to ascertain where the person is being detained, the nature of the allegations, and if a bond hearing has been scheduled on the case. I then either proceed with representing the individual or assist the family in securing legal representation. Many of our callers and/or their families have no criminal history and no outstanding deportation orders, yet have encountered ICE in their day-to-day activities—for example in a raid on their workplace or when ICE comes to their home or neighborhood looking for an individual named in a warrant. ICE has even entered public school grounds to make arrests. One of my clients is a woman whose husband was detained by ICE in a workplace raid; she was recently followed and arrested by ICE agents while dropping off her six year-old child at an Oakland public school. *The Oakland Tribune* published an article about her on December 19, 2007 (a true and correct copy is attached hereto as Exhibit 2).

2

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

6. Once an undocumented individual is arrested, they are taken to ICE's Detention and Removal Office in San Francisco. They are then sent to a county jail in one of several locations around the Bay Area or an ICE detention facility and held until their removal can be executed or until they appear in immigration court in San Francisco. Detainees are allowed to make collect calls to family members from the detention facility but can be moved from one detention facility to another depending on availability of space. Some detainees remain in detention for an extended period until their deportation can be arranged or while their case in immigration court is pending or until a bond is presented. For detainees who are ultimately removed from the United States, they arrive in their country of origin by plane and must begin their lives anew. This can be particularly traumatic for people who have lived for many years in the United States and have few if any memories or ties to their countries of origin. This situation can be especially acute when there are no relatives or support networks in the country of origin to assist the person in reintegrating in to that society.

7. Some of our clients have been targeted by ICE through a "tip" by a third party. One significant example is of workers from the Woodfin Suites Hotel ("Woodfin") in Emeryville, California. I have provided educational training to several of the Woodfin workers and represent one individual worker. Workers at the Woodfin, including undocumented workers, engaged in labor organizing to establish and then enforce a local minimum wage law. These organized workers, including one of my clients, were fired by the hotel. In addition, news accounts (a true and correct copy of which is attached to this declaration as Exhibit 3) have reported that Samuel Hardage, the CEO of the Woodfin, contacted his friend and local Congressman Brian Bilbray of San Diego, who chairs the House Immigration Reform Caucus, about the situation at the Woodfin. Bilbray then is reported to have alerted ICE that hotels in Emeryville are employing undocumented workers. After Bilbray's reported intervention, ICE conducted an audit of Woodfin employees' Social Security numbers and ICE agents conducted home visits of Woodfin workers–including my client—who were identified in the audit as lacking valid numbers.

3

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

8. The Woodfin Suites Hotel enforcement action has sent a message to other undocumented immigrants throughout the East Bay that they could be reported to ICE, arrested, and deported if they publicly advocated for their legal rights.

9. In addition, it is reasonable for an undocumented person to fear harassment by members of their community if their undocumented immigration status is publicly revealed. For example, clients regularly report that landlords utilize immigration status and threats of reports to the immigration authorities against tenants who assert their rights.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on: December 21, 2007

_____
ALLISON DAVENPORT

4

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

# EXHIBIT 1

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

**San Francisco Chronicle**

**The human face of immigration raids in Bay Area**

**Arrests of parents can deeply traumatize children caught in the fray, experts argue**

Tyche Hendricks, Chronicle Staff Writer

Friday, April 27, 2007

Immigration agents arrested siblings Victor and Elvira Mendoza, 21 and 17, when it turned out the fugitive they were looking for no longer lived at the Mendozas' home. Officers detained 6-year-old U.S. citizen Kebin Reyes for 12 hours when they arrested his father as an illegal immigrant.

These and many other families across the Bay Area and the nation were turned upside down this year by Operation Return to Sender, a federal immigration crackdown begun last May. The raids focus on illegal immigrants who have ignored deportation orders, but 37 percent of the 18,149 people arrested nationwide through Feb. 23 were not wanted fugitives.

Mental health experts say the raids are traumatizing children. Legal scholars and public officials are raising constitutional questions about the way the raids are carried out and about their impact on communities as a whole. And immigrant advocates say changes in immigration law -- including tougher provisions enacted in 1996 -- leave little room for illegal immigrants to correct their status.

"They (the raids) are putting some teeth back in immigration law," said Tim Aitken, deputy director for detention and removal operations in the San Francisco office of the U.S. Immigration and Customs Enforcement agency. "Our focus is, we want to go after the worst of the worst. ... But we can't be blind to someone who doesn't have lawful status in the United States."

The American Civil Liberties Union and the Lawyers' Committee for Civil Rights sued federal authorities in San Francisco on Thursday on behalf of Kebin Reyes, now 7, saying agents violated the child's civil rights when they took him into custody. Attorneys charge that the federal government violated Kebin's Fourth and Fifth Amendment rights to liberty and to being secure in his own home.

When agents arrested his father, Guatemalan-born Noe Reyes, on March 6, they would not allow him to call relatives who could take charge of Kebin and instead held the boy until an alarmed uncle heard about the arrest from neighbors, Noe Reyes and his lawyers said Thursday. "He went with his dad so he wouldn't be left home alone," said immigration agency spokeswoman Lori Haley. "We work with the families to find someone to take care of the child."

Noe Reyes, the boy's sole parent in the United States, who was released April 18, said Kebin has been fearful and withdrawn since the arrest and suffers recurring nightmares.

Lawyers and legal scholars have raised constitutional concerns about how the raids are being conducted. They accuse agents of gaining access to homes by insufficiently identifying themselves and bearing warrants that often contain inaccurate addresses for the fugitives they're seeking. Elected officials also said that when federal agents announce that they are "police," it undermines local law

6

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

enforcement. And many people have questioned the right of agents to interrogate people not named in warrants about their own immigration status.

But immigration officials said questioning people who live with or associate with the targets of warrants meets the federal standard of "reasonable suspicion" that those people might be illegal immigrants.

"If agents are going to the home of a target they believe is in the country illegally, they could reasonably suspect that others in the house might be here illegally as well," said Haley.

Under federal law as amended in 1996, agents have the authority to interrogate anyone "believed to be an alien" about his or her right to be in the country.

Blake Chisam, legal counsel to the House Judiciary Committee's subcommittee on immigration, said some rationales for reasonable suspicion might not stand up in court.

"You'd have to have an articulable basis," he said. "I don't think profiling would work."

Immigrant advocates agree.

"Just because someone is Latino or has an accent doesn't mean an officer has reasonable suspicion they are undocumented," said Lawyer's Committee staff attorney Philip Hwang. "Even being in the household where one occupant is undocumented doesn't create reasonable suspicion, because there are legion mixed-status households."

San Rafael Mayor Al Boro, Richmond Police Chief Chris Magnus and San Francisco District Attorney Kamala Harris -- among many officials here and across the country -- have said agents' practice of identifying themselves as police damages the trust local law enforcement agencies have built in immigrant communities.

Immigration officials defend their use of the word "police," saying all law enforcement agents have that right. But Hwang said residents might open their doors because they believe the agents are local police concerned for their safety. "It can't be consent unless the individual knows who they're letting into their home," Hwang said.

Kevin Johnson, an immigration law specialist at the UC Davis School of Law, said it seems like agents don't care whether the information in their warrants is wrong if it enables them to make arrests.

"That seems like an abuse of the warrant," Johnson said, "an abuse of the legal process."

Professor Rachel Moran at UC Berkeley's Boalt Hall School of Law said a warrant naming a specific individual doesn't authorize agents to search that person's home or question other residents there.

Victor and Elvira Mendoza were detained for weeks after agents arrived at their San Pablo home in January to serve a warrant for someone who didn't live there. The brother and sister had come to the Bay Area from Mexico in 2003 to be reunited with their parents, legal U.S. residents, whom they had last seen when Victor was 13 and Elvira 9.

7

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

Victor has studied English and has honed his skills as a clown, performing at schools and nursing homes and on the St. Paul's Catholic Church float in San Pablo's Cinco de Mayo parade, where he plans to appear again this year. And Elvira pulled down straight A's at De Anza High School, where she is preparing to graduate in June.

"Everyone else in our family has papers except my sister and me," said Victor Mendoza. "When we were in Mexico, we tried to get papers to come but we couldn't, so we crossed the border without permission. It's kind of hard to be without your parents."

Now the siblings await hearings on their fate before an immigration judge. Their lawyer, Stephen Coghlan of San Francisco, said many factors conspire against Mexican citizens gaining legal status here.

The wait for immigration visas for Mexican family members of U.S. citizens and permanent residents is six to 19 years. And the 1996 changes in the law greatly tightened the standards by which illegal immigrants can stave off deportation and get a "green card."

Undocumented immigrants now must prove they have been in the country 10 years and have good moral character, and their deportation must be deemed to cause a relative "exceptionally unusual hardship," a threshold almost impossible to meet, Coghlan said.

"It was a complete sea change," said Coghlan. "It's heartbreaking. Victor's a nice, articulate, soft-spoken guy who's had no contact with the law. ... He would be a fine, upright, outstanding citizen, a productive member of society. ... They call them illegal, but there's no way to be legal."

Bay Area residents have said farewell to devoted parent volunteers, talented soccer coaches and close friends. Scores of Berkeley residents mourned the departure of Felipe and Norma Espinoza, who lived undocumented in the United States for two decades and built a much richer life for their three boys than they would have had in their hamlet in Michoacan, Mexico.

The Espinozas were placed in deportation proceedings before the current federal campaign. They hired a lawyer to try to gain legal residency, but the lawyer -- later disbarred -- didn't show up for court appearances after he took their money. In February, the couple told their sons to say goodbye to their classmates and pack their bags. The court had ordered them deported and the family returned to the two-room house where Felipe was born.

Felipe, a former steelworker, said in a phone interview that he hasn't yet found work, even as a field hand. Felipe Jr., 14, said he is studying math two years behind the geometry class he left at Berkeley High School and wishes he could return to the Bay Area, even without his parents.

Child psychology experts say children suffer most from the disruption of armed agents coming into their homes and taking away their parents -- and sometimes themselves. Children can experience stress, depression and anxiety disorders, said Amana Ayoub, a psychologist at the Center for Survivors of Torture, located in San Jose, who is familiar with Kebin Reyes' experience.

Psychiatrist Dr. Alicia Lieberman, director of the Child Trauma Research Project at UCSF, said children who witness their parents being taken into custody lose trust in their parents' ability to keep them safe and begin to see danger everywhere.

8

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

"Over and above the sense of terror about, 'What will happen to my mommy and daddy and what will happen to me?' the common thread is, 'We cannot trust the authorities,' " Lieberman said.

Many adults have responded the same way, said Evelyn Sanchez, advocacy coordinator with the Bay Area Immigrant Rights Coalition.

"We've been in touch with a lot of families that have been affected by the raids, and understandably they are scared," Sanchez said. "Being undocumented is no light matter anymore, and they are really taking cover."

Kebin Reyes' lawyers also said immigration officials need clear procedures to ensure children's welfare. Agents are supposed to allow detainees to arrange care for their children, according to a letter Karyn Lang, a top immigration official, wrote March 14 to Rep. Zoe Lofgren, D-San Jose, who leads the House's immigration subcommittee.

Elected officials who support the raids say the onus for protecting children is on their immigrant parents.

"It's unfortunate that families become detached," said Kurt Bardella, spokesman for Rep. Brian Bilbray, R-Carlsbad (San Diego County), who chairs the House Immigration Reform Caucus. "But when someone enters this country illegally, and they have a child here, they have made conscious decisions while their status in this country is uncertain. They are subjecting themselves and their families to the risk that the law might be enforced."

Sen. Dianne Feinstein of California last month wrote to Homeland Security Secretary Michael Chertoff, who oversees the immigration enforcement agency, expressing concern about how children are being treated during raids.

"I believe the federal government has a special obligation to ensure that the children of the undocumented individuals are treated humanely and left with appropriate caregivers," Feinstein wrote.

Rocío Avila, a lawyer for La Raza Centro Legal in San Francisco, said an adult client of hers was detained during a raid even though he is a U.S. citizen.

"He attempted to let them know he was a U.S. citizen, and they didn't initially believe him," she said. "He asked, 'Who are you here to see? Do you have a warrant?' They handcuffed him immediately and put him on the floor."

The man, fearful of publicizing his name, is considering legal action.

Elizabeth Larose Dunn, who leads Marin Montessori School, said a sixth-grade student whose parents were arrested in immigration raids in March and did not want to be identified by name is a high achiever and "beloved in the school."

"This is America, a place we'd like to think all of our children are safe," she said. "I'm so sad about this on a personal level."

The arrests

9

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

In a crackdown begun last May against illegal immigrants who ignored deportation orders, including convicted criminals, U.S. Immigration and Customs Enforcement agents arrested 18,149 people by Feb. 23.

More than one-third were people the agents encountered and independently suspected were illegal immigrants; officials are calling these "collateral" arrests.

Here's a breakdown of total and "collateral" arrests in California and the country:

National: 18,149 arrests -- 36.9 percent collateral (6,696)

Los Angeles region: 1,198 arrests -- 41.5 percent collateral (497)

San Diego region: 511 arrests - 56.6 percent collateral (289)

San Francisco region: 1,423 arrests -- 44.8 percent collateral (638)

Source: Associated Press (Immigration and Customs Enforcement data covers May 26, 2006-Feb. 23, 2007)

*E-mail Tyche Hendricks at thendricks@sfchronicle.com.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/04/27/MNGJIPGO341.DTL

This article appeared on page **A - 1** of the San Francisco Chronicle

10

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & татому SUBMIT DECLARATIONS UNDER SEAL

# EXHIBIT 2

11

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

## Oakland Tribune

Immigration agents detain mom at Oakland school
By Katy Murphy, STAFF WRITER
Article Last Updated: 12/19/2007 02:46:44 AM PST

OAKLAND — Immigration agents detained a pregnant mother Tuesday morning at an East Oakland elementary school. The woman's frightened 6-year-old daughter was told to go to class as her mother was led away for questioning, according to staff at Melrose Bridges Academy.

"She walked out, sobbing, down the hall," said Suki Mozenter, an English-language coach who witnessed the event.

U.S. Immigration and Customs Enforcement spokeswoman Virginia Kice said the agents wanted to talk with Maria Ramirez about her husband's small business. Her husband, Jose De Jesus Guzman-Baez, faces federal charges of knowingly employing illegal immigrants. He has been in custody since November and faces deportation.

Ramirez was released before noon on Tuesday, but she could be ordered to return to Mexico. During questioning, Kice said, it became clear that she was in the country illegally.

Kice, who originally was told the agents had detained Ramirez on her way out of Melrose Bridges after she dropped off her daughter, later said the officers accompanied her into the school.

They did so for her child's sake, she said. "The officers wanted to ensure that the child was not left unattended," Kice said.

But Tuesday afternoon after school, dozens of parents, teachers and students came together to decry the event.

"This is supposed to be a safe place," Noemi Contreras, whose children attend the nearby middle school, Melrose Leadership Academy, said in Spanish.

"They are scaring people with everything that is happening."

Moyra Contreras, principal of Melrose Leadership Academy, helped organize Tuesday's demonstration. Ramirez's son is an eighth-grader at her school, but he isn't the first student to fear the deportation of a mother or father.

In the last month, Contreras said, three parents have been detained or placed in detention.

"The fact that parents and children don't know if they're going to see each other at the end of the day is very difficult, psychologically, for our kids," Contreras said. She added, "We want our students and our families to come to the schools without fearing arrest."

Mozenter said she first saw the two immigration agents walking outside the school as she arrived in the morning. Minutes later, when she was picking up her keys in the main office, she saw them walk inside with Ramirez and her young daughter.

12

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

The girl was crying, Mozenter recalled.

Mozenter said the men explained that they needed to talk to Ramirez and that she was in the country illegally. When Ramirez asked to call her attorney before leaving the school, Mozenter said, the agents said they didn't want to have to take her away in handcuffs in front of the other parents.

Ramirez left with them. When she returned, just before noon, she gave her daughter a hug and told her to go to lunch with her friends. Her daughter didn't want to let go, Mozenter said.

Ramirez said to her in Spanish, "They're not going to take me away."

Reporter Barbara Grady contributed to this story. Read Katy Murphy's Oakland schools blog at http://www.ibabuzz.com/education.

13

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

# EXHIBIT 3

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

**East Bay Express**

**Whose Side is ICE On?**

**Officials from Immigration and Customs Enforcement take sides in the ongoing labor dispute at Emeryville's Woodfin Suites.**

By Wendy Patterson

Printer-friendly version | Send a letter | E-mail story
November 21, 2007

Early in the morning of October 4, as Rosa Flores was preparing for work, she answered a knock at her door. The couple standing there said they had been sent to investigate the labor dispute at Emeryville's Woodfin Suites hotel. They wore no identifying clothing and offered no credentials but said they were from US Immigration and Customs Enforcement (ICE).

DAVID BACON



Woodfin Suites workers and their supporters during a rally.

In April, Emeryville's Woodfin hotel had fired Flores and eleven other housecleaners in the middle of a labor dispute over Measure C, which requires hotels to pay housekeepers a minimum of $9 an hour. Flores had been an outspoken leader until she was fired for a Social Security number mismatch.

"Do you know that immigration was involved in that?" Flores said the agents asked her, referring to the labor dispute. She said they then showed her news clippings in which she had been quoted as one of the leaders on the picket lines. Flores said she needed to leave for work and told the officials, "Look, I'll come to your office to talk to you. ... I have to leave now." So they wrote down the local ICE office address and left their names: David Moss and Hermilia Flores.

Flores' lawyer, Allison Davenport of the Centro Legal de la Raza, said that when she later called to inquire about the nature of the visit, Moss refused to elaborate but told her it was about an "ongoing investigation regarding her prior employment." Neither Davenport nor Flores, who is being identified here with a pseudonym, has heard from them since then.

Federal immigration officials got involved in the labor dispute after a Republican congressman with ties to Woodfin's CEO asked the agency to intervene. That CEO, Samuel Hardage, is a longtime donor to conservative causes and candidates including his local congressman, Brian Bilbray of San Diego. Hardage brought up his hotel's situation to his congressman in a "casual conversation," he admitted in a recent interview. Bilbray, who chairs the House Immigration Reform Caucus, then alerted ICE that

15

"hotels in Emeryville are ... employing undocumented workers." The congressman's involvement was first reported by the *San Francisco Bay Guardian*.

Activists believe Hardage asked immigration officials to investigate his own hotel as a way of retaliating against workers involved in a labor dispute that wasn't going well for the hotel.

<a href='http://ads.eastbayexpress.com/ads/adclick.php?n=fa1c3729-isl' target='_blank'><img src='http://ads.eastbayexpress.com/ads/adview.php?n=fa1c3729-isl&amp;what=zone%3A18' border='0' alt=''></a>

In January, a state court ordered Woodfin to rehire Flores and the twenty other workers it had fired in December while the city investigated complaints that the hotel was not complying with Emeryville's living-wage ordinance. It was shortly after that — in a letter dated February 21, 2007 — that Bilbray sought federal intervention. When the agency's investigation found that some workers' Social Security numbers didn't match those in federal records, they were fired. By calling in the feds, the hotel effectively trumped local authorities and was able to fire twelve of the workers.

Nor did Bilbray's effort stop with Woodfin. He asked ICE to investigate all four Emeryville hotels. The results of that effort became apparent on August 29, when ICE agents showed up at the Hilton Garden Inn and snatched dishwasher Felipe Leon, 52, a Mexican immigrant who had worked there for eighteen years. Leon is now in deportation proceedings for using fraudulent identification to obtain a Social Security card, according to ICE spokesperson Virginia Kice. Hotel officials did not return calls for comment, but union representative Lian Alan said they were "surprised and didn't know what was going on" when the agents arrived. The agency subsequently gave the Hilton Garden Inn a list of twelve unauthorized workers, who Alan said were immediately fired.

As for Emeryville's two other hotels, Jeff Given, manager at the Courtyard Marriott Hotel, confirmed that his hotel was investigated but said the inquiry did not result in any actions against workers. Sheraton Four Points hotel manager Epenesa Pakola declined to answer questions.

But even as the enforcement effort has spread to the city's other hotels, Woodfin remains the focal point of legal strife. While the other three hotels have complied with Measure C and even paid back wages, Woodfin has twice sued the city in federal court to have the ordinance declared unconstitutional. Both cases were dismissed.

Although the hotel began complying with the measure in August 2006, it still owes nearly $250,000 in back wages to fifty workers and $50,000 in fines and fees to Emeryville, according to city attorney Michael Biddle. The hotel has missed two city-imposed deadlines to pay. By October, city officials had become so exasperated that they went to state court asking for a judgment to force the hotel to pay the money. Woodfin is expected to countersue.

Why would a large corporation go to so much trouble to avoid paying workers a minimum of $9 an hour in a tiny city like Emeryville? "Measure C is about forcing a union organization on business," the hotel chain's ardently anti-union CEO said in an interview. Although the hotel itself is not unionized, Hardage claims that the East Bay Alliance for a Sustainable Economy (EBASE), the local worker advocacy group behind Measure C, is basically a union. "Measure C is not a living-wage ordinance," added hotel lawyer Bruno Katz in a separate interview. "It's a collective bargaining agreement masquerading as a living-wage ordinance."

16

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

In fact, Measure C is a different way of accomplishing some of the workplace gains that once would have been the exclusive province of a union action. Passed by voters in 2005, the ordinance requires that all housekeepers make a minimum of $9 an hour and that any housekeepers who clean more than 5,000 square feet in an eight-hour shift receive time-and-a-half compensation.

Hardage was adamant that "the workers were not fired for retaliation" to their vocal support of the ordinance. Instead, he said, Woodfin was just following up on the letters it had received from the Social Security Administration alerting it to discrepancies in the employees' documentation. When asked why his hotel had not followed up in the years before the labor dispute, he denied having received such letters before.

But in fact, these so-called "no-match letters" are sent out annually by the Social Security Administration. "Woodfin knew of the no-match for years and was never concerned about them before," said EBASE organizer Brooke Anderson. "It was only once the workers were standing up for their rights that they used this as a pretext to fire them." Indeed, Flores said she had worked at Woodfin for three years before the hotel brought up the issue of no-match. "They never mentioned it until a couple months after we began asking for a higher wage," she said.

Monica Guizar of the National Immigration Law Center said the immigration agency was ignoring its own internal operating procedures by "taking retaliatory actions against workers who speak out." She was referring to a 1998 "Memorandum of Understanding" between the Department of Labor and the old Immigration and Naturalization Service, in which the agency agreed to not intervene where there was a labor dispute in progress. The rationale was that workers would not report labor abuses if they feared immigration action against them. "Labor laws protect all workers regardless of their immigration status, and there are laws that clearly protect workers from being fired when they are in the middle of a labor dispute," Guizar said.

But ICE, which was created in 2003 as the successor to the old Immigration and Naturalization Service, and is part of the sprawling Department of Homeland Security, has not been abiding by those guidelines. "A labor dispute does not preclude us from conducting an investigation," said Kice, who declined to comment on her agency's investigation of Woodfin.

The Bush Administration has plans for an even stiffer crackdown. Last August, Homeland Security Secretary Michael Chertoff announced an unprecedented new rule that would require employers to fire employees who are unable to correct their no-match issue within ninety days. But as soon as Chertoff announced the proposed rule, a group of labor and immigration rights groups went to court to stop it.

While DHS's target was clearly illegal immigrants — who often do use fraudulent Social Security numbers to gain employment — government statistics show that a full 70 percent of the people who receive no-match letters are US citizens. And so, on October 10, US District Judge Charles Breyer issued an injunction blocking implementation of the agency's plan. His ruling stated that, if not stopped, the DHS rule "would result in irreparable harm to innocent workers and employers" by resulting "in the termination of employment to lawfully employed workers."

Labor and immigrants rights activists say the real intent of this crackdown was to pressure Congress to pass the President's plan for immigration reform. Chertoff himself said as much when, in responding to Judge Breyer's ruling, he said, "President Bush made clear in August that we are going to do as

17

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL

much administratively as we can ... to enforce our immigration laws. Today's ruling is yet another reminder of why we need Congress to enact comprehensive immigration reform."

And so, the raids are likely to continue. According to ICE statistics, there were 4,077 administrative raids of workplaces between October 2006 and October 2007, an increase of 816 percent over the same time frame in 2003. There already have been more than half a dozen raids in the Bay Area this year.

Meanwhile, the city of Emeryville continues its fight to uphold Measure C, on behalf of the hotel housekeepers. The city is scheduled to face off against Woodfin Suites in court on February 27.

And Flores is cleaning houses now, uncertain of her future.

18

DECL OF ALLISON DAVENPORT IN SUPPORT OF MTN FOR LEAVE TO PROCEED USING FICTITIOUS NAMES & TO SUBMIT DECLARATIONS UNDER SEAL