Slip Copy, 2007 WL 662463 (E.D.Cal.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. California.
L.H., A.Z., D.K., and D.R., on behalf of themselves and all other similarly situated juvenile parolees in California, Plaintiffs,
v.
Arnold SCHWARZENEGGER, Governor, State of California, et al, Defendants.
No. CIV. S-06-2042 LKK/GGH.
Feb. 28, 2007.

Carole Shauffer, Corene Thaedra Kendrick, Karen Kennard, Kristen A. Palumbo, Briana Lynn Morgan, Bingham McCutchen LLP, Susan Lynn Burrell, Maria V. Morris, Meghan Regina Lang, Michael Bien, Sarah Laubach, Rosen Bien & Galvan, LLP, San Francisco, CA, Donald Specter, Prison Law Office, San Quentin, CA, Gay Crosthwait Grunfeld, Rosen Loeb and Pines, Sherman Oaks, CA, for Plaintiffs.

Benjamin Terrence Rice, CA Department of Justice, Office of the Attorney General, Sacramento, CA.

James Michael Sobolewski, Office of the Attorney General, Sacramento, CA, for Defendants.

*ORDER*

LAWRENCE K. KARLTON, United States District Court Senior Judge.
**\*1** Plaintiffs, juvenile parolees in California, allege that defendants have a policy and practice of denying juvenile parolees their constitutional rights to due process, equal protection and effective assistance of counsel. Plaintiffs also allege that defendants have a policy and practice of denying class members with disabilities their statutory rights under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101-12213, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

Pending before the court are three motions, plaintiffs' motion for class certification and defendants' motion to dismiss and/or strike, as well as a motion to use plaintiffs' full names. The court resolves the motions based on the papers and after oral argument.

I.

**Factual Allegations & Background**

This suit is brought by four plaintiffs, L.H., A.Z., D.K., and D.R., on behalf of "a class of over 4,000 juveniles who have been or are at imminent risk of being wrongfully and unconstitutionally deprived of their liberty in connection with the granting, extending and/or revoking of their parole in California." First Amended Complaint ¶ 1 ("FAC").

**A. The Four Named Plaintiffs**

**1. L.H.**

L.H. is a 23-year-old Department of Juvenile Justice ("DJJ") parolee, who has spent approximately five years in DJJ facilities. FAC ¶ 72. He was paroled and then placed under a parole hold (arrested) for being under the influence of alcohol while living at a residential substance abuse center. L.H. did not receive a preliminary hearing. Plaintiffs aver that after more than a month in custody, on the date appointed for L.H's parole

revocation hearing, the parole officer assigned to the case failed to bring the case file, resulting in an additional three weeks of delay. L.H. was therefore in DJJ custody without a probable cause or revocation hearing for more than two months. *Id.*

When L.H.'s hearing occurred, L.H. avers that he did not know he had the right to counsel and was not appointed counsel. FAC ¶ 73. L.H. was sentenced to serve additional months in DJJ custody.

L.H. maintains that he has needed special education since childhood and requires assistance with reading. FAC ¶ 74. According to the complaint, L.H. suffered from developmental delays attributable to premature birth and a head injury during childhood. L.H. maintains that he is an individual with a disability as that term is defined in Section 504 and the ADA.

L.H. is currently on parole until 2008.

## 2. A.Z.

A.Z. is a 22-year-old DJJ parolee, who recently served a six month parole revocation term. A.Z. has been subject to parole revocation proceedings on three separate occasions. In all three proceedings, A.Z. asked for counsel but was informed that counsel could not be appointed. A.Z. alleges that the hearings were conducted without counsel. FAC ¶ 76. A.Z. also maintains that the hearings occurred more than 50 miles from A.Z.'s residence, making it difficult or impossible for him to present witnesses in his favor. *Id.* Moreover, A.Z. had been in custody for several months prior to the hearings. *Id.*

*\*2* At A.Z.'s most recent revocation hearing, the hearing officer asked whether he was "harmed" by the parole department's inability to find a police report of his arrest. A.Z., unrepresented by counsel, replied in the negative. In retrospect, A.Z. maintains that this was incorrect. He was harmed because he had to serve an additional 30 days in county jail while parole representatives searched for the police report. FAC ¶ 77.

A.Z. also maintains that at the last minute, and without any notice or explanation, A.Z.'s parole agent changed the sentence recommendation from continuation on parole to return to custody. The hearing officer revoked A.Z.'s parole, refusing to give him credit for the 30 days served in county jail. A.Z. promptly attempted to appeal that decision, but his appeal was initially "lost" and only granted after his attorney wrote to defendants. *Id.* A.Z. alleges that his case was particularly complex because criminal charges were brought in addition to parole revocation charges, and, as discussed, the related police report was lost for 30 days. FAC ¶ 78.

A.Z. is currently on parole until 2008.

## 3. D.K.

D.K. is a 23-year-old currently released on parole supervision. After being released on parole in June 2005, he was arrested by his parole agent on or about August 15, 2005 for an alleged "dirty" drug test and was incarcerated pending his parole revocation hearing. D.K. avers that he did not receive a copy of the drug test results, and he did not receive a preliminary hearing. On or about September 1, 2005, D.K. received notice that he would have a parole revocation hearing on September 8. With such short notice, D.K. maintains that it was difficult or impossible to obtain witnesses or evidence in his favor. Despite the short notice, his mentor, who helped D.K. find employment when he was released on parole, appeared for the hearing. This witness, however, was not permitted to speak. FAC ¶ 81.

The revocation hearing was conducted without an attorney to represent D.K. despite his request for assistance. Per his parole agent's recommendation, D.K. was continued on parole. He was released to parole supervision on or about September 15, 2005, a month after his initial arrest. D.K. alleges that he lost his job as a result of the month in custody. *Id.*

D.K. avers that he has history of drug and alcohol abuse and has participated in substance abuse counseling beginning before his release from custody. FAC ¶ 82. He does not have a high school diploma or G.E.D. At the time of his arrest and revocation hearing, his DJJ file contained diagnoses of mental disorders. *Id.* D.K. asserts that he is an individual with a disability as that term is defined in Section 504, 29 U.S.C. section 705(20), and the ADA.

D.K. is on parole until 2007.

**4. D.R.**

D.R. is a 23-year old DJJ parolee, who was first committed to DJJ five years ago. D.R. paroled in January 2004, and was living in the community. In or around December 2004, D.R. was arrested and placed in custody on three alleged parole violations: use of marijuana, driving on a suspended/revoked license, and failure to report a police contact to his parole agent. D.R. received notice of the alleged charges over a month after he was taken into custody, a mere four days before his revocation hearing. D.R. did not receive a preliminary hearing. FAC ¶ 84.

***3** At his hearing, D.R. maintains that he requested two evidentiary witnesses, neither of whom was called by defendants. D.R. also alleges that he was never shown the laboratory results upon which the marijuana charge was based. D.R. asserts that he did not request an attorney because he was informed that he was not eligible for appointed counsel. *Id.*

D.R.'s parole was revoked in January 2005. He immediately appealed the decision, stating that his due process rights were violated by defendants' failure to provide sufficient notice of the hearing and the failure to call his witnesses. D.R. requested, but never received, a copy of his hearing tape. Three months later, the appeal was denied. FAC ¶ 86.

D.R. asserts that he spent 21 months in custody and went to four Parole Consideration Hearings before the BPH finally ended his parole revocation term and released him. D.R. requested, but never received, copies of two of his Parole Consideration Hearing tapes. FAC ¶ 87.

D.R. maintains that he has a history of mental health concerns, and attempted suicide while in custody for his parole revocation. D.R. maintains that DJJ failed to provide him with adequate treatment or counseling, yet at one of his parole consideration hearings, BPH expressly denied parole to D.R. due to his need for mental health treatment. After that hearing, D.R. did not see a mental health professional again for months. FAC ¶ 88.

D.R. is on parole until 2007.

**B. Plaintiffs' General Allegations**

Plaintiffs assert that these experiences are part of defendants' general practice of, among other things: (1) failing to provide preliminary hearings to determine whether there is probable cause to believe there has been a parole violation, FAC ¶ 28(2) failing to provide or allow for assistance of counsel when required by law, *id.* at ¶ 51-61(3) failing to allow parolees an opportunity to confront witnesses or present evidence, *id.* at ¶ 33-38, 50 and (4) failing to hold final parole revocation proceedings within a reasonable time, *id.* at ¶ 32.

Plaintiffs maintain that their status as juveniles causes them to be in particular need of constitutional and statutory protections. Plaintiffs' complaint sets forth the ways in which juvenile parolees are less educated, less mature and less able to understand the revocation process as compared to adult parolees. FAC ¶ 2, 5-23. For example, it is estimated that among juvenile detainees in the United States, nearly 60 percent read at or below a fifth to sixth grade level, with 32 percent reading at or below a fourth grade level. *Id.* ¶ 6. Plaintiffs also aver that one report estimates that as many as 60 or 70 percent of incarcerated youth nationwide have diagnosable mental disorders. *Id.* ¶ 12. Plaintiffs assert that these sorts of factors exacerbate the problems faced by juvenile parolees. In part because DJJ is administered within the adult correctional system, plaintiffs maintain that DJJ staff have no background or training in juvenile parole matters. *Id.* ¶ 21.

**C. The Proposed Class**

***4** The proposed class consists of juvenile parolees in or under the jurisdiction of California, including all juvenile parolees with disabilities as that term is defined in Section 504 of the Rehabilitation Act and the ADA, who are: (i) in the community under parole supervision or who are at large (ii) in custody in California as alleged parole violators, and who are awaiting revocation of their parole or (iii) in custody, having been found in violation of parole and returned to custody. FAC ¶ 105.

#### D. Related Cases

On September 15, 2006, the court related the pending suit to *Valdivia v. Schwarzenegger,* No. Civ. S-94-0671 LKK/GGH (E.D.Cal.1994). In *Valdivia,* plaintiffs are adult parolees in California. The *Valdivia* plaintiffs brought suit alleging, inter alia, that California's parole process deprived them of due process and their right to counsel under the Sixth Amendment. *See* 2002 Complaint. On June 14, 2002, the court granted plaintiffs' motion for summary judgment, holding that the "current California parole revocation system violated the plaintiffs' due process rights." *Valdivia v. Davis,* 206 F.Supp.2d 1068, 1078 (E.D.Cal.2002) (Karlton, J.).

A permanent injunction was issued on March 9, 2004. Pursuant to the injunction, defendants were ordered to serve adult parolees with, inter alia: (1) notice of charges within three business days of the placement of a parole hold (2) the right to counsel in probable cause and parole revocation and hearings (3) a preliminary hearing to determine good cause for detention within ten business days after the deadline for notice and (4) a final revocation hearing within 35 days of the hold, at which adult parolees can present and cross-examine witnesses and offer documentary evidence.

Although not related by order of the court, there is a second case which is also related to the pending suit. In *Armstrong v. Davis,* No. C-94-2307 (N.D.Cal.2001), plaintiffs are adult prisoners and parolees with disabilities. A revised permanent injunction was issued on February 11, 2002. The injunction ordered that defendants identify, track, and provide reasonable accommodations to adult parolees with disabilities at parole proceedings, and required that adult parolees with disabilities receive access to forms in alternate formats, to equipment and assistance to effectively communicate, and to a grievance procedure for processing denials of requests for accommodations.

Plaintiffs assert that since they will remain under DJJ jurisdiction until the age of 25, they will not receive the protections that adult parolees receive under *Armstrong* or *Valdivia.*

### II.

### ANALYSIS

#### A. STANDING

Defendants move to dismiss on the grounds that plaintiffs have failed to demonstrate standing to sue for equitable relief. Defendants assert that since the plaintiffs are on parole, they are not subject to defendants' patterns and practices relating to parole revocation. It is pure speculation, defendants argue, that plaintiffs will be subjected to parole revocation proceedings. Accordingly, plaintiffs have no standing under Article III. For the reasons discussed below, the court cannot agree.

#### 1. Applicable Law

**\*5** On a motion to dismiss, the allegations of the complaint must be accepted as true. *Takhar v. Kessler,* 76 F.3d 995, 1000 (9th Cir.1996), quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The court is bound to give plaintiffs the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). Thus, plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. *See id.; see also Wheeldin v. Wheeler,* 373 U.S. 647, 648, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963) (inferring fact from allegations of complaint).

To establish standing, plaintiffs must demonstrate that they have:

(1) suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610(2000). These requirements together constitute the "irreducible constitutional minimum" of standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The party invoking federal jurisdiction bears the burden of establishing these elements. *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan,* 504 U.S. at 561 (internal citations and quotation marks omitted).

In class action suits, the named plaintiffs must also have standing when the class is certified. *Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). The named plaintiffs must be a "member of the class which he or she seeks to represent at the time the class action is certified by the district court." *Id.* Since the class in this case has not yet been certified, the court analyzes the standing of the named plaintiffs and not the class as a whole. *See Nelsen v. King County,* 895 F.2d 1248, 1255 (9th Cir.1990).

In the case at bar, the parties do not dispute the last two standing requirements-causal connection and redresability. Accordingly, the court will confine its analysis to the question of injury.

**2. Injury In Fact**

In order to enjoy standing, plaintiffs must plead an actual or imminent injury; "speculative" injuries are insufficient to confer standing. *Lujan,* 504 U.S. at 561. Moreover, where, as here, plaintiffs seek prospective injunctive relief, they must also demonstrate "that he is realistically threatened by a repetition of [the violation]." *Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (holding that plaintiff cannot establish the requisite type of harm simply by pointing to some past injury). The Ninth Circuit has characterized this additional showing as the "realistic repetition" requirement. *Armstrong v. Davis,* 275 F.3d 849, 861 (9th Cir.2001).

*\*6* Plaintiffs may demonstrate that the harm is capable of realistic repetition when the harm is part of a "pattern of officially sanctioned ... behavior, violative of the plaintiffs' [federal] rights." *LaDuke v. Nelson,* 762 F.2d 1318, 1323 (9th Cir.1985). As the Ninth Circuit explains, "where the defendants have repeatedly engaged in the injurious acts in the past, there is a sufficient possibility that they will engage in them in the near future to satisfy the 'realistic repetition' requirement." *Armstrong,* 275 F.3d at 861. When a named plaintiff asserts that injuries have been inflicted upon a class of plaintiffs, the court may consider the harm asserted by the class to determine if there is a credible threat that the named plaintiff's injury will recur. *Id.* citing *LaDuke,* 762 F.2d at 1326. In *Armstrong,* the court explained:

Where a court, through its specific factual findings, documents the threat of future harm to the plaintiff class and establishes that the named plaintiffs (or some subset thereof sufficient to confer standing on the class as a whole) are personally subject to that harm, the "possibility of recurring injury ceases to be speculative," and standing is appropriate.

*Armstrong,* 275 F.3d at 861 (internal citations omitted).

**a. Threat of Future Harm**

In the case at bar, the named plaintiffs have demonstrated that they are realistically threatened by future harm. As in both *Valdivia* (to which this case is related) and *Armstrong,* the plaintiffs here base their standing on the "threat of future injury from a systemically defective parole revocation procedure." *Valdivia v. Schwarzenegger,* No. Civ. S-94-0671 LKK/GGH (E.D. Cal. order issued Dec. 1, 1994) ("Valdivia Order").

As in *Valdivia,* qualitative indicators are one factor the court considers in its analysis of the likelihood of future injury. *See Valdivia* Order at 8. *See also Armstrong,* 275 F.3d at 861 (court may look at harm asserted by class as a whole). Plaintiffs allege that juvenile parolees in California have an extremely high recidivism rate. Approximately 70% of juvenile parolees are arrested within 36 months of release. FAC ¶ 3.

Many of the returns to custody are for technical violations. Statistics from the California Department of Corrections and Rehabilitation's Division of Juvenile Justice report that, of 3,599 parole violation actions handled in 2005, 490 were for being absent without leave (AWOL), and of those, 132 (27.0%) resulted in revocation or recommitment; 1,415 were for other technical violations, and of those, 1,135 (80%) resulted in

revocation or recommitment; 238 were for law violations in which the person was not prosecuted or found not guilty, and of those, 94 (39.5%) resulted in revocation or recommitment. *Id.*

As this court remarked in *Valdivia,*

[t]hese statistics illustrate the unique degree to which parolees are subject to the challenged revocation procedures. Parolees are, by definition, already subject to defendants' oversight and control. Consequently, they are far more likely to experience recurrent injuries than are plaintiffs who have attempted to challenge practices that only randomly affect members of the general public.

**\*7** *Valdivia* Order at 8. For the same reasons, the named plaintiffs in the case at bar are likely to experience recurrent injuries.

Moreover, characteristics unique to juvenile parolees make it more likely that they will face parole revocation proceedings in the future. In their complaint, plaintiffs assert that juvenile parolees demonstrate limited cognitive and emotional development, as well as significant rates of educational deficiencies. *See* FAC ¶ 5-9. Plaintiffs also maintain that the incidences of serious mental health and learning disabilities for juvenile parolees is far higher as compared to the general public. *See* FAC ¶ 9-10. Plaintiffs purport that in California, as many as half of the wards in DJJ custody have mental, emotional, or learning disabilities. Approximately 25 % of all wards within DJJ are registered with Special Education and assigned individualized education plans. FAC ¶ 11. These factors suggest that juvenile parolees are uniquely vulnerable to violating their parole and being subject to the complained of practices.

In *Armstrong,* the court was faced with very similar facts and found that "a person with disabilities is more likely to be suspected of conduct that results in the revocation of parole than other parolees." The court concluded:

It is therefore likely that these individuals will have difficulty interacting with the personnel who supervise their parole, explaining any innocent but non-conforming behavior, and showing remorse for otherwise minor infractions of the conditions of their parole that do not rise to the level of unlawful conduct. These problems make it more likely that such parolees will be subjected to the parole revocation process, even though they have not committed any unlawful act or violated any condition of their parole.

*Armstrong,* 275 F.3d at 867. The same logic applies to the case at bar.

Juvenile parolees' relationship to the parole system is comparable to the relationship between plaintiffs and defendants in *R.G. v. Koller,* 415 F.Supp.2d 1129 (D.Haw.2006). There, three gay and lesbian youth sued the Hawaii Youth Corrections Facility for discriminatory practices. Although the three plaintiffs were not incarcerated at the time they filed their complaint, the court held that plaintiffs had standing to seek prospective injunctive relief. Relying in part on a statistic that 82.2% of wards in Hawaii are rearrested after released on parole, the court held that this type of statistical evidence made it "neither remote nor speculative" that plaintiffs would return to the facility. *Id.* at 1136-37.

The personal experience of the named plaintiffs also suggest that the complained of injury will reoccur. At the time the First Amended Complaint was filed, one of the plaintiffs, A.Z. had already been through three parole revocation proceedings. FAC ¶ 76. Plaintiffs state that since the First Amended Complaint was filed, A.Z. has been again subjected to parole revocation proceedings on two separate occasions, and D.R. on one occasion. As in *Valdivia,* "these prior injuries serve as evidence that the future threat is likely to actually occur." *Valdivia* Order at 10. *See also Lyons,* 461 U.S. at 102 (noting that past wrongs are evidence "bearing on whether there is a real and immediate threat of repeated injury"; *Kolender v. Lawson,* 461 U.S. 352, 357 n. 3, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (finding a "credible threat" of future injury in part based on plaintiffs' past experiences with defendants' conduct).

**\*8** Additionally, plaintiffs L.H and D.K. are substance abusers. Like two of the named plaintiffs in *Valdivia,* L.H.'s and D.K.'s problems with alcohol and drugs contributed to their exposure to parole revocation proceedings. As this court observed in *Valdivia,* alcohol or drug-related parole violations could again "catalyze the revocation process." *Valdivia* Order at 10. The same logic applies here. Given L.H.'s and D.K.'s problems, there is a high likelihood that they will continue to face parole revocation proceedings.

Defendants argue that the "possibility of plaintiffs being subjected to future parole revocation hearings is uniquely within their control." Defs.' Mot. to Dismiss at 12. This argument has been squarely rejected by this court and the Ninth Circuit. In *Armstrong,* the Ninth Circuit found that adult parolee plaintiffs could not control

whether they would be injured again by the defendants' illegal conduct because parolees can be subject to revocation proceedings at any time without engaging in unlawful conduct. *Id.* at 866. The court explained:

The [parole] Board is not required to establish probable cause to begin the parole revocation process, nor is it necessary that any law enforcement officer observe the alleged violation, the Board may start parole revocation proceedings when a rather low level of suspicion arises as the result of "some minimal inquiry" into the facts of the case.

*Id.* This court's order in *Valdivia* also rejected the very argument defendants now raises. This court concluded that "parolees are, by definition, already subject to defendants' oversight and control." *Valdivia* Order at 9. *See also R.G. v. Koller,* 415 F.Supp.2d at 1137 (rejecting defendants argument the plaintiffs do not have standing because they will only return to custody if they violate the law).

For the reasons explained above, both *Valdivia* and *Armstrong* are on point and instructive. Juvenile parolees, like adult parolees and adult parolees with disabilities, continue to face the real risk of future injury based on their status as parolees. There is no reason for the court to now second guess either its own prior order, or the decision of the Ninth Circuit.

**b. Actual Injury**

Plaintiffs have presented sufficient allegations of actual injury to confer standing. *Lujan,* 504 U.S. at 561. Plaintiffs allege they are injured by defendants' policies and practices regarding parole revocation. The named plaintiffs have alleged that defendants have violated their constitutional rights in several ways: (1) failing to provide preliminary hearings to determine whether there is probable cause to believe there has been a parole violation, FAC ¶ 28(2) failing to provide or allow for assistance of counsel when required by law, *id.* at ¶ 51-61(3) failing to allow parolees an opportunity to confront witnesses or present evidence, *id.* at ¶ 33-38, 50 and (4) failing to hold final parole revocation proceedings within a reasonable time, *id.* at ¶ 32.

***9** This alleged treatment is sufficient to constitute an actual injury. *See Armstrong* at 865. As in *Armstrong,* the consequences of the defendants' alleged unlawful actions is that plaintiffs have been unable to meaningfully participate in the parole process. This constitutes actual injury. *Id.*

In light of plaintiffs' status as parolees, their ongoing supervision by defendants, their high recidivism rate, their allegations of past injury, and the specific experiences of the named plaintiffs, the threat of parole revocation is sufficiently real and imminent to satisfy the Article III injury requirement.

**B. CLASS CERTIFICATION**

Plaintiffs move for class certification pursuant to Rule 23(b) (2) of the Federal Rules of Civil Procedure. The proposed class consists of juvenile parolees in or under the jurisdiction of California, including all juvenile parolees with disabilities as that term is defined in Section 504 of the Rehabilitation Act and the ADA, who are: (i) in the community under parole supervision or who are at large (ii) in custody in California as alleged parole violators, and who are awaiting revocation of their parole or (iii) in custody, having been found in violation of parole and returned to custody. *See* FAC ¶ 105.

**1. Applicable Law**

A party seeking to certify a class must demonstrate that it has met all four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Zinser v. Accufix Research Inst., Inc. .,* 253 F.3d 1180, 1186 (9th Cir.2001).

Rule 23(a) allows a class to be certified:

only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In other words, the class must satisfy the requirements of numerosity, commonality,

typicality, and adequacy.

Rule 23(b) provides for three types of class actions. Fed.R.Civ.P. 23(b). Plaintiffs here seek to certify the class under Rule 23(b)(2), which allows a class to be certified if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

This court must conduct a "rigorous analysis" of the moving party's claims to examine whether the requirements are satisfied, *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The court is "at liberty" to consider evidence that relates to the merits, if such evidence also goes to the requirements of Rule 23. *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992). However, the court may not consider whether the party seeking class certification has stated a cause of action or is likely to prevail on the merits, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). If the court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class. *Zinser,* 253 F.3d at 1186.

**2. Numerosity**

*\*10* Rule 23(a) allows a class to be certified only if the "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a). The numerosity requirement does not require that joinder of all members be impossible, but only that joinder be impracticable. *Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 448 (N.D.Cal.1994). Moreover, plaintiffs need not state the exact number of potential class members, nor is a specific number of class members required for numerosity. *Arnold,* 158 F.R.D. at 448. Whether joinder is impracticable depends on the facts and circumstances of each case. *Id.*

When the number of proposed class members does not, on its own, satisfy the numerosity requirement, the court may consider other factors such as the geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive or declaratory relief is sought. *Jordan v. Los Angeles County,* 669 F.2d 1311, 1319 (9th. Cir.1982) (vacated on other grounds by 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982)).

In the case at bar, plaintiffs assert that the proposed class includes over 4,000 individuals. "This number includes juvenile parolees who have been or are at imminent risk of being wrongfully and unconstitutionally deprived of their liberty in connection with the revoking, subsequent granting, and extending of their parole." Pls. Mot. for Class Cert. at 8. Defendants do not contest that plaintiffs have satisfied this requirement as to their constitutional claims. Defendants do, however, argue that plaintiffs do not meet the numerosity requirement with respect to plaintiffs' ADA and Section 504 claims. Defendant avers that there is no specific allegation regarding the number of juveniles who are in danger of having their rights under the ADA and Section 504 violated. The court cannot agree.

Plaintiffs' complaint sets forth sufficient allegations to suggest that, among the 4,000 juvenile parolees, many have disabilities.[FN1] Plaintiffs assert that one U.S. Department of Justice Survey found learning disabilities in nearly 50% of juveniles in custody. *See* FAC ¶ 10. Plaintiff also asserts that in California as many as half of the wards in DJJ custody have mental, emotional or learning disabilities. Approximately 25% of all wards are registered with Special Education and assigned individualized treatment plans. FAC ¶ 11.[FN2]

> FN1. The ADA defines disability as: (a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment. 42 U.S.C.A. § 12102(2).
>
> FN2. The court notes that these numbers do not specifically establish the exact number of juvenile parolees in California who are disabled. However, it is not necessary that evidence of the class size be exact. A reasonable estimate of the class size, based on common sense assumptions of numerosity, is sufficient. *See Arnold,* 158 F.R.D. at 448; *Civic Ass'n of Deaf of New York City, Inc. v. Giuliani,* 915 F.Supp. 622, 632 (S.D.N.Y.1996) ("[P]recise quantification of the class members is not necessary because the court may make 'common sense assumptions' to support a finding of numerosity."); *Retired Chicago Police Ass'n v. City of Chicago,* 141 F.R.D. 477, 484-85 (N.D.Ill.1992) (numerosity finding may be based on common sense assumptions), aff'd in part, rev'd in part on other grounds, 7 F.3d 584 (7th Cir.1993)

Although the allegations in the complaint must be taken as true for the purposes of class certification, *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th. Cir.1975), the court is "at liberty" to consider evidence that relates to the merits if such evidence also goes to the requirements of Rule 23, *Hanon,* 976 F.2d at 508. Here, plaintiffs submitted evidence in the form of a report entitled, "Identifying Mental Health Treatment Needs Amount Serious Institutilized Delinquents Using Paper and Pencil Screening Instruments: Finial Report to the National Institute of Justice" (2003). The report found that the prevalence of diagnosable mental disorders among incarcerated juvenile populations is as "as high as 60-70 %." *See* Reply Decl. of Kirsten A. Palumbo, Ex. A at 1.

***11** The very nature of the allegations also suggests that joinder is impracticable. According to plaintiffs' allegations, deficiencies in DJJ make it difficult, if not impossible, to identify and track the number of juvenile parolees with disabilities. Given the difficulty in even identifying disabled plaintiffs, joiner would be impracticable if not impossible.

Other courts have similarly found that joinder is impractical where it is difficult to identify the members of the proposed class. *See, e.g., Phillips v. Joint Legislative Comm.,* 637 F.2d 1014, 1022 (5th Cir.1981) (numerosity found in race discrimination suit where neither party could count or identify class members, as defendant-employer did not track applicants' race); *Israel v. Avis Rent-A-Car Sys., Inc.,* 185 F.R.D. 372, 378 (S.D.Fla.1999) (numerosity found where identifying class members was difficult because much of information was within defendant's control), rev'd on other grounds, 211 F.3d 1228 (11th Cir.2000).

For these reasons, the court concludes that joinder of the class members would be impracticable. Plaintiffs have satisfied the numerosity requirement.

### 3. Common Issue of Law or Fact

The commonality requirement is met if "plaintiffs' grievances share a common question of law or of fact." *Armstrong,* 275 F.3d at 868. It is well established that "all questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient ..." *Hanlon,* 150 F.3d at 1019.

In civil-rights suits the commonality requirement "is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong* at 868, citing *LaDuke,* 762 F.2d at 1332.

In the case at bar, the common issue raised by plaintiffs is whether "defendants' policies, procedures and practices violate [plaintiffs'] constitutional and statuary rights in parole proceedings." Pls. Mot. for Class Cert. at 10. Plaintiffs allege that defendants defective practices affect all of the putative class members.

Defendants contend that the commonality requirement cannot be met with respect to plaintiffs' disability claims. Defendants assert:

Because of the uncertainty of the number of qualified individuals with disabilities, the case-by-case review of records and files necessary to determine if a plaintiff is a qualified individual with disability, and the individualized nature of the relief that may be required, certification of the Plaintiffs' disability claims in the present case should also be denied.

Defs.' Oppo. to Pls. Mot. at 12-13. This argument has been squarely rejected by the Ninth Circuit. In *Armstrong,* defendants argued that "a wide variation in the nature of the particular class members' disabilities precludes a finding of commonality." *Armstrong,* 275 F.3d at 868. The court rejected this argument, holding instead that, "in a civil-rights suit, that commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Id.* The court went on to explain that:

***12** In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality ... Certainly, the differences that exist here do not justify requiring groups of persons with different disabilities, all of whom suffer similar harm from the Board's failure to accommodate their disabilities, to prosecute separate actions. The commonality requirement is met.

*Id.* The reasoning of *Armstrong* applies with equal force to the case at bar. Here, as in *Armstrong,* disabled plaintiffs are challenging practices which prevent them from participating meaningfully in the parole process. The allegations of system wide deficience affects all of the putative class members with disabilities, regardless

of the specific nature of their individual disability.

For these reasons, the court finds that plaintiffs have satisfied the commonality requirement.

**4. Typicality**

The typicality requirement of Rule 23(a) is fulfilled if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Typicality requires that "the claims of the class representatives be typical of those of the class, and to be 'satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.' " Armstrong, 275 at 868 (citing Marisol v. Giuliani, 126 F.3d 372, 376 (2nd Cir.1997)). Moreover, the typicality requirement may be satisfied if "all the members of the purported class would be benefitted by the suit plaintiffs seek to bring." Ellis v. Naval Air Rework Facility, Alameda, Cal., 404 F.Supp. 391, 396 (N.D.Cal.1975).

In the case at bar, plaintiffs satisfy the typicality requirement. As previously discussed, the deprivations complained of by plaintiffs affect the entire plaintiffs class. Minor differences among the class are inconsequential. *See Armstrong.* Moreover, plaintiffs assert a common claim, namely, that the current parole process violates constitutional and statutory rights.

Defendants assert that L.H. and D.K. are not in fact disabled and therefore neither of these plaintiffs meet the typicality requirement. *See* Defs.' Oppo to Pls.' Mot. for Class Cert. at 11. In support of this assertion, defendants attached excerpts from L.H.'s and D.K.'s files. Defendants maintain that these excerpts demonstrate that the two plaintiffs are not, in fact, disabled. For example, defendants point to certain records which document that D.K. "completed all proficiency tests in math, reading, and writing in order to take his G.E.D." Defs.' Oppo. at 10. Based on these records and others, defendants conclude that D.K is not disabled.

With respect to L.H., defendants identify certain records and conclude that although L.H. had "early educational problems … these problems appear to be due to habitual truancy rather than any developmental disability." *Id.* at 10. In light of the assertion that neither of these named plaintiffs are disabled, defendants maintain that the typicality requirement is not met. The court must reject defendants' position. As the Ninth Circuit recently reiterated, "arguments evaluating the weight of evidence or the merits of a case are improper at the class certification stage." Dukes v. Wal-Mart, Inc., 474 F.3d 1214 at 6 (9th Cir.2007), citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

*\*13* In *Blackie v. Barrack,* the Ninth Circuit set forth the applicable standard to apply in this circumstance:

The court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that the plaintiff may be altogether unable to prove his allegations. While the court may not put the plaintiff to preliminary proof of his claim, it does require sufficient information to form a reasonable judgment. Lacking that, the court may request the parties to supplement the pleadings with sufficient material to allow an informed judgment on each of the Rule's requirements.

524 F.2d 891, 901 (9th Cir.1975). *See also* Westways World Travel, Inc. v. AMR Corp., 218 F.R.D. 223, 231 (C.D.Cal.2003). In *Blackie,* the court concluded that the lower court judge had,

analyzed the allegations of the complaint … and the other material before him (material sufficient to form a reasonable judgment on each requirement), considered the nature and range of proof necessary to establish those allegations, determined as best he was able the future course of the litigation, and then determined that the requirements were met at that time … That is all that is required.

Blackie, 524 F.2d at 900-01. In short, at the class certification stage, plaintiffs need only provide sufficient information for the court to form a reasonable judgment about whether plaintiffs' claims are typical. *Id.*

In examining the allegations set forth in the complaint, as well as the evidence submitted by both plaintiffs and defendants, the court finds that there is sufficient information to conclude that plaintiffs' claims are typical of the class.<sup>FN3</sup>

> FN3. The court also notes in passing that even if it were appropriate for the court to decide whether plaintiffs are disabled, the evidence submitted by defendants is inconclusive. The

excerpts of plaintiffs' records which were submitted by defendants reveal that both L.H. and D.K. have problems. Neither the defendants, nor the court, is in a position to render an expert opinion as to whether or not these problems are related to disabilities. The records submitted by defendants fail to demonstrate that L.H. and D.K. are not disabled; instead, it simply reveals that these youths have problems.

L.H. maintains that he has needed special education since childhood and requires assistance with reading. FAC ¶ 74. According to the complaint, L.H. suffered from developmental delays attributable to premature birth and a head injury during childhood. Without passing judgment on whether L.H. is in fact disabled, the court finds that the evidence submitted by plaintiffs supports the allegations. The records filed under seal by plaintiffs reveal that L.H. has a learning disability and received special education. *See* Reply Decl. of Gay Crosthwait Grunfeld, ¶ 11-14 & Exs. E-H.

The complaint also alleges that D.K.'s DJJ file contained diagnoses of mental disorders. *See* FAC ¶ 82. The sealed records submitted by plaintiffs confirm that D.K. has been diagnosed with mental disorders while in DJJ/CYA custody. *See* Reply Decl. of Gay Crosthwait Grunfeld, Ex. D. Again, without deciding whether or not D.K. is in fact disabled, the court concludes that plaintiffs have submitted sufficient information so as to meet the typicality requirement of Rule 23.

Moreover, part of plaintiffs' allegation is that defendants fail to properly identify, document, and treat juvenile parolees with disabilities. *See* FAC ¶ 148 ("In violation of Section 504 and the ADA, defendants have failed to develop adequate policies and practices that enable them to identify, assess or reasonably accommodate juvenile parolees with disabilities"). For example, plaintiffs aver that the Individualized Education Plan ("IEP") and school records for L.H. are missing from his central file despite several references to the existence of these documents elsewhere in his file. *See* Grunfeld Decl., ¶ 15-16 & Ex. I. For the reasons explained, the court finds that plaintiffs have provided "sufficient information to form a reasonable judgment" that the typicality requirement is met. *See Blackie* at 901.

**5. Adequacy of Representation**

*\*14* The fourth and final Rule 23(a) requirement-adequacy-requires: (1) that the class representatives and class counsel not have conflicts of interest with the class and (2) that the class be represented by qualified counsel who will vigorously prosecute the case on behalf of the class. *Hanlon,* 150 F.3d at 1020.

With respect to the first part of the requirement, the named plaintiffs' interests are aligned with those of the class as a whole. The same is true for plaintiffs' counsel. Moreover, neither party has altered the court as to any potential conflict of interest.

Defendants do, however, argue that D.K. is not a proper representative since he no longer resides in California. *See* Defs. Oppo. at 13. Plaintiffs concede that D.K. does presently live in Kansas. However, according to the Interstate Compact and its Rules, California retains authority to revoke parole. *See* Palumbo Decl., Ex. C at § 3.3.5 (Interstate Compact Bench Book for Judges and Court Personnel). In fact, the receiving state (Kansas) cannot revoke D.K.'s parole. *Id.* Only California can. *Id.* Accordingly, D.K. continues to share interests with the class.[FN4]

> FN4. The proposed class is defined as those juveniles who are: (i) in the community under parole supervision or who are at large; (ii) in custody in California as alleged parole violators, and who are awaiting revocation of their parole; or (iii) in custody, having been found in violation of parole and returned to custody. *See* FAC ¶ 105.

Defendants do not dispute that the class will be represented by qualified counsel who will vigorously prosecute the case on behalf of the class. *Hanlon,* 150 F.3d at 1020. The court finds that the law firms representing plaintiffs are competent and experienced. All three firms have had cases before this court on prior occasions. The court has observed first hand the high level of competence exhibited by plaintiffs' counsel.

For these reasons, the court finds that plaintiffs have satisfied the adequacy of representation requirement of Rule 23.

### 6. Rule 23(b) Criteria

The plaintiff class must also satisfy one of the requirements of Rule 23(b). Here, plaintiffs seek certification pursuant Rule 23(b)(2), which applies where a defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). For a class to be certified under this section, "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole," even if not all class members have been injured by the challenged practice. *Walters v. Reno,* 145 F.3d 1032, 1047 (9th Cir.1998).

For all the reasons previously discussed, it is evident that the class members complain of a pattern and practice that applies to the class as a whole, namely, the parole revocation proceedings. Accordingly, plaintiffs have satisfied the requirements of Rule 23(b).

With good cause appearing for all of the reasons discussed above, plaintiffs' motion for class certification is granted. Accordingly, the court certifies the following class for all claims raised in plaintiffs' first amended complaint: juvenile parolees in or under the jurisdiction of California, including all juvenile parolees with disabilities as that term is defined in Section 504 of the Rehabilitation Act and the ADA, who are: (i) in the community under parole supervision or who are at large; (ii) in custody in California as alleged parole violators, and who are awaiting revocation of their parole; or (iii) in custody, having been found in violation of parole and returned to custody. FAC ¶ 105.

### C. USE OF PLAINTIFF'S FULL NAMES

*\*15* The parties disagree on whether plaintiffs may proceed in pseudonym, without identifying themselves in court papers. In the interest of moving the case forward, the parties initially stipulated to allow plaintiffs to temporarily proceed in pseudonym. *See* November 14, 2006 stipulation and order. Defendants now move to use plaintiffs' full names. Defendants argue that plaintiffs have little interest in proceeding anonymously, particularly when weighed against the prejudice defendants would face and the public's interest in full disclosure. For the reasons discussed below, the court disagrees.

#### 1. Applicable Law

In general, all parties to a suit must include their full names on the face of the complaint. Fed.R.Civ.P. 10(a) (stating that the complaint "shall include the names of all the parties"). Under this rule and the cases interpreting it, there is no express right to conceal names. *Doe v. Rotsker,* 89 F.R.D. 159, 161 (D.Cal.1981). However, where a party can show a substantial privacy interest that outweighs the presumption of openness, the party may proceed with anonymity. *Id.*

In *Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058 (9th Cir.2000), the Ninth Circuit sets the controlling legal standard for "a district court's discretionary decision to permit a party to proceed anonymously." *Id.* at 1968. The court explains that "a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity." *Id.* The Ninth Circuit identified three circumstances in which anonymity is appropriate, two of which are relevant here: (1) when use of a party's real name creates a risk of "retaliatory physical or mental harm" against the party; and (2) when anonymity is necessary to preserve privacy in a sensitive and highly personal matter. *Id.* Several factors are considered in evaluating a plaintiff's interest in proceeding anonymously: (1) the severity of the threatened harm, (2) the reasonableness of plaintiffs' fears, and (3) the plaintiffs' particular vulnerability. *Id.* at 1068. The court addresses each element in turn.

#### 2. The Severity of the Threatened Harm

A severe harm falls somewhere between social stigma, *Rotsker,* 89 F.R.D. 159 (holding that professional embarrassment did not amount to severe harm), and the combination of job loss, deportation, and reprisals against family members, *Advanced Textile,* 214 F.3d 1058. In *Advanced Textile,* the court considered the threatened harm to be severe because, as non-resident workers in Saipan, plaintiffs were susceptible to deportation and economic harm if they lost their jobs in retaliation for the lawsuit. *Id.* at 1071.

In the case at bar, it is evident that the threatened harm faced by plaintiffs is severe. Should plaintiffs' names be revealed, plaintiffs allege that they will face "retaliatory acts including physical harm, denial of privileges, groundless revocation of parole, addition of time to their sentences, denial of necessary medical or mental health treatment, denial of educational opportunities, and housing placements that expose them to the threat of harm." Pls.' Opp'n to Defs.' Mot. at 5.

*16 Defendants argue that the severity of threatened harm is low because the only harm is parole revocation. The court cannot agree. The groundless revocation of parole is very much a severe harm as it necessarily implicates, inter alia, parolees' liberty interests. Moreover, a groundless parole revocation exposes a parolee to a host of other possible harms including retaliation. Plaintiff D.K. alleges, "retaliation against wards by CYA/DJJ staff is part of the Youth Authority system." Decl. of D.K. in Oppo. to Defs. Mot. As D.K. explains, "[t]here is an 'us versus them' mentality and when a ward mentions the lawsuits against the DJJ, such as the Farrell case, or mentions the Prison Law Office, parole agents and correctional officers become very tense and retaliate against wards by giving arbitrary time-adds, putting wards on lookdown and taking away privileges." *Id.*

D.K. maintains that when he pursued a personal injury lawsuit against DJJ and filed grievances against individual DJJ employees, he faced retaliatory actions. For example, when a guard found out D.K. had filed a grievance against him, the guard began refusing D.K. access to a shower. *Id.* Similarly, when D.K. investigated the possibility of a lawsuit against DJJ, custody staff terminated D.K. from his job in landscaping. *Id.* DK's time in custody was also extended by six months. *Id.* These allegations support plaintiffs' position that the threatened harm is in fact severe.

Defendants also argue that, pursuant to the November 14 Stipulation and Order, plaintiffs' names have been revealed to defendants so proceeding with anonymity is unnecessary. *See, e.g., Doe v. Hallock,* 119 F.R.D. 640, 644 (S.D.Miss.1987) (holding that there is no need for anonymity when the persons from whom retaliation is feared already know plaintiffs' full names).

This argument is equally unavailing. The stipulation makes clear that knowledge of plaintiffs' identities should be used only to the extent necessary to proceed with the case and only by those parties directly involved. As such, not all persons from whom retaliation is feared know the plaintiffs' names. Pursuant to the stipulation, parole agents, counselors, guards, wardens, or other employees of DJJ do not-and will not-know plaintiffs' real names.

In short, plaintiffs have established that there is a threat of severe harm.

### 3. The Reasonableness of Plaintiffs' Fears

The second prong of the *Advanced Textile* test requires that plaintiffs' fears of threatened retaliation be reasonable. *Advanced Textile,* 214 F.3d at 1068. Fear of threatened retaliation is reasonable if a reasonable person would believe the threat could be carried out. *Id.* at 1071. Under this prong, the court considers whether plaintiffs were actually threatened, and may also consider evidence of a history of retaliatory practices. *Id.*

As previously discussed, plaintiff D.K. alleges that he was retaliated against and that there is a culture of retaliation in the DJJ. Moreover, the declarations of other persons familiar with the parole system indicate that retaliation is a common practice within the system. *See* Decl. of Grunfeld in Opp'n to Defs.' Mot. (stating that ongoing investigation into DJJ practices revealed retaliatory practices); Decl. of Norman in Opp'n to Defs.' Mot. (discussing the retaliatory practices that occurred in relation to *Stevens v. Harper,* No. CIV-S-01-0675 DFL-PAN). Their claims indicate that defendants and their employees have the power not only to threaten retaliation, but also to carry it out. *Id.* As such, plaintiffs' fears are reasonable.

### 4. The Plaintiffs' Particular Vulnerability

*17 The Ninth Circuit has explained that when one party is under the control or power of the other party, the former is particularly vulnerable to retaliation. *Advanced Textile,* 214 F.3d at 1072 (finding that plaintiffs were subject to the will of the defendants, who could at any time terminate their employment, deport them, and affect their living situations).

Because plaintiffs are on parole and remain wards of the juvenile system, they are subject to the power and

control of the defendants. *Id.* Moreover, plaintiffs' status as juveniles make them, in many respects, more vulnerable than adults. Plaintiffs' complaint sets forth the ways in which juvenile parolees are less educated, less mature and less able to understand the revocation process as compared to adult parolees. FAC ¶ 2, 5-23. These age related characteristics make plaintiffs' particularly more vulnerable to threats and retaliatory actions.

Defendants argue that plaintiffs can find recourse within the court system should abuses occur. This argument is without merit. As the Ninth Circuit explained in *Advanced Textile,* "[plaintiffs] are more effectively protected from retaliation by concealing their identities than by relying on the deterrent effect of post hoc remedies." 214 F.3d at 1071.

For these reasons, the court finds that plaintiffs are particularly vulnerable to threats of retaliation from the defendants. Given that plaintiffs have a substantial interest in proceeding anonymously, the court next addresses the possible prejudice to defendants and the public.

### 5. Plaintiffs' Interests Balanced Against Prejudice to Defendants and the Public's Interest in Full Disclosure

Plaintiffs' substantial interest in proceeding anonymously must be balanced against any prejudice to the defendant, as well as the public's interest in full disclosure of plaintiffs' names. *Advanced Textile,* at 1068. For the reasons set forth below, the court finds that any prejudice to the defendants is minimal and the public's interest in full disclosure is outweighed by the public's interest in cases such as this proceeding on the merits.

#### a. Prejudice Against the Defendant

Defendants fail to demonstrate how they will be prejudiced by plaintiffs preceding anonymously. Pursuant to the November 14 stipulation and order, defendants have access to plaintiffs' full names, which they can use to the extent needed to investigate plaintiffs' claims.

Defendants claim that they face adverse publicity from the using initials. They argue that using initials supports the plaintiffs' allegations that DJJ participates in retaliatory practices. Defendants claim they will be unable to disprove or challenge these allegations without the use of full names. These arguments are unconvincing. There is no evidence that revealing the full names to the public will allow defendants to better challenge or disprove the allegations.

Because defendants can use the plaintiffs' names to the extent necessary to investigate the claims and there is no evidence to 37 suggest that using full names would alleviate adverse publicity, defendants' interest in full disclosure is minimal.

#### b. Public Interest in Full Disclosure

*\*18* In general, the public has an interest in access to judicial proceedings, which is supported by the use of full names. *Advanced Textile* at 1067. However, when the willingness to file suit is chilled by fear of retaliatory action, the public interest in seeing the suit move forward on its merits outweighs the public interest in knowing the plaintiffs' names. *Id.* at 1073. A chilling effect is likely to occur where defendants would be able to exert leverage over plaintiffs who file suit. *See id.* at 1073 (discussing the effects of the employer-employee relationship). Revealing plaintiffs' full names could have a chilling effect on this case and others like it. As previously discussed, plaintiffs are subject to DJJ control and their status as juveniles makes them uniquely vulnerable. As such, defendants could exert leverage on plaintiffs should their names be revealed, thereby chilling their willingness to bring suit. Because the public has an interest in having this case heard on the merits, anonymity is appropriate.

In balancing the prejudice to defendants against the public's interest in having the case proceed on the merits, the scale clearly tips in favor of plaintiffs.<sup>FN5</sup>

> FN5. Plaintiffs also make a compelling argument regarding the sensitivity of the plaintiffs' juvenile records. Because the court finds that anonymity is appropriate under the *Advanced Textile* balancing test, the plaintiffs' second argument is not addressed.

Defendants' Opposition to Plaintiffs' Motion for
Leave to Proceed Using Fictitious Names
Case No. 3:07cv4299-PJH

For the reasons discussed herein, the court finds that the plaintiffs may move forward using only their initials. Accordingly, defendants' motion to proceed using plaintiffs' full names must be denied.

**D. Motion to Strike**

Defendants request that certain "irrelevant and immaterial allegations" be struck from plaintiffs' first amended complaint.

Defendants object to allegations regarding conditions of confinement as well as allegations pertaining to certain records. For the reasons discussed herein, defendants' motion to strike must be denied.

**1. Applicable Law**

Rule 12(f) provides that a court "may order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter." Immaterial matter is that which has "no essential or important relationship to the claim for relief or the defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material." 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 (2006). Impertinent matter consists of "statements that do not pertain, and are not necessary, to the issues in question." *Id.* Finally, scandalous matter is that "which improperly casts a derogatory light on someone, most typically on a party to the action." *Id.*

"[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial ..." Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir.1983).

It is well established that "motions to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." Colaprico v. Sun Microsystems, Inc., 758 F.Supp. 1335, 1339 (N.D.Cal.1991), *see also* Neveu v. City of Fresno, 392 F.Supp.2d 1159, 1170 (E.D.Cal.2005) (J. Wanger). For this reason, "[m]otions to strike are disfavored and infrequently granted." Neveu, 392 F.Supp.2d at 1170.

**2. Allegations regarding conditions of confinement**

*\*19* Defendants request that the court strike allegations relating to general allegations regarding national and state-wide characteristics of juveniles and allegations regarding educational, medical, mental health and custody conditions and services at DJJ. *See* Defs.' Motion to Strike at 16.

As evidenced by this court's discussion on standing, the allegations regarding characteristics of juvenile parolees has a direct connection to the subject matter of this litigation. Parolees' education, medical and mental health conditions relate to their ability to fully participate in parole revocation proceedings. Similarly, these characteristics are also relevant in determining the need for legal representation. In *Gagnon v. Scarpelli,* the Supreme Court specifically observed that in the context of parole revocation proceedings, "the unskilled or uneducated probationer or parolee may well have difficulty in presenting his version of a disputed set of facts." Gagnon v. Scarpelli, 411 U.S. 778, 787, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). Accordingly, the Supreme Court held that, "in passing on a request for the appointment of counsel, the responsible agency ... should consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself." Id. at 790-791. In light of the Supreme Court's clear concern about parolees' ability to represent themselves, the court finds that the characteristics of juvenile parolees very much relevant.

Defendants also argue that allegations regarding conditions of confinement are irrelevant and immaterial since they are subject to a consent decree in *Farrell v. Hickman,* No. RG 03079344 (Alameda County Super. Ct. filed Jan. 16, 2003). Defendants argue that the allegations regarding conditions in DJJ facilities "distracts from the focus of this litigation ... and allow plaintiffs the opportunity to relitigating [sic] issues that have been resolved by another court." Defs'. Mot. to Strike at 18.

The *Farrell* case pertains to conditions of confinement in DJJ facilities, including, inter alia, mental health services, medical services, and educational services.[FN6] The *Farrell* case does not address parole or parole revocation proceedings. While there is some overlap in the types of issues (for example, the prevalence of

juveniles with mental health problems), the legal claims in the two cases are completely separate, as are the requested remedies. Given that motions to strike are strongly disfavored, the existence of the *Farrell* case is not a sufficient reason which would justify striking allegations which pertain to conditions of confinement.

FN6. Plaintiffs represent that the *Farrel* case is in the remedial phase.

### 3. Allegations Regarding Public Records

Defendants also move to strike paragraph 24 of plaintiffs' first amended complaint. The paragraph reads:

The process of imposing parole holds and parole consideration and revocation for juveniles is an opaque system lacking clear rules or standards to guide staff, juvenile parolees, attorneys, and parents. As demonstrated by defendants' inadequate and confused response to a Public Records Act request by plaintiffs' counsel concerning parole procedures, even defendants are unable to articulate the way the system is intended to function.

*\*20* First Amended Complaint ¶ 24. Defendants contend that the statement is incorrect, inaccurate and has "no place" in the complaint. Defs.' Mot. at 19. Defendants then proceed to explain the ways in which the records request was misdirected and extremely broad. Accordingly, defendants maintain that this statement "mischaraterizes" the truth of the circumstances. *Id.*

Defendants' argument is without merit. The allegation that defendants cannot articulate how the system is intended to function is clearly related to plaintiffs' more general claims regarding the deficiencies in the parole revocation proceedings. Determining whether the allegation is a mischaracterization of the facts is a question the court need not address on a motion to strike. Instead, the court need only evaluate whether "it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Colaprico, Inc.,* 758 F.Supp. at 1339. Here, the allegation clearly may bear on the subject matter of the litigation.

In sum, defendants have failed to establish that any of the challenged allegations are "redundant, immaterial, impertinent, or scandalous matter." F.R. Civ. P. 12(f). Accordingly, the court denies defendants' motion to strike.

### III.

### Conclusion

1. Defendants' Motion to Dismiss and or Strike is DENIED.

2. Defendants' Motion to use Plaintiffs' Full Names is DENIED.

3. Plaintiffs' Motion for Class Certification is GRANTED.

IT IS SO ORDERED.

E.D.Cal.,2007.
L.H. v. Schwarzenegger
Slip Copy, 2007 WL 662463 (E.D.Cal.)


Motions, Pleadings and Filings (Back to top)

• 2007 WL 1023497 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion to Permit Use of Plaintiffs' Full Names (Feb. 20, 2007)
• 2007 WL 1023496 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiffs' Opposition to Motion to Dismiss Motion to Dismiss and Motion to Strike (Feb. 16, 2007)
• 2007 WL 1023495 (Trial Motion, Memorandum and Affidavit) Reply in Support of Plaintiff's Motion for Class Certification (Feb. 15, 2007)

- [2007 WL 1023492](#) (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion to Permit Use of Plaintiffs' Full Names (Feb. 6, 2007)
- [2007 WL 1023493](#) (Trial Motion, Memorandum and Affidavit) Opposition to Defendants' Motion to Dismiss and Motion to Strike (Feb. 6, 2007)
- [2007 WL 1023494](#) (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification (Feb. 6, 2007)
- [2007 WL 669848](#) (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Class Certification (Jan. 23, 2007)
- [2:06cv02042](#) (Docket) (Sep. 13, 2006)

END OF DOCUMENT

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.