JOHN T. AFFELDT (SBN 154430)
JENNY PEARLMAN (SBN 224879)
TARA KINI (SBN 239093)
PUBLIC ADVOCATES, INC.
131 Steuart Street, Suite 300
San Francisco, California 94105
Tel. (415) 431-7430
Fax (415) 431-1048
Email: jaffeldt@publicadvocates.org
        jpearlman@publicadvocates.org
        tkini@publicadvocates.org

JEFFREY SIMES (NY SRN 2813533), appearing *pro hac vice*
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 813-8879
Fax: (212) 355-3333
Email: jsimes@goodwinprocter.com

Attorneys for PLAINTIFFS
(Additional attorneys listed on following page)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

SONYA RENEE *et al.*,

                    Plaintiffs,

        v.

MARGARET SPELLINGS, in her official capacity;
UNITED STATES DEPARTMENT OF EDUCATION,

                    Defendants.

Case No.  07-04299 PJH

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND
EXHIBITS IN SUPPORT**

Time: 9:00
Date: April 23, 2008
Courtroom:  3, 17th Floor

PATRICK THOMPSON (SBN 160804)
NICOLE E. PERROTON (SBN 233121)
ELIZABETH F. STONE (SBN 239285)
GOODWIN PROCTER LLP
101 California Street # 1850
San Francisco, California 94111
Tel: (415) 733-6000
Fax: (415) 677-9041
Email: pthompson@goodwinprocter.com

DAVID B. COOK (DC BN 113522), appearing *pro hac vice*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
Tel: (202) 346-4000
Fax: (202) 346-4444
Email: dcook@goodwinprocter.com

Attorneys for PLAINTIFFS

## **TABLE OF CONTENTS**

STATEMENT OF ISSUES PRESENTED...........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................1

STATEMENT OF FACTS .............................................................................................2

    A.   NO CHILD LEFT BEHIND'S "HIGHLY QUALIFIED" TEACHER PROVISIONS. ...............................2

          1.  NCLB Defines a "Highly Qualified" Teacher as One Who Has Obtained Full State Certification. .................................................................................3

          2.  NCLB's "HQT" Requirements and Enforcement Provisions Seek to Provide All Students with "Highly Qualified" Teachers. .......................................3

    B.   THE U.S. DEPARTMENT OF EDUCATION'S REGULATION DEFINES THE TERM "HIGHLY QUALIFIED" TEACHER TO INCLUDE TEACHERS PARTICIPATING IN ALTERNATIVE CERTIFICATION PROGRAMS AND WORKING TOWARDS FULL CERTIFICATION. .......................4

    C.   DEFENDANTS' REGULATION SUBSTANTIALLY AFFECTS THE IMPLEMENTATION OF NCLB'S "HIGHLY QUALIFIED" TEACHER PROVISIONS, ESPECIALLY IN CALIFORNIA WHERE ALTERNATIVE ROUTE TEACHERS DISPROPORTIONATELY TEACH IN UNDERPERFORMING, LOW-INCOME, HIGH MINORITY SCHOOLS. .............................6

          1.  Defendants' Regulation Substantially Impacts NCLB Implementation. .................6

          2.  The Growth and Disproportionate Distribution of Alternate Route Teachers in California.. .............................................................................8

ARGUMENT ...............................................................................................................10

    I.   *CHEVRON* SETS FORTH THE APPLICABLE LEGAL STANDARD. ................................10

    II.  ED'S REGULATION DEFINING THE TERM "HIGHLY QUALIFIED" TEACHER IS CONTRARY TO CONGRESS' UNAMBIGUOUS INTENT SET FORTH IN NCLB'S PLAIN LANGUAGE. .............10

          A.  The Plain Language of the NCLB Act Defines the Term "Highly Qualified" Teacher as One Who Has Already Completed the Credentialing Process and "Obtained" Full Certification.................................................................11

i

B.  ED's  Regulation Conflicts With NCLB By Defining "Highly Qualified" To Include Teachers Still Working Toward Full Certification. ...................................11

C.  ED's Regulation Also Conflicts With Congress' Explicit Exclusion of Provisionally-Certified Teachers From the "Highly Qualified" Definition. .........14

D.  The Statute Creates No Ambiguity. ......................................................................15

III.  ED'S INTERPRETATION OF THE STATUTE IS INCONSISTENT WITH THE LEGISLATIVE HISTORY AND PURPOSE OF THE NCLB ACT AND THUS IS NOT ENTITLED TO DEFERENCE UNDER THE *CHEVRON* TEST. ...............................................................................15

A.  The Legislative History Reflects Congressional Intent That Only Fully Certified Teachers Should Be Considered "Highly Qualified." ...........................15

B.  ED's Proffered Reasons for Its "Highly Qualified" Definition are Without Merit...........................................................................................................17

C.  ED's Regulation is Inconsistent With the Statutory Scheme and Undermines NCLB's Goals of Ensuring Access to High Quality Teachers—Particularly for Poor and Minority Students—and of Public Transparency. ..................................18

IV.  BECAUSE ED'S REGULATION CONFLICTS WITH THE NCLB ACT, THE COURT SHOULD INVALIDATE IT AND ISSUE AN INJUNCTION TO ENSURE COMPLIANCE. ...................20

CONCLUSION....................................................................................................................23

ii

# __TABLE OF AUTHORITIES__

## __Cases__

*Bresgal v. Brock,*
 843 F.2d 1163 (9th Cir. 1987) .................................................................22

*Brown v. Harris,*
 491 F. Supp. 845 (N.D. Cal. 1980) ..........................................................21

*California Cosmetology Coalition v. Riley,*
 110 F.3d 1454 (9th Cir. 1997) .................................................10, 12, 13, 21

*Chevron U.S.A. v. Echazabal,*
 536 U.S. 73 (2002) ....................................................................................12

*Chevron, U.S.A. v. Natural Resources Defense Council,*
 467 U.S. 837 (1984)............................................................................10, 15

*Citizens for Better Forestry v. U.S. Dept. of Agric.,*
 490 F. Supp. 2d 1059 (N.D. Cal. 2007) ...................................................21

*Earth Island Institute v. Ruthenbeck,*
 490 F.3d 687 (9th Cir. 2007) ...............................................................21, 22

*Eisinger v. Fed. Labor Relations Auth.,*
 218 F.3d 1097 (9th Cir. 2000) ..................................................................13

*FEC v. Democratic Senatorial Campaign Comm.,*
 454 U.S. 27 (1981).....................................................................................18

*Gorbach v. Reno,*
 219 F.3d 1087 (9th Cir. 2000) ..................................................................21

*Int'l Bhd. Of Teamsters, Chauffers, Warehousemen & Helpers of Am. v. Daniel,*
 439 U.S. 551 (1979) ..................................................................................15

*Kaiser Aluminum & Chem. Corp. v. Bonneville Power Admin.,*
 261 F.3d 843 (9th Cir. 2001) ....................................................................18

*Koshland v. Helvering,*
 298 U.S. 441 (1936) ..................................................................................12

*Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*,
    297 U.S. 129 (1936) .................................................................................20

*MCI Telecomms. Corp. v. AT & T Co.*,
    512 U.S. 218 (1994) .................................................................................10

*Miller v. AT & T Corp.*,
    250 F.3d 820 (4th Cir. 2001) ..................................................................13

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    127 S. Ct. 2518 (2007) .............................................................................19

*Nat'l Muffler Dealers Ass'n v. United States*,
    440 U.S. 472 (1979) .................................................................................15

*Natural Res. Def. Council v. EPA*,
    966 F.2d 1292 (9th Cir. 1992) ................................................................21

*Northwest Envtl. Advocates v. EPA*,
    2005 U.S. Dist. LEXIS 5373 (N.D. Cal. 2005) .....................................21

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) .............................................................................10, 11

*Schneider v. Chertoff*,
    450 F.3d 944 (9th Cir. 2006) ..................................................................21

*Shivaraman v. Ashcroft*,
    360 F.3d 1142 (9th Cir. 2004) ................................................................13

*United States v. Calamaro*,
    354 U.S. 351 (1957) .................................................................................12

*United States Term Limits v. Thornton*,
    514 U.S. 779 (1995) .................................................................................12

*Ventana Wilderness Alliance v. Bradford*,
    2007 U.S. Dist. LEXIS 48366, *7 (N.D. Cal. 2007) ............................13

**Federal Statutes**

5 U.S.C. § 706..............................................................................................21

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLANTIFFS' MOTION FOR
SUMMARY JUDGMENT AND EXHIBITS IN SUPPORT
CASE NO. 07-04299 PJH

20 U.S.C. § 6301 ...................................................................................................................19

20 U.S.C. §§ 6311-6312 .....................................................................................................2, 4, 19

20 U.S.C. § 6319 ...............................................................................................................3, 4

20 U.S.C. § 6672 ...................................................................................................................18

20 U.S.C. § 6674 ...................................................................................................................18

20 U.S.C. § 6681 ...................................................................................................................18

20 U.S.C. § 7801 ........................................................................................................... *passim*

**Federal Regulations**

34 C.F.R. § 200.56. ....................................................................................................... *passim*

34 C.F.R. § 200.55. ...............................................................................................................4, 5

**Other Authorities**

147 Cong. Rec. H2611-01, at *H2626 (May 23, 2001) ...................................................16

147 Cong. Rec. H4121-01, at *H4127-H4128 (July 18, 2001) ......................................16

147 Cong. Rec. S13365 (Dec. 18, 2001) ........................................................................16

148 Cong. Rec. S5341-S5343 (June 11, 2002) .........................................................16, 17

Conf. Rep. No. 107-334 to accompany HR 1 (Dec. 12, 2001) ......................................16

Cal. Educ. Code § 44251 ..................................................................................................14

Cal. Educ. Code § 44274.2 ..............................................................................................14

Cal. Educ. Code § 44325 et seq. .......................................................................................8

Cal. Educ. Code § 44450 et seq, .......................................................................................8

Cal. Code Regs. tit.5, § 6101 .............................................................................................6

Cal. Code Regs. tit.5, § 6110 .............................................................................................6

v

## STATEMENT OF ISSUES PRESENTED
### (Civ. L.R. 7-4)

1. Where Congress defined a "highly qualified" teacher under the No Child Left Behind Act as one who has "obtained full state certification," does Defendants' challenged regulation exceed the scope of the NCLB Act and thereby violate the Administrative Procedure Act by defining a "highly qualified" teacher to include individuals who are still participating in alternative certification programs and only making progress toward full certification?

2. If Defendants' regulation exceeds the scope of the NCLB statute and thereby violates the APA, what relief is appropriate to remedy the continuing effects of Defendants' unlawful regulation?

## INTRODUCTION AND SUMMARY OF ARGUMENT

In enacting the No Child Left Behind Act ("NCLB" or the "Act"), Congress was explicit that children in the public schools of this country should receive their instruction from "highly qualified" teachers, a term that Congress essentially defined to include only those teachers who have completed their teacher preparation programs and obtained full state certification. Defendants U.S. Department of Education and Secretary of Education Margaret Spellings (together "ED" or "Defendants") are thwarting this unambiguous mandate by implementing a regulation that abrogates this definition of "highly qualified" teacher in favor of one that is the opposite of what Congress directed.  According to Defendants, teachers who are merely *participating* in alternative preparation programs and only *progressing* toward full certification are, by Defendants' regulation, "highly qualified."  As a result, individuals with no prior teacher training or experience—over 10,000 in California alone—are now deemed "highly qualified" the day they enter an alternative route certification program and take full responsibility for a classroom.  This mislabeling of under prepared teachers perverts Congress's carefully laid out statutory vision and disserves the children and parents whom the Act sought to benefit.

Delivering "highly qualified" teachers to every student in every core course is a cornerstone of NCLB, which seeks to improve academic achievement for all children.  The "highly qualified" teacher definition also plays a vital role in Congress's requirement that parents

1

should receive accurate information about the qualifications of their children's teachers. Defendants' evasion of this critical Congressional standard by regulatory fiat has undermined the promise of No Child Left Behind for Plaintiffs, for hundreds of thousands of California public school students, and for the nation as a whole. The consequences of Defendants' actions are particularly severe in California where alternative route teachers-in-training are concentrated in low-performing, low-income, high minority schools like Plaintiffs'—in direct contradiction of Congress' mandate under NCLB that poor and minority students not be taught by non-"highly qualified" teachers at disproportionate rates.[1]  Because Defendants' regulation conflicts with the unambiguous, plain language of NCLB as well as with its underlying goals and purposes, Plaintiffs ask this Court to void the regulation as violative of the Administrative Procedure Act and enjoin its further use.

## STATEMENT OF FACTS

### A.  No Child Left Behind's "Highly Qualified" Teacher Provisions.

Since 2002, the No Child Left Behind Act has served as the current version of the Elementary and Secondary Education Act, first enacted in 1965, and the foundation for federal education policy.  The ultimate goal of NCLB is for all students to attain proficiency in reading and math by 2014, eliminating the significant academic achievement gaps between students of different socioeconomic and racial/ethnic groups.  20 U.S.C. § 6311(b)(2)(F).  An essential component of NCLB's promotion of academic achievement and accountability is that students must be taught by "highly qualified" teachers.  Defendant Spellings' official correspondence to states acknowledges the importance of teacher quality in meeting the goals of NCLB:

> [NCLB] recognizes that *teacher quality is one of the most important factors in improving student achievement and eliminating these achievement gaps*. As a result, the law set the important goal that all students be taught by a "highly qualified teacher" (HQT) who holds at least a bachelor's degree, *has obtained full*

---

[1] In California, these individuals are known as intern teachers and are typically employed and paid as full-time teachers while they take teacher preparation classes at night or on weekends.

2

> *State certification*, and has demonstrated knowledge in the core academic subjects he or she teaches.

Exh. 1, Spellings Letter to Chief State School Officers (Oct. 21, 2005) (emphasis added).

Accordingly, as discussed below, NCLB contains over a dozen provisions relating to "highly qualified" teachers, including a definition of the term and numerous provisions establishing specific "highly qualified" teacher ("HQT") requirements.

**1.     NCLB Defines a "Highly Qualified" Teacher as One Who Has Obtained Full State Certification.**

In the "Definitions" section of the NCLB Act, Congress defined what it meant by the term "highly qualified" "when used with respect to any public elementary school or secondary school teacher teaching in a State:"

> (i) the teacher has *obtained full State certification as a teacher (including certification obtained through alternative routes to certification) or passed the State teacher licensing examination, and holds a license to teach in such State*, except that when used with respect to any teacher teaching in a public charter school, the term means that the teacher meets the requirements set forth in the State's public charter school law; and
> (ii) the teacher has not had certification or licensure requirements waived on an emergency, temporary, or provisional basis.

20 U.S.C. § 7801(23)(A) (emphasis added).  On its face, the statute requires that a teacher have already "*obtained* full state certification" to be deemed "highly qualified."  *Id.*[2]

**2.     NCLB's "HQT" Requirements and Enforcement Provisions Seek to Provide All Students with "Highly Qualified" Teachers.**

NCLB's "highly qualified" teacher provisions can be divided into four major categories: (1) the "highly qualified" teacher requirement, (2) equitable distribution requirements, (3) HQT "plan" requirements, and (4) public reporting and accountability requirements.

First, beginning with the 2002-03 school year, new hires in schools with low-income students receiving federal Title I funds are to meet the "highly qualified" standard.  20 U.S.C. § 6319(a)(1)-(2).  For all schools, NCLB mandates that, by the end of the 2005-2006[3] academic year, all students be taught by an HQT in core academic classes.[4]  20 U.S.C. § 6319(a)(2).

---

[2] California (like most states) does not have a single, summative "state teacher licensing examination."  Thus, the second option in § 7801(23)(A)(i) is of little relevance.

[3] Defendants later extended this deadline until the end of the 2006-2007 school year.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND EXHIBITS IN SUPPORT
CASE NO. 07-04299 PJH

Second, during the time it takes to provide all students with HQTs in core academic classes, NCLB mandates that poor and minority students not be taught by inexperienced, non-HQTs at higher rates than other students.  20 U.S.C. § 6311(b)(8)(C).

Third, to meet these mandates, the Act requires that every state and local school district develop specific plans to provide "highly qualified" teachers in all core academic classes and to arrange for the equitable distribution of these teachers.  20 U.S.C. §§ 6311(b)(8)(C), 6319(a)(2), 6311(a)(1) (state plans); §§ 6312(b)(1)(N), §6319(a)(3), 6312(c)(1)(I) (district plans).  See also 1st Am. Compl. ¶ 49 (for further description of the state and district plan requirements).

Fourth, the Act sets forth several reporting requirements to ensure that parents, students, policy makers, and the public have accurate information regarding the presence, the number and the distribution of "highly qualified" teachers.  Schools receiving Title I funds must inform individual parents when a non-"highly qualified" teacher teaches his/her child for more than four weeks.  20 U.S.C. § 6311(h)(6)(B)(ii).  Moreover, every year, states and school districts are required to report to the public accurate information regarding the progress that schools, districts, and states are making towards meeting NCLB's HQT requirements and the numbers of teachers who are not "highly qualified."  20 U.S.C. § 6311(h)(1)(C)(viii); §§ 6311(h)(2), 6319(b)(1)(A).  States, in turn, must provide this information to the U.S. Department of Education, (20 U.S.C. §§ 6311(h)(4)(G), 6319(b)(1)(B)), which then reports to Congress the nationwide statistics on "highly qualified" teachers (20 U.S.C. § 6311(h)(4)-(5)).

**B.    The U.S. Department of Education's Regulation Defines the Term "Highly Qualified" Teacher to Include Teachers Participating in Alternative Certification Programs and Working Towards Full Certification.**

On December 2, 2002, then Secretary of Education Rod Paige issued final regulations, which became effective January 2, 2003, redefining the term "highly qualified" teacher.  These regulations permit individuals who are merely *participating* in an alternative route to

---

[4] "Core academic subjects" are English, reading/language arts, math, science, foreign languages, civics and government, economics, arts, history, and geography.  34 C.F.R. § 200.55(c).

4

certification program" (34 C.F.R. § 200.56(a)(2)(ii) (emphasis added)) and who have not yet

"*obtained* full state certification" (20 U.S.C. § 7801(23)(A)) to be deemed "highly qualified."

Indeed, the regulations expressly state that individuals can only be certified to teach on a

temporary basis and need only "demonstrate[] satisfactory progress toward full certification."  34

C.F.R. § 200.56(a)(2)(ii)(3)-(4).  Specifically, the regulation provides:

> (a)  In general
> > (1) Except as provided in paragraph (a)(3) of this section, a teacher covered under § 200.55 must –
> > > i.      Have obtained full State certification as a teacher, which may include certification obtained through alternative routes to certification; or
> > > ii.     (A) Have passed the State teacher licensing examination; and (B) Hold a license to teach in the State.
> > (2) A teacher meets the requirement in paragraph (a)(1) of this section if the teacher –
> > > i.      Has fulfilled the State's certification and licensure requirements applicable to the years of experience the teacher possesses; or
> > > ii.     *Is participating in an alternative route to certification program* under which –
> > > > (A) The teacher –
> > > > > (1) Receives high-quality professional development that is sustained, intensive, and classroom-focused in order to have a positive and lasting impact on classroom instruction, before and while teaching;
> > > > > (2) Participates in a program of intensive supervision that consists of structured guidance and regular ongoing support for teachers or a teacher mentoring program;
> > > > > (3) *Assumes functions as a teacher only for a specified period of time not to exceed three years*; and
> > > > > (4) *Demonstrates satisfactory progress toward full certification as prescribed by the State*; and
> > > > (B) The State ensures, through its certification and licensure process, that the provisions in paragraph (a)(2)(ii) of this section are met.
> > (3) A teacher teaching in a public charter school in a State must meet the certification and licensure requirements, if any, contained in the State's charter school law.
> > (4) If a teacher has had certification or licensure requirements waived on an emergency, temporary, or provisional basis, the teacher is not highly qualified.

5

34 C.F.R. § 200.56(a) (emphases added).  Under these regulations, a teacher-in-training with no prior training nor any prior experience teaching is deemed "highly qualified" on the day she enters an alternative certification program and begins to serve as a full-time classroom teacher.

C. **Defendants' Regulation Substantially Affects the Implementation of NCLB's "Highly Qualified" Teacher Provisions, Especially in California Where Alternative Route Teachers Disproportionately Teach in Underperforming, Low-income, High Minority Schools.**

1. **Defendants' Regulation Substantially Impacts NCLB Implementation.**

Defendants' regulation seriously impairs the implementation of the numerous provisions of NCLB designed to ensure that all children have access to "highly qualified" teachers, both nationwide and in California.  All four categories of HQT provisions are impacted.

In California, the State Board of Education has adopted "highly qualified" teacher regulations in order to implement NCLB in the state.  In doing so, the State Board has adopted the "highly qualified" teacher definition as set forth in Defendants' regulation—including defining participants in alternative route credentialing programs as "highly qualified" teachers for purposes of NCLB.  *See* CAL. CODE REGS. tit. 5, §§ 6101, 6110.  As a result of Defendants' regulation, California, its districts and schools currently place over 10,000 alternative route program participants in core classrooms—including in the schools and classrooms that Plaintiffs attend—and count them as "highly qualified" teachers.  *Id.;* Exh. 12; Renee Decl. ¶ 6, 10; Heredia Decl. ¶ 4; N. Doe Decl. ¶ 4; Rubio Decl. ¶¶ 5-6, 10; Gonzalez Decl. ¶ 7; Johnson Decl. ¶¶ 4, 7; Ramirez Decl. ¶¶ 4, 6; J. Doe Decl. ¶¶ 4-5, 7; Rivera Decl. ¶¶ 9, 11; Mehrens Decl. ¶¶ 10-11.  Other states, districts and schools nationwide are given the same authority to label their alternative route teachers as "highly qualified" by Defendants' regulation.[5]

---

[5] Defendants do not maintain data on how many "highly qualified" teachers nationally qualify as such by virtue of their participation in alternative route certification programs.  Based on an annual graduation rate of 59,000 teachers from alternative route programs nationally, *see* 1st Am. Compl. ¶ 54, and the fact that alternative route participants typically take two (and sometimes as long as three) years to complete their programs, Plaintiffs estimate that over 100,000 individuals are participating in alternative route programs nationally at any one time and are considered "highly qualified."

1    Secondly, because teachers still participating in alternative route programs are labeled
2    "highly qualified," California and its districts are able to place interns disproportionately in low-
3    income and high minority schools without regard to NCLB provisions requiring the equitable
4    distribution of non-HQTs.  *See, e.g.*, Renee Decl. ¶ 10; Rubio Decl. ¶ 10; Gonzalez Decl. ¶ 7;
5    Johnson Decl. ¶ 7; Ramirez Decl. ¶ 6; J. Doe Decl. ¶ 7; Shields Decl. ¶¶ 11-13, Exh. B.  *See also*
6    Exh. 2-7 (containing data from the California Department of Education website demonstrating
7    the percentage of intern teachers at Plaintiffs' schools as well as the disproportionate
8    concentration of poor and minority students at those schools); Exh. 2, 8-9 (demonstrating the
9    percentage of intern teachers at schools and in districts attended by members' of organizational
10   plaintiffs).  Similar results are permitted nationwide as a result of Defendants' regulation.

11   Thirdly, state and school district plans for meeting the HQT requirement are substantially
12   altered when teachers-in-training through alternative certification programs are counted as
13   "highly qualified."  The data and the premises upon which these plans are based ignore the
14   significantly greater objectives that must be met were alternative route program participants not
15   counted as "highly qualified."  In particular, Defendants' regulation deprives the Plaintiffs, the
16   Plaintiff organizations and their members and the public of the benefit of state and local district
17   plans to redress the hiring and placement of non-"highly qualified" teachers, including interns.
18   Renee Decl. ¶ 11; Heredia Decl. ¶ 7; N. Doe Decl. ¶ 9; Rubio Decl. ¶ 11; Gonzalez Decl. ¶ 8;
19   Johnson Decl. ¶ 9; Ramirez Decl. ¶ 8; J. Doe Decl. ¶ 9; Rivera Decl. ¶ 11; Mehrens Decl. ¶ 11.

20   Finally, as a result of Defendants' regulation, parents, students, policymakers and the
21   public receive much different information about students' access to HQTs.  In particular, parents
22   in schools receiving Title I funds for low-income student assistance—over half of all public
23   schools in California[6]—do not receive a letter notifying them when their child has been taught
24   for four or more weeks by a teacher-in-training through an alternative certification program, as
25   would otherwise be required under NCLB.  *See, e.g.,* N. Doe Decl. ¶¶ 7, 9.  District and state
26   "annual report cards" containing information on the percentages of classes being taught by HQTs
27
28

---

[6] *See* Ed Source, *California's School Accountability System Under the Federal No Child Left Behind Act (NCLB)* (August 2007), *available at*: http://www.edsource.org/pub_edfct_ayp.cfm.

7

and progress towards meeting the HQT goal report misleadingly higher numbers of HQTs because of Defendants' regulation. Similarly, Secretary Spellings's annual report to Congress regarding the progress made towards meeting the HQT goal is based on HQT numbers inflated by district and state counts of alternative route teachers-in-training as HQTs. All of the individual Plaintiffs in this action—as well as Californians for Justice and California ACORN and their members—are among those deprived of accurate information about non-"highly qualified" teachers teaching in their school, district, state, and nation, thereby inhibiting their ability to hold schools accountable for delivering fully prepared teachers. *See* Renee Decl. ¶ 11; Heredia Decl. ¶ 7; N. Doe Decl. ¶ 9; Rubio Decl. ¶ 11; Gonzalez Decl. ¶ 8; Johnson Decl. ¶ 9; Ramirez Decl. ¶ 8; J. Doe Decl. ¶ 9; Rivera Decl. ¶ 11; Mehrens Decl. ¶ 11.

As a result of Defendants' major alteration of the type of teacher that is considered "highly qualified," Defendants' regulation substantially alters the operation of NCLB. Accordingly, Congress', the public's, and Plaintiffs' goal of improving the quality of teachers in our nation's public schools is adversely affected. *See* Rivera Decl. ¶¶ 5, 10; Mehrens Decl. ¶¶ 6, 9.

### 2. The Growth and Disproportionate Distribution of Alternate Route Teachers in California.

In California, the most common alternative teacher certification programs are university or school district-based intern programs. There are 10,000 such "intern teachers" in California working toward their full (*i.e.,* a preliminary or professional clear) teaching credential. *See, e.g.,* Exh. 10, California Internship Teacher Preparation: Frequently Asked Questions, *downloaded from* http://www.ctc.ca.gov/educator-prep/intern/intern-FAQ.html. *See also* CAL. EDUC. CODE §§ 44325–44329.5 (district interns); §§ 44450–44468 (university interns). All of these intern teachers, regardless of how inexperienced or unprepared, are automatically deemed "highly qualified" under Defendants' regulation.

Since Defendants issued the challenged regulation in 2002, the number of intern teachers in California has risen by approximately 50%. *See* Exh. 11-12 (indicating that the number of intern teachers in California jumped from 7,251 in 2001-2002 to 10,716 in 2006-2007). This

8

significant increase in the number of intern teachers in California has coincided with a significant

decrease in the number of emergency-credentialed teachers, who are not considered "highly

qualified" under NCLB or its implementing regulations.  *See* Exh. 13 (Center for the Future of

Teaching and Learning, *The Status of the Teaching Profession 2005*, at 31).

Nearly a quarter of interns (23%) across the state teach in the 10% of schools serving the

highest concentrations of minority students (98-100% non-white), while less than 2% teach in

the 10% of schools with the lowest concentration of minority students.  Shields Decl. ¶ 13, Exh.

B.  Whereas, on average, less than 1% of the teaching staff are interns in schools with the lowest

concentration of minority students, the 10% of schools which are nearly entirely minority

students have over five times as many interns.  *Id.* at Exh. B.  The distribution of intern teachers

by school achievement shows a similar pattern in California.  Sixty percent of interns serve in the

lowest-performing 30% of schools in the state based on California's Academic Performance

Index ("API"), while only 10% serve in the highest-performing 30% of schools in the state.  *Id.*at

¶ 13, Exh. B.  Students in the lowest-performing decile of schools see six times more interns on

their school's teaching staff than students in the highest-performing decile.  *Id.* at Exh. B.

Interns are also disproportionately concentrated in schools serving predominantly poor students.

Sixty-two percent of interns are concentrated in the poorest half of the state's schools, whereas

only 13% of interns are in the least poor quartile.  *Id.* at ¶ 11*;* Exh. 14 at 76 (Center for the

Future of Teaching and Learning, *Teaching and California's Future: The Status of the Teaching*

*Profession 2007*).  *See also* Shields Decl. ¶ 13, Exh. B.  Plaintiffs, Plaintiffs' children, and

Plaintiffs' members attend California public schools which exemplify these statistics.  Exhs 2-7,

16.

In short, Defendants' inclusion of teachers still working towards full certification as

"highly qualified" has significantly increased the number of underprepared, under-certified

teachers, particularly in poor, poor-performing and minority-dominated schools.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND EXHIBITS IN SUPPORT
CASE NO. 07-04299 PJH

# ARGUMENT

I. *CHEVRON* SETS FORTH THE APPLICABLE LEGAL STANDARD.

Administrative agencies may not, as Defendants have here, implement regulations that are contrary to the "unambiguously expressed intent of Congress." *Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). In *Chevron*, the Supreme Court set forth a two-part test for judicial review of an administrative agency's construction of a statute it administers. First, a court must consider "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-843.[7] Second, and only *if* the statute is silent or ambiguous on the question at issue, courts must defer to the agency's reasonable interpretation of the statute as long as the interpretation is consistent with the purpose of the statute. *Chevron*, 467 U.S. at 843-45. However, "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." *MCI Telecomms. Corp. v. AT & T Co.*, 512 U.S. 218, 229 (1994).

As set forth below, ED's regulation defining the term "highly qualified" teacher is flatly contrary to the plain language Congress used in NCLB. Thus, the court need reach only the first step of the *Chevron* test to decide in favor of Plaintiffs. Nonetheless, even were the court to conclude that NCLB's definition of "highly qualified" teacher is somehow ambiguous, the court must still reject ED's regulation under step two of the *Chevron* test. Because the regulation is inconsistent with the legislative history and purpose of the NCLB Act—indeed, it is "manifestly contrary to the statute" (*Chevron*, 467 U.S. at 844)—it is not entitled to judicial deference.

II. **ED's REGULATION DEFINING THE TERM "HIGHLY QUALIFIED" TEACHER IS CONTRARY TO CONGRESS' UNAMBIGUOUS INTENT SET FORTH IN NCLB'S PLAIN LANGUAGE.**

---

[7] *See also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("[The] first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. [The] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent'"); *California Cosmetology Coal. v. Riley*, 110 F.3d 1454, 1458 (9th Cir. 1997).

**A.  The Plain Language of the NCLB Act Defines the Term "Highly Qualified" Teacher as One Who Has Already Completed the Credentialing Process and "Obtained" Full Certification.**

In determining the "plainness or ambiguity of the statutory language," a court looks to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. Here, the NCLB Act, in pertinent part, defines a "highly qualified" teacher as follows:

> (i)    the teacher has *obtained full State certification as a teacher* (including certification obtained through alternative routes to certification) or passed the State teacher licensing examination, and holds a license to teach in such State . . .; and
>
> (ii)   the teacher has not had certification or licensure requirements waived on an emergency, temporary, or provisional basis.

20 U.S.C. § 7801(23)(A) (emphasis added).  This language could not be clearer.  A teacher is "highly qualified" *only if* she "has obtained full State certification" *or* has "passed the State teacher licensing examination, and hold[s] a license to teach in such State." *Id.* Thus, Congress here has explicitly set forth two and only two potential avenues to earn the label "highly qualified."

**B.  Ed's Regulation Conflicts With NCLB By Defining "Highly Qualified" To Include Teachers Still Working Toward Full Certification.**

ED's regulation defining "highly qualified" teacher restates the statute's two avenues for obtaining "highly qualified" status in 34 C.F.R. § 200.56(a)(1)(i) and (ii).  However, the regulation introduces an unauthorized *third* means to be deemed "highly qualified" in subsection (a)(2)(ii) that flatly contradicts 20 U.S.C. § 7801(23)(A)(i)—*i.e.*, teachers "*participating in* an alternative route to certification program." 34 C.F.R. § 200.56(a) (emphasis added).  Thus, under the regulation, teachers-in-training who are merely "participating in an alternative route to certification program," *id.*, but who have not yet "obtained full State certification" or "passed the State teacher licensing examination and [earned] a license to teacher," 20 U.S.C. § 7801(23)(A), are now deemed "highly qualified."  Indeed, there is no requirement that alternative route program participants pass "the State teacher licensing examination" where a state might have

11

such.  (*See* note 2, *supra*.)  Even more clearly evidencing a *direct* conflict with the statute, the regulation grants HQT status to alternative route participants who demonstrate only that they are making "progress toward full certification," 34 C.F.R. § 200.56(a)(2)(ii)(A)(4), rather than that they have "obtained full state certification," as the statute requires, 20 U.S.C. § 7801(23)(A)(i).

The conflict between the statute and regulation is glaring.  Congress unmistakably demonstrated its intent by using the present perfect tense which indicates an action has been completed: "*has obtained* full State certification" or "*[has] passed* the State teacher licensing examination, and holds a license to teach."  20 U.S.C. § 7801(23)(A) (emphasis added). Congress included no other means to earn the label "highly qualified," and, by unequivocal implication, excluded any other potential avenue––particularly any other method that did not require completion of the teacher certification or licensing process.[8]  ED's regulation, which uses the present progressive verb tense to allow an individual who "is participating" in an alternative certification program to be deemed "highly qualified" (34 C.F.R. § 200.56(a)) stands in stark contrast to the two routes which Congress articulated in its statutory definition of "highly qualified" teacher.  This contrast, along with the regulation's granting HQT status to teachers-in-training making "progress toward full certification" versus teachers who have "obtained full State certification," makes plain the irreconcilable conflict between Congress' and ED's definitions of  a "highly qualified" teacher.

"A regulation may not serve to amend a statute, *Koshland v. Helvering*, 298 U.S. 441, 447 (1936), nor add to the statute 'something which is not there.' *United States v. Calamaro*, 354 U.S. 351 (1957)."  *California Cosmetology Coalition v. Riley*, 110 F.3d 1454, 1460 (9th Cir. 1997).  But that is exactly what Defendants have done here, by adding to the category of "highly qualified" those individuals who have not yet "obtained full State certification," (20 U.S.C. § 7801(23)(A)(i)), who are merely "participating in an alternate route to certification program,"

---

[8] The maxim *expressio unius exclusio alterius*—the expression of one item of an associated group or series excludes another left unmentioned—is apt here.  *See, e.g, United States Term Limits v. Thornton*, 514 U.S. 779, 793 (1995); *Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 81 (2002) (citations omitted).

1  (34 C.F.R. § 200.56(a)).  Congress could easily have chosen to add additional or more lenient

2  means to obtain the status of "highly qualified" but it elected not to do so.  It could have blessed

3  the use of teachers merely working towards certification but it did the exact opposite.  ED,

4  therefore, exceeded its authority when it issued the regulation defining a "highly qualified"

5  teacher.  *See California Cosmetology Coalition*, 110 F.3d at 1457-59 (holding that Secretary of

6  Education's regulations governing the amount of money schools could retain from student

7  financial aid programs when students withdrew from schools were inconsistent with Congress's

8  amendments to the Higher Education Act and in excess of the Secretary's authority.)

9        In fact, courts are particularly reluctant to condone regulatory tinkering with Congress'

10  statutory *definitions*, such as the one involved here.  As the Ninth Circuit has warned, where a

11  statute provides an unambiguous definition, "no deference is due to the [agency's] construction

12  of the statutory term."  *Shivaraman v. Ashcroft*, 360 F.3d 1142, 1146 (9th Cir. 2004).  *See also*

13  *Eisinger v. Fed. Labor Relations Auth.,* 218 F.3d 1097, 1105 (9th Cir. 2000); *Miller v. AT & T*

14  *Corp.*, 250 F.3d 820, 834 (4th Cir. 2001); *Ventana Wilderness Alliance v. Bradford*, 2007 U.S.

15  Dist. LEXIS 48366, *7 (N.D. Cal. 2007) (court must first consider whether "statutory or

16  regulatory provision expressly defines the meaning of the term at issue").

17        In *Eisinger*, 218 F.3d 1097, 1104-05 (9th Cir. 2000), for example, the Ninth Circuit

18  invalidated a labor regulation denying individuals standing to file certain petitions, where the

19  underlying statute explicitly permitted "any person" to file such a petition and defined the term

20  "person" to include an individual.  In reaching its decision, the court noted:

> As a rule, [a] definition which declares what a term "means". . .
> excludes any meaning that is not stated.  We conclude that the
> intent of Congress was unambiguous.  Congress has permitted
> "any person" to file a § 7111 petition and specifically defined a
> "person" as an "individual." Given the clarity of Congress's intent
> in this case, we will not inquire beyond the first step of the
> *Chevron* test.

*Id.* at 1105 (citations omitted).  Here, as in *Eisinger*, Congress's intent regarding what is meant

by the term "highly qualified" teacher is unambiguously expressed in the Act's definition and

excludes any other meaning not stated therein.

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.    **ED's Regulation Also Conflicts With Congress' Explicit Exclusion of Provisionally-Certified Teachers From the "Highly Qualified" Definition.**

The regulation runs afoul of the statute in another respect.  The NCLB Act specifically excludes from the definition of "highly qualified" those teachers who have had "certification or licensure requirements waived on an emergency, temporary, or provisional basis."  20 U.S.C. § 7801(23)(A)(ii).  This provision emphasizes the clear congressional declaration in section 7801(23)(A)(i) that teachers must have already "obtained *full* State certification" or licensure to be deemed "highly qualified."  *Id.* (emphasis added).  Yet, ED's regulation permits participants in alternative route teacher certification programs to be deemed "highly qualified" only on a provisional basis "not to exceed three years" 34 C.F.R. § 200.56(a)(2)(ii)(A)(3).  The notion that a temporary or provisional certification "not to exceed three years" is equivalent to "full State certification" is refuted merely by stating it.[9]

ED itself admits this irreconcilable conflict between its regulation—certifying alternative route participants as "highly qualified" for a limited period of only three years—and Congress's exclusion of "emergency, temporary, or provisional[ly]" certified teachers from the definition of "highly qualified."  In the rulemaking history surrounding ED's regulation, in response to comments made regarding the proposed definition of a "highly qualified" teacher, ED concedes that its regulation permitting alternative route participants to be labeled "highly qualified" for up to three years is the "one exception" to the statutory exclusion of "emergency, temporary, or provisional[ly]" credentialed teachers from the definition of "highly qualified."  *See* 67 Fed. Reg. 71710, 71764-71765 (Dec. 25, 2002) found in Administrative Record filed with the Court December 14, 2007 (hereinafter referred to by "AR" bates number) at AR0000099-100. Unfortunately for Defendants, there is no statutory basis for creating this "one exception."

---

[9] In California, full certification comes in the form of preliminary, professional clear and/or life credentials.  *See* CAL. EDUC. CODE § 44274.2 (requirements for preliminary and professional clear credentials); CAL. EDUC. CODE § 44251 (length of time for which credentials are valid).

14

**D.    The Statute Creates No Ambiguity.**

The statute's one explicit reference to alternative certification routes creates no ambiguity sufficient to justify ED's adding a third avenue for "highly qualified" status.  The reference comes in a parenthetical—"(including certification obtained through alternative routes to certification)"—that modifies "has obtained full State certification as a teacher," 20 U.S.C. § 7801(23)(A)(i).  This parenthetical merely describes a way in which the required "full State certification" might be obtained, clarifying that traditional teacher preparation programs and alternative certification programs are both equally regarded methods of obtaining "full State certification."  Whichever route an individual pursues, however, the Act clearly states that the teacher must already have "obtained" full certification to be labeled "highly qualified."  It does not, as ED's regulation does, permit an individual still "*participating in* an alternative route to certification program," 34 C.F.R. § 200.56 (a)(2)(ii) (emphasis added), to be considered "highly qualified."

**III.  ED'S INTERPRETATION OF THE STATUTE IS INCONSISTENT WITH THE LEGISLATIVE HISTORY AND PURPOSE OF THE NCLB ACT AND THUS IS NOT ENTITLED TO DEFERENCE UNDER THE *CHEVRON* TEST.**

According to *Chevron,* given the clarity of NCLB's HQT definition the Court need look no further to reject ED's overbroad regulation.  Nonetheless, even were the Court to find some ambiguity in Congress's definition of "highly qualified" teacher, ED's regulation should not be accorded deference under part two of the *Chevron* analysis because it is "manifestly contrary to the statute."  *Chevron*, 467 U.S. at 843-44.  In addition to the text of a statute, courts look to a statute's history and purpose to determine whether deference is due.  *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 566 n.20 (1979); *Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472 (1979).

**A.    The Legislative History Reflects Congressional Intent That Only Fully Certified Teachers Should Be Considered "Highly Qualified."**

There is relatively little legislative history because the adoption of the precise definition chosen by Congress was quick and uncontroversial.  In the Conference Report, in which

Congress settled on the requirement that teachers be "highly qualified," the Conference

Committee agreed, with no debate or disagreement, on the statute's current definition, being

clear to insert "full" before "state certification" and adding the provision excluding individuals

teaching on an emergency or temporary basis from HQT status. CONF. REP. NO. 107-334 to

accompany HR 1 (Dec. 12, 2001). In approving the language in the Act, Congress expressed no

hesitation or concern about the heightened standard being set for teacher qualification. That

Congress viewed this requirement as essential, unambiguous and unyielding is confirmed by

both the absence of debate, amendments or controversy concerning the statute's "highly

qualified" definition and by statements of support for raising teacher quality standards, including

from California members.

Congresswoman Solis (Los Angeles) criticized the "overabundance of teachers who do

not have credentials" in her district and urged the conferees "to remember those low income

students, the new face of California and the country." 147 CONG. REC. H4121-01, at *H4127-

H4128 (July 18, 2001). Congressman Miller (Martinez), the senior Democrat on the House

Education and Labor Committee and a key player in securing the passage of NCLB, highlighted

the promise of the Act in urging his colleagues to pass the bill:

> . . . the poorest school districts with the poorest children, as the President will
> point out, and the poorest performing children, under this legislation, within 4
> years they are going to have a qualified teacher in every classroom. Today
> they have teachers on emergency credentials. Today they have teachers on
> provisional credentials. They are going to have to get those teachers trained,
> certified and qualified to teach in the subject matter in which they are teaching.

147 CONG. REC. H2611-01, at *H2626 (May 23, 2001). Senator Lieberman, in directly praising

the Conference Committee's "highly qualified" definition explained that the "high state

standard" qualification requirements "ensure that all teachers have the crucial knowledge

necessary to ensure that students may meet the state's challenging academic achievement

standards in all core subjects." 147 CONG. REC. S13365 (Dec. 18, 2001).

In fact, some of the strongest legislative statements confirming what the "highly

qualified" definition intended arose after the Act's passage when ED joined the issue by

circulating draft guidance on June 6, 2002, 148 CONG. REC. S5341, 5342-43 (June 11, 2002), and

16

then noticing its proposed regulation defining "highly qualified" two months later. *See* 67 Fed. Reg. 51018 (Aug. 6, 2002) at AR0000034. Both the House and Senate education committees strongly opposed ED's proposed "highly qualified" definition. Senator Kennedy, chairman of the Health, Education, Labor and Pensions Committee ("HELP") and another NCLB leader, remarked: "In the draft guidance. . . .[a]lternate route teachers can be considered highly qualified while holding a provisional certification while they are working to obtain full certification. *This is inconsistent with the definition in [NCLB] which holds the same standards for all teachers.*" 148 CONG. REC. S 5341, 5342-43 (June 11, 2002) (emphasis added). Comments to ED's proposed regulations by the majority members of the Senate HELP Committee stated that: "[t]he provision exempts teachers with alternative certification from the certification requirement. *This directly contradicts the statute. The statutory language is clear that all teachers must be certified.* This should be struck." AR0000136 (emphasis added). The House Democratic Committee Staff made similar comments:

> This provision. . . specifically exempts teachers in alternative certification programs from obtaining certification if a State deems they are permitted to teach in the classroom. <u>This would allow uncertified teachers to be considered highly qualified.</u> This contradicts the statute. . . .

AR0000110 (emphasis in original).

### B. ED's Proffered Reasons for Its "Highly Qualified" Definition are Without Merit.

In response to these comments from both the House and Senate sub-committees on education—as well as comments from numerous other interested organizations critical of the proposed regulation[10]—ED proffered two reasons to justify the "exception" (67 Fed. Reg. 71764-71765 (Dec. 2, 2002) (AR0000099)) it made in including alternative route participants within the definition of "highly qualified" teacher:

---

[10] Among those who criticized the proposed regulation were the National Educational Association (AR0000155), Education Trust (AR0000196), the Citizens' Commission on Civil Rights (AR0000272), and the Center for Law and Education (AR0000336).

> First, Congress has chosen both to authorize and fund two alternative route programs, Troops-to-Teachers and Transition to Teaching, in Title II, part C of the ESEA, and has permitted States and LEAs to use Title II, part A formula grant funds to hire teachers in alternative route programs. Hence, we do not believe that Congress intended that teachers in alternative route program would be unable to teach until they had obtained full State certification. Beyond this, we believe that the LEAs [*e.g.,* districts] can and should be able to continue to effectively use alternative routes to certification as a mechanism for increasing the numbers of teachers who are capable of providing effective instructions, and, indeed, that these alternative routes can also serve as models for the certification system as a whole.

*Id.* In fact, nowhere do the statutes authorizing these programs alter the Act's HQT definition, nor do they state that participants instantaneously become "highly qualified" the day they join the alternative route program, nor, conversely, do they prohibit participants from teaching before they earn HQT designation. To the contrary, these two programs are designed to help participants "to *become* highly qualified teachers." *See, e.g.*, 20 U.S.C. §§ 6672(b)(1), 6674(f)(1)(A) (Troops-to-Teachers) (emphasis added); s*ee also* 20 U.S.C. § 6681 (Transition to Teaching programs use funds "to *develop* a teacher corps. . . as highly qualified teachers" (emphasis added)).

ED's second stated rationale—that "alternative routes can also serve as models for the certification system as a whole" (67 Fed. Reg. 71764 (Dec. 2, 2002); AR0000099)—reflects a policy judgment, one the statute permits ED no room to make. The legislative history, statutory framework and administrative record confirm what the statutory language already makes clear: Congress meant exactly what it said in demanding that only fully certified teachers earn the label of "highly qualified."

### C.     ED's Regulation is Inconsistent With the Statutory Scheme and Undermines NCLB's Goals of Ensuring Access to High Quality Teachers—Particularly for Poor and Minority Students—and of Public Transparency.

The Supreme Court has long recognized that administrative regulations that are inconsistent with their statutory mandate or that frustrate the policies that Congress sought to implement must be rejected. *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32 (1981); *see also Kaiser Aluminum & Chem. Corp. v. Bonneville Power Admin.*, 261 F.3d 843,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND EXHIBITS IN SUPPORT
CASE NO. 07-04299 PJH

848-49 (9th Cir. 2001).  In determining the meaning, or ambiguity, of a term and thus whether

*Chevron* deference is due to an agency's interpretation of that term, "the words of a statute must

be read in their context and with a view to their place in the overall statutory scheme."  *Nat'l*

*Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2534 (2007).  Here, ED's

regulation labeling teachers participating in alternative certification programs as "highly

qualified" undermines the overall statutory scheme and legislative purposes of NCLB by

frustrating the numerous provisions of the Act designed to ensure all students—and especially

poor and minority students—have full and equal access to high quality, fully trained and certified

teachers in order to promote universal proficiency in academic subjects.

The primary goals of NCLB are to make all students "proficient" in reading and math by

2014 and to close the achievement gap between low-income and minority students and their

more affluent, white peers.  *See* 20 U.S.C. §§ 6301, 6311(b)(2)(F), 6311(b)(2)(B).  As stated by

Defendant Secretary of Education Margaret Spellings (*see* Exh. 1), a cornerstone of NCLB's

accountability scheme for ensuring that these ambitious goals are met is that all children must be

taught by "highly qualified" teachers, defined in the statute as teachers with "full state

certification" who have "not had certification or licensure requirements waived on an

emergency, temporary, or provisional basis" (20 U.S.C. § 7801(23)(A)).

Thus, ensuring that all students, particularly poor and minority students, have high

quality teachers is central to fulfilling the purposes of the Act.  Defendants' regulation runs

counter to these purposes by permitting states, districts, and schools to lower the standard of

quality of the teacher all students are owed under NCLB.  Rather than ensuring that all students

have a teacher who has at least obtained full state certification and/or (where a state has such)

passed the state's summative teacher licensing examination, ED's regulation permits students to

be taught by teachers who are still in training in alternative route programs—perhaps just

beginning them—who are only making "satisfactory progress toward full certification," and who

are only certified on a provisional basis not to exceed three years.  34 C.F.R. § 200.56(a)(2)(ii).

Whatever ambiguity one might possibly find in the Act could not justify such a dramatic

reduction in the standard of teacher all students are owed.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND EXHIBITS IN SUPPORT
CASE NO. 07-04299 PJH

By so significantly reducing the minimum standard of a "highly qualified" teacher, ED substantially undermines all the various purposes of the Act's teacher quality provisions, *see* Facts A.2., *supra*. Namely: (1) the core requirement that all students receive a "highly qualified" teacher in core subjects is radically watered down; (2) the requirement that poor and minority students not receive disproportionately more teachers who are underprepared—as evidenced by the dramatic data in California concerning the distribution of interns, *see* Facts C.2., *supra*—is abandoned; (3) the requirement that states and districts develop plans to ensure all students have fully prepared and certified teachers is ignored with respect to teachers-in-training in alternative route programs; and (4) the public accountability requirements—from the 4-week letters to parents of students taught by not-"highly qualified" teachers, to school, district, state, and federal reports on the distribution of fully prepared and certified teachers—are seriously undercut when teachers-in-training are treated the same as those who are fully prepared and certified.

In sum, because ED's regulation frustrates Congress' goals of assuring all students access to high quality teachers and of transparency in and accountability for providing all students with such teachers, it is owed no deference and must be struck down even under the second *Chevron* test should the Court ever reach the question.

## IV. BECAUSE ED'S REGULATION CONFLICTS WITH THE NCLB ACT, THE COURT SHOULD INVALIDATE IT AND ISSUE AN INJUNCTION TO ENSURE COMPLIANCE.

Because ED has exceeded its authority in adopting the challenged regulation defining the term "highly qualified" teacher, the Court should deem the regulation void and unenforceable, and grant the declaratory and injunctive relief that Plaintiffs seek.

It is well-established that an agency regulation conflicting with a statute is null. In *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129 (1936), the Supreme Court stated:

> The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law, for no such power can be delegated by Congress, but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity.

20

1    *Id*. at 134.

2        The Ninth Circuit has consistently prohibited the enforcement of agency regulations where

3    such regulations were an improper exercise of rulemaking authority and conflicted with the

4    underlying statute.  *See, e.g., California Cosmetology Coalition*, 110 F.3d at 1456-58, 1461

5    (affirming summary judgment and permanent injunction as to regulations that failed to "effect[] the

6    statutory scheme" and "add[ed] 'something which is not there' to the explicit language of the

7    [statute] and exceed[ed] the Secretary's authority."); *accord Gorbach v. Reno*, 219 F.3d 1087, 1099

8    (9th Cir. 2000) (affirming district court's grant of injunctive relief prohibiting the INS from

9    proceeding with denaturalization proceedings under unlawful regulation).[11]

10        Under the Administrative Procedure Act, a court is authorized to "set aside agency

11   action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

12   otherwise not in accordance with the law."  5 U.S.C. § 706.  As set forth in Sections II and III

13   above, ED's regulation defining the term "highly qualified" teacher to include a teacher who is

14   currently participating in an alternative teacher preparation program is manifestly contrary to the

15   definition provided by Congress in the NCLB statute itself.  Thus, pursuant to the APA, the

16   reviewing court "shall hold unlawful and set aside" (5 U.S.C. § 706) ED's regulation.  *See*

17   *Natural Res. Def. Council v. EPA*, 966 F.2d 1292, 1297, 1304 (9th Cir. 1992)*; Citizens for Better*

18   *Forestry v. U.S. Dept. of Agric.*, 481 F. Supp. 2d 1059 (N.D. Cal. 2007); *Northwest Envtl.*

19   *Advocates v. EPA*, 2005 U.S. Dist. LEXIS 5373 (N.D. Cal. 2005).

20        Moreover, this Court has authority to grant injunctive relief that is nationwide in scope,

21   where, as here, a federal agency's misinterpretation of a federal statute has a nationwide effect.

22   In *Earth Island Institute v. Ruthenbeck*, 490 F.3d 687 (9th Cir. 2007), for example,

23   environmental organizations challenged United States Forest Service regulations that excluded

24   _____

25   [11] *See also Schneider v. Chertoff*, 450 F.3d 944 (9th Cir. 2006) (affirming declaratory and
     injunctive relief where the Department of Homeland Security issued regulations that were
26   inconsistent with, and *ultra vires* to, the Nursing Relief Act); *Brown v. Harris*, 491 F. Supp. 845,
     847-48 (N.D. Cal. 1980) (on summary judgment, enjoining Department of Housing and Urban
27   Development from "further enforcement and dissemination for purposes of enforcement" of
     Section 8 regulation where regulation permitted property owner to play a role in evictions,
28   "contrary to the clear and definite words of the statute").

21

from notice, comment, and administrative appeal any agency decision that does not require an environmental assessment or impact statement. The Ninth Circuit held that the regulations conflicted with the Appeals Reform Act, which does not provide for any exemptions or exclusions from the USFS's mandatory duty to provide notice, comment, and administrative appeal for decisions implementing Forest Plans, and affirmed the district court's nationwide injunction precluding any enforcement and implementation of the invalidated regulations. *Id.* at 697-699. In doing so, the court noted that the nationwide injunction was not discretionary, but rather was "compelled by the text of the Administrative Procedure Act." *Id.* at 699; *cf. Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987) (holding that Secretary of Labor's definition of "agricultural employment" conflicted with the Migrant and Seasonal Agricultural Workers Protection Act and affirming declaratory relief nationwide in scope).

While the relief Plaintiffs seek is necessarily nationwide in nature, it will not unduly disrupt the public school system or impose undue burdens on states, districts or schools. The Court's order should not displace any teachers presently under contract for the current school year. Moreover, it is unclear how, if at all, the Court's order would affect near-term hiring, given Defendants' current enforcement practices that only require states and districts to make "an adequate effort" toward the HQT goal and that thereby continue to permit the hiring of non-"highly qualified" teachers.[12] In addition to pressuring states and districts to make this "adequate effort," what the Court's order would achieve is precisely what Congress intended: (1) public

---

[12] Not a single state met the deadline for ensuring that all students are taught by a "highly qualified" teacher in their core classes by the end of the 2005-06 school year. Exh. 15 (Spellings Letter, July 23, 2007); 1st Am. Compl. at ¶ 51; Answer to 1st Am. Compl. at ¶ 51. In October 2005, Defendant Spellings, on a state-by-state basis, extended until the end of the 2006-07 school year the deadline by when all students were to be taught by a "highly qualified" teacher. Exh. 1 (Spellings Letter, Oct. 21, 2005). Due to a lack of current data, it is unclear whether any state met the 2006-07 extended deadline. Answer to 1st Am. Compl. at 54. In a public letter dated July 23, 2007, Secretary Spellings assured States that they would not be sanctioned for failing to meet the 100% "highly qualified teacher" 2006-07 deadline provided they make "an adequate effort" towards meeting the HQT goal. Exh. 15.

22

reporting of accurate data regarding the true numbers of "highly qualified" teachers, (2) a more equitable distribution of non-"highly qualified" teachers, including participants in alternative preparation programs, and (3) state and district plans for meeting the "highly qualified" teacher goal that are based on accurate data and definitions for "highly qualified" teachers.

## **<u>CONCLUSION</u>**

For all of the reasons stated above, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment in all respects.

Dated: January 18, 2008                    Respectfully submitted,

_____
JOHN T. AFFELDT

_____
TARA KINI
JENNY PEARLMAN
PUBLIC ADVOCATES, INC.
Attorneys for Plaintiffs

23