JOHN T. AFFELDT (SBN 154430)
JENNY PEARLMAN (SBN 224879)
TARA KINI (SBN 239093)
PUBLIC ADVOCATES, INC.
131 Steuart Street, Suite 300
San Francisco, California 94105
Tel. (415) 431-7430
Fax (415) 431-1048
Email: jaffeldt@publicadvocates.org
        jpearlman@publicadvocates.org
        tkini@publicadvocates.org

JEFFREY SIMES (NY SRN 2813533), appearing *pro hac vice*
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 813-8879
Fax: (212) 355-3333
Email: jsimes@goodwinprocter.com

Attorneys for PLAINTIFFS
(Additional attorneys listed on following page)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| SONYA RENEE *et al.*,<br><br>       Plaintiffs,<br><br>   v.<br><br>MARGARET SPELLINGS, in her official capacity;<br>UNITED STATES DEPARTMENT OF EDUCATION,<br><br>      Defendants. | Case No.  07-04299 PJH<br><br>**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT & REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT & EXHIBITS IN SUPPORT**<br><br><br>Time: 9:00<br>Date: April 23, 2008<br>Courtroom:  3, 17th Floor |

PATRICK THOMPSON (SBN 160804)
NICOLE E. PERROTON (SBN 233121)
ELIZABETH F. STONE (SBN 239285)
GOODWIN PROCTER LLP
101 California Street # 1850
San Francisco, California 94111
Tel: (415) 733-6000
Fax: (415) 677-9041
Email: pthompson@goodwinprocter.com

DAVID B. COOK (DC BN 113522), appearing *pro hac vice*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 346-4000
Fax: (202) 346-4444
Email: dcook@goodwinprocter.com

Attorneys for PLAINTIFFS

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................2

I.  DEFENDANTS' NEW POSITION THAT INTERNS HAVE "FULL STATE
    CERTIFICATION" CONFLICTS WITH THE PLAIN MEANING OF "FULL" IN
    NCLB, WITH ALL PRIOR POSITIONS TAKEN BY DEFENDANTS IN THE
    RECORD AND WITH CALIFORNIA CERTIFICATION LAW.........................................2

    A.  Defendants Seek to Write "Full" Out of NCLB's Certification Standard ..............2

    B.  Defendants Have Consistently Recognized that Alternate Route Participants
        Such as Interns Lack "Full State Certification" .......................................................5

    C.  California Certification Law Does Not Accord Interns Full Certification .............7

II. DEFENDANTS' RED HERRING STANDING ARGUMENT THAT 34 C.F.R. §
    200.56(a)(2)(i) ALSO DEFINES ALTERNATIVE ROUTE TEACHERS AS
    "HIGHLY QUALIFIED" DIRECTLY CONFLICTS WITH THE NCLB STATUTE,
    WITH § 200.56(a)(2)(i), AND WITH DEFENDANTS' INTERPRETATIONS OF §
    200.56(a)(2)(i) IN THE RECORD ......................................................................9

    A.  Defendants' New Reading of Subsection (a)(2)(i) Conflicts with NCLB and
        Qualifies So Many Credential Holders With "Full State Certification" as to
        Render the Provision Meaningless........................................................................10

    B.  As Supported by Defendants' Own Pre-Litigation Interpretation, the Only
        Plausible Reading of Subsection (a)(2)(i) is One that Accords "Full State
        Certification" *Only* to Teachers Who Have *Fully* Met the Certification
        Requirements Applicable to Their Years of Experience. .....................................11

    C.  34 C.F.R. § 200.56(a)(2)(i) is Best Understood as a Legitimate Attempt by
        Defendants to Determine if "Full State Certification" Should Be Accorded a
        Relative or an Absolute Meaning ........................................................................13

III. DEFENDANTS' REMAINING ARGUMENTS TO SAVE 34 C.F.R. § 200.56(a)(2)(ii)
     FAIL...........................................................................................................14

     A.  Defendants' New Narrow Reading of the "Waiver" Prohibition in NCLB
         Conflicts With Their Prior Definition of the Term As Set Forth in the Record ....14

i

B. Congress's Support for Alternative Route Programs Is Not Inconsistent with its Intent That All Students Have "Fully-Certified," "Highly-Qualified" Teachers ....................................................................................................15

IV. THE PLAINTIFFS HAVE STANDING. ...............................................................18

A. The Individual Plaintiffs Have Standing. ..................................................18

B. The Organizational Plaintiffs Have Standing ...........................................18

1. CFJ and CA ACORN Meet the Requirements for Article III Organizational Standing. ...............................................................18

2. CFJ and CA ACORN Meet the Requirements for Prudential Standing Because Their Organizational Interests in Improving Schools and Empowering Parents Directly Fall Within the Zone of Interests that NCLB Seeks to Protect ..................................................................19

C. Consideration of Extra-Record Evidence is Appropriate to Establish Plaintiffs' Standing and to Explain Technical Terms ...............................................21

V. PLAINTIFFS ARE ENTITLED TO NATIONWIDE RELIEF AND ALL THE RELIEF REQUESTED. ......................................................................................................22

A. Plaintiffs Are Entitled to Nationwide Relief Because the Defendants' Unlawful Regulation is Nationwide in Scope .........................................22

B. Plaintiffs Are Entitled to All the Injunctive Relief They Seek ...............24

CONCLUSION ...............................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

# TABLE OF AUTHORITIES

## Cases

*American Lands Alliance v. Norton,*
    No. 00-2339, 2004 U.S. Dist. LEXIS 27533 (D.D.C. June 2, 2004)........................................23

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,*
    515 U.S. 687 (1995)...............................................................................................................4

*Bautista-Perez v. Mukasey,*
    No. C 07-4192TEH, 2008 WL 314486 (N.D. Cal. Feb. 4, 2008).............................................24

*Bennett v. Spear,*
    520 U.S. 154 (1997)..............................................................................................................20

*Black & Decker Corp. v. Commissioner,*
    986 F.2d 60 (4th Cir. 1993) ...................................................................................................11

*Blue Cross and Blue Shield Ass'n v. Shalala,*
    No. 90-1528, 90-1356, 1996 WL 636131 (D.D.C. Aug. 27, 1996)..........................................22

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988)................................................................................................................2

*Califano v. Yamasaki,*
    442 U.S. 682, 99 S. Ct. 2545 (1979).....................................................................................23

*California Cosmetology Coalition v. Riley,*
    110 F.3d 1454 (9th Cir. 1997) ...............................................................................................22

*Ctr. for Biological Diversity v. Abraham,*
    218 F. Supp. 2d 1143 (N.D. Cal. 2002) ...........................................................................20, 21

*Ctr. for Biological Diversity v. Brennan,*
    No. C 06-7062 SBA, 2007 WL 2408901 (N.D. Cal. Aug. 21, 2007)........................................25

*Center for Law and Education v. Department of Education,*
    396 F. 3d 1152 (D.C. Cir. 2005) ...........................................................................................20

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..............................................................................................................22

*Citizens for Better Forestry v. U.S. Dept. of Agriculture,*
   No. C 05-1144 PJH, C 04-4512 PJH, 2007 WL 1970096 (N.D. Cal. July 31, 2007) ...............23

*Clarke v. Securities Industries Ass'n,*
   479 U.S. 388 (1987)......................................................................................................................20

*Demby v. Schweiker,*
   671 F.2d 507 (D.C.Cir. 1981) .........................................................................................................4

*Earth Island Inst. v. Ruthenbeck,*
   490 F.3d 687 (9th Cir. 2007), *cert. granted,* 128 S. Ct. 1118 (2008) ........................................22

*Evans v. Hartnett County Bd. of Educ.,*
   684 F.2d 304 (4th Cir. 1982) .......................................................................................................22

*Gorbach v. Reno,*
   219 F.3d 1087 (9th Cir. 2000) .....................................................................................................22

*Great Basin Mine Watch v.Hankins,*
   456 F.3d 955 (9th Cir. 2006) .......................................................................................................21

*Harmon v. Thornburgh,*
   878 F.2d 484 (D.C. Cir. 1989) .....................................................................................................24

*Hart v. McLucas,*
   535 F.2d 516 (9th Cir. 1976) .......................................................................................................11

*Heartwood, Inc. v. U.S. Forest Service,*
   73 F.Supp.2d 962 (D.S. Ill. 1999), *aff'd* 230 F.3d 947 (7th Cir. 2000) ......................................23

*INS v. Legalization Asst. Proj. of L.A. County Fed. of Labor,*
   510 U.S. 1301 (1993)....................................................................................................................20

*Int'l Bhd. of Teamsters v. Daniel,*
   439 U.S. 551 (1979)........................................................................................................................2

*Karuk Tribe of Cal. v. United States Forest Serv.,*
   379 F. Supp. 2d 1071 (N.D. Cal. 2005) .......................................................................................21

*La Vallee Northside Civic Assoc. v. Virgin Islands Coastal Zone Mgmt. Comm'n,*
   866 F.2d 616 (3d Cir. 1989).........................................................................................................11

*Meyer v. Brown & Root Constr. Co.,*
   661 F.2d 369 (5th Cir. 1981) .......................................................................................................22

iv

*Miles v. Apex*,
  498 U.S. 19 (1970)..................................................................................................3

*Mizrahi v. Gonzales*,
  492 F.3d 156 (2d Cir. 2007)...................................................................................18

*Nat'l Credit Union Admin. V. First Nat. Bank & Trust Co.*,
  522 U.S. 479 (1998)..........................................................................................19, 20

*Nat'l Mining Assn. v. U.S. Army Corps of Engineers*,
  145 F.3d 1399 (D.D.C. 1998) ................................................................................23

*Northwest Envtl. Advocates v. EPA*,
  NO. C 03-05760 SI, 2005 WL 756614 (N.D. Cal. Mar. 30, 2005) ...........................22

*Northwest Envtl. Defense Ctr. v. Bonneville Power Admin.*,
  117 F.3d 1520 (9th Cir. 1997) ...............................................................................21

*Northwest Envtl. Defense Ctr. v. Bonneville Power Admin.*,
  477 F.3d 668 (9th Cir. 2007) .................................................................................24

*Norton v. Southern Utah Wildlife Alliance*,
  542 U.S. 55 (2004)................................................................................................24

*Sierra Club v. Clark*,
  755 F.2d 608 (8th Cir. 1985) ...................................................................................4

*Sierra Club v. Morton*,
  405 U.S. 727 (1972)..............................................................................................19

*Sierra Pacific Indus. v. Lyng*,
  866 F.2d 1099 (9th Cir. 1989) ...............................................................................24

*Smith v. Pacific Properties and Development Corp.*,
  358 F.3d 1097 (9th Cir. 2004) ...............................................................................19

*Southwest Ctr. for Biological Diversity v. U.S. Forest Service*,
  100 F.3d 1443 (9th Cir. 1996) ...............................................................................21

*Trustees for Alaska v. Hodel*,
  806 F.2d 1378 (9th Cir. 1986) ...............................................................................25

v

*TRW Inc. v. Andrews*,
      534 U.S. 19 (2001)..................................................................................................13

*Ventana Wilderness Alliance v. Bradford*,
      2007 U.S. Dist. LEXIS 48366 (N.D. Cal. 2007) ....................................................21

**Federal Statutes**

5 U.S.C. §§ 706(1)-(2) ..................................................................................................x

20 U.S.C. § 6301 ........................................................................................................20

20 U.S.C. § 6311(h) ....................................................................................................21

20 U.S.C. § 6613 ........................................................................................................16

20 U.S.C. § 6623 ........................................................................................................16

20 U.S.C. § 6681 ........................................................................................................17

20 U.S.C. § 7801(23)(A)....................................................................................... *passim*

**Federal Regulations**

34 C.F.R. § 200.56. .............................................................................................. *passim*

34 C.F.R. § 230.1. ......................................................................................................16

Higher Education Act of 1965, P.L. 105-244, Sec. 207(a)............................................15

**Other Federal Authorities**

Conf. Rep. No. 107-334 to accompany H.R. 1 (Dec. 12, 2001) ......................................4

67 Fed. Reg. 71764-71765 (Dec. 2, 2002)....................................................................5

Fed. R. Civ. P. 56(c)..................................................................................................22

H.R. Rep. No. 107-63 (May 14, 2001) ..........................................................................4

H.R. 1, 107th Cong. (1st Sess. 2001) (May 23, 2001)....................................................4

S. Rep. No. 107-7 (June 14, 2001)................................................................................4

vi

## California Statutes and Regulations

CAL. CODE REGS. tit. 5, § 13025(i) ...................................................................................9

CAL. CODE REGS. tit. 5, § 80413 ...............................................................................8, 9

CAL. EDUC. CODE § 44225.7 .........................................................................................9

CAL. EDUC. CODE § 44251 ........................................................................................8, 9

CAL. EDUC. CODE § 44259 ........................................................................................7, 8

CAL. EDUC. CODE § 44274.2 ..........................................................................................8

CAL. EDUC. CODE § 44325 .............................................................................................8

CAL. EDUC. CODE § 44455 .............................................................................................8

CAL. EDUC. CODE § 44463 .............................................................................................8

## Other Authorities

*Dictionary.com Unabridged (v 1.1).* Random House, Inc., *available at*
http://dictionary.reference.com/browse/full (last visited Mar. 6, 2008) ............................3

CTC Leaflet No. CL-709, "District Intern Credential," *available at*
http://www.ctc.ca.gov/credentials/leaflets/cl709.pdf (last visited 3/6/08)........................8

CTC, *Standards for Quality and Effectiveness for Teacher Preparation Programs for Preliminary Multiple Subject and Single Subject Teaching Credentials* (March 2007), *available at* http://www.ctc.ca.gov/educator-prep/standards/AdoptedPreparationStandards.pdf (last visited 3/6/08) ...................................................................................................................7

PLTS. CONSOLIDATED MPA IN OPPOSITION TO DEFS. CROSS-MOTION FOR SUMMARY JUDGMENT & REPLY IN
SUPPORT OF PLTS. MOTION FOR SUMMARY JUDGMENT & EXHIBITS IN SUPPORT (CASE NO. 07-04299 PJH)

1

## **INTRODUCTION**

When Congress passed the No Child Left Behind Act in 2001 ("NCLB" or "the Act"), it made a promise to all students—but especially poor and minority students—that they would be taught by fully-certified, "highly qualified" teachers.  Defendants' regulation reneges on that promise by forever classifying teachers as "highly qualified" who—in the words of the regulation itself—are still "progress[ing] toward full certification" but who have not yet obtained it.  Defendants thereby currently allow over 100,000 classrooms nationally to be filled with teachers still learning to teach in alternate route certification programs who are classified as if they were the most fully prepared and experienced of teachers.  And Defendants have propagated this charade—in direct contravention of NCLB's mandates for transparency and equitable distribution of qualified teachers—disproportionately on low-income, students of color.

Congress built an unambiguous, prescriptive definition of the term "highly qualified" teacher into the Act itself and created numerous overlapping accountability provisions to ensure that states, districts, and schools would keep moving toward the promise of a fully prepared teacher for all students.  While deferring to states to set their own level of full certification, Congress clearly intended that children receive instruction from teachers who have obtained what each *state* considers its most complete preparation.  And, in fact, as the well-known national standards regularly employed by Defendants (or "ED") indicate, states typically do as California has done:  accord full state certification *only* to those who have completed their pedagogical training in teacher preparation programs—whether by traditional or alternative route—and not to teachers still *participating* in those programs.

Though allowing *states* some deference to modify their definition of full certification, Congress nowhere authorized *Defendants* to create any exceptions to the unambiguous standard, and nowhere do Defendants muster the argument it did.  Instead, ED defends its regulatory exception for alternate route teachers as a response to a manufactured ambiguity that clearly does not exist.  The fact that Congress has funded some alternate route programs to assist some high need schools in attracting and retaining future "highly qualified" graduates is entirely consistent with NCLB's statutory scheme and in no way compels Defendants' regulatory fiat.

1

1     In response to this litigation, Defendants opportunistically posit for the first time a series

2  of new interpretations of the Act that fly in the face of a long record of their past interpretations

3  of NCLB—the latter of which consistently align with Plaintiffs' positions.  Defendants' tactics

4  are nothing less than misleading litigation maneuvering that disserve this Court.  On key

5  questions of  (1) the meaning of the term "full state certification," (2) what it means under NCLB

6  to have certification requirements "waived," (3) whether 34 C.F.R. § 200.56(a)(2)(i) is an

7  additional mechanism under which alternative route teachers may be considered to have "full

8  state certification," (4) the meaning of a parenthetical in the statute mentioning alternate route

9  teachers, and (5) whether an automatic violation of NCLB occurs if a state or district has not met

10 the 100% "highly qualified" teacher requirement, Defendants offer answers that repeatedly

11 conflict with their own positions in the record.  This Court owes no deference to Defendants'

12 "*post hoc* litigating position, adopted by counsel for [the agency]" (*Bowen v. Georgetown Univ.

13 Hosp.*, 488 U.S. 204, 212-213 (1988)), particularly where this position "is flatly contradicted by

14 [the agency's] past actions" (*Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 565-568 (1979)).

15     Defendants' additional arguments that Plaintiffs lack standing to sue and that Plaintiffs

16 are not entitled to nationwide and affirmative relief have been soundly rejected by precedents in

17 this Court and in the Ninth Circuit and should be rejected here.

18     The irony of this case about a law that is premised on accountability is that, as to

19 implementing the Act's central teacher quality provision, the entity most in need of

20 accountability is ED itself.  Because Defendants' regulation conflicts with the unambiguous,

21 plain language of NCLB, with its legislative history, its statutory framework, and Defendants'

22 own interpretations of the Act, Plaintiffs request that this Court void the regulation as violative of

23 the Administrative Procedure Act and enjoin its further use in California and nationwide.

## **ARGUMENT**

I.   **DEFENDANTS' NEW POSITION THAT INTERNS HAVE "FULL STATE CERTIFICATION" CONFLICTS WITH THE PLAIN MEANING OF "FULL" IN NCLB, WITH ALL PRIOR POSITIONS TAKEN BY DEFENDANTS IN THE RECORD AND WITH CALIFORNIA CERTIFICATION LAW.**

### **A.  Defendants Seek to Write "Full" Out of NCLB's Certification Standard.**

2

1         Defendants contend in their Opposition that interns in California (and, by implication,

2 alternate route teachers nationally) can qualify for the "full state certification" that Congress

3 required for "highly qualified" teachers because "nothing in [20 U.S.C.] section 7801(23)(A) sets

4 forth any specific, measurable standard that could be applied unambiguously to find the

5 preliminary credential to be full certification while the intern credential, which is obtained

6 through alternative route programs…, is not.".  Defs. Opp. at 11:3-13; 18:16-20; 19:2-4.

7 Defendants' argument, however, would write the critical word "full" out of the statute.  Congress

8 did not say that a "highly qualified" teacher is any one who has obtained merely *some* type of

9 state certification to be a classroom teacher.  Congress mandated "*full* state certification."

10 Contrary to Defendants' newfound position, the term "full" is a robust standard with a plain,

11 commonly understood and unambiguous meaning:  "(1) completely filled; containing all that can

12 be held; filled to the utmost capacity…(2) complete; entire; maximum…."[1]  Plaintiffs agree that

13 Congress did not itself seek to fill out the phrase "full state certification" but rather chose to rely

14 on the states' certification standards which it knew to be in effect.[2]  The fact that Congress built

15 into the "highly qualified" standard a reference to state credentialing regimes hardly renders

16 section 7801(23)(A) standardless:  Congress clearly intended that each child receive instruction

17 from teachers who have received what his or her state has determined to be its fullest, most

18 complete level of preparation.

19         The legislative history confirms as much.  Both H.R. 1 (the House version which

20 eventually was signed into law as the NCLB Act) and S. 1 (the parallel Senate version that

21 supplied key provisions to the final Act) contained a heightened standard for teachers by

22 requiring that teachers who are "fully qualified" (the House's term) or "highly qualified" (the

23 Senate's term) have state certification.  H.R. 1 (introduced March 22, 2001) (defining "fully

24 qualified" to mean "the teacher has obtained State certification"); S. 1 (introduced March 28,

25 2001) (defining "highly qualified" to mean the teacher "is certified or licensed by the State

---

[1] *Dictionary.com Unabridged (v 1.1)*. Random House, Inc., *available at* http://dictionary.reference.com/browse/full (last visited Mar. 6, 2008).

[2] *See Miles v. Apex Marine*, 498 U.S. 19, 32 (1970) ("We assume that Congress is aware of existing law when it passes legislation.").

3

1    involved").[3]  When the Conference Committee came together to hammer out the final legislation,

2    they adopted the Senate's term "highly qualified" and clarified their intent behind the definition

3    of this term in two ways:  by inserting the word "full" before "state certification" and adding the

4    provision excluding individuals who have had regular certification requirements waived on an

5    emergency, temporary, or provisional basis from "highly qualified" teacher status.  CONF. REP.

6    NO. 107-334 to accompany H.R. 1 (Dec. 12, 2001).

7         Contrary to Defendants' suggestion, Defs. Opp. 24:12-17, because "a conference report

8    represents the final statement of terms agreed to by both houses, next to the statute itself it is the

9    most persuasive evidence of congressional intent."  *Demby v. Schweiker*, 671 F.2d 507, 510

10   (D.C.Cir. 1981); *accord Sierra Club v. Clark*, 755 F.2d 608, 615 (8th Cir. 1985).  A court should

11   accord this type of legislative history great weight.  *Id.*  The fact that the Conference Committee

12   made its two amendments without debate—a point which Defendants use to disregard this

13   important legislative history entirely (Defs. Opp. 24:13-17)—only serves to highlight that it was

14   an uncontroversial clarification of the "highly qualified" teacher definition, made to ensure that

15   Congress' intent would be clear.  Indeed, the Supreme Court has concluded that a lack of debate

16   should not lead a court to disregard the actions of a Conference Committee.  *Babbitt v. Sweet*

17   *Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995).  Rather, "an obviously

18   broad word that the [Committee] went out of its way to add to an important statutory

19   definition"—such as the word "full" here added to the "highly qualified" definition—"is

20   precisely the sort of provision that deserves a respectful reading."  *Id.* at ?[4]

21
22
23
24
25
26
27
28

---

[3] *See also* H.R. Rep. No. 107-63, at 223-224 (May 14, 2001), H.R. 1, 107th Cong., at 921-922 (1st Sess. 2001) (May 23, 2001) and S. Rep. No. 107-7, at 283-284 (June 14, 2001) (later drafts of these bills maintaining, in pertinent part, their respective definitions pre-Conference Committee).

[4] Note, it is not safe to infer that the original bills without "full" intended a lesser standard.  Not uncommonly, lay people assume that teacher certification and licensure is similar to legal licensure, that is, they believe that one is either fully licensed or not at all.  A lawyer cannot practice until fully completing all licensing requirements, but after receiving a license, can practice any kind of law anywhere in that state.  Credentialing of public school teachers operates very differently.  As is evident from this case, teacher certification has many different degrees of certification which restrict a teacher's authorization in different manners, *e.g.,* temporally, geographically, or by subject matter and/or grade level.  *See, e.g.,* Exh. 17.  One feature of this complicated system is that teachers with sub-standard certifications like emergency permits or

4

1

2

**B.  Defendants Have Consistently Recognized that Alternate Route Participants Such As Interns Lack "Full State Certification."**

3

Defendants' Opposition takes the tenuous position that Congress established the "full

4

state certification" standard without having any sense of what they had mandated, leaving

5

Defendants to fill in a wide-open void.  In fact, the record consistently demonstrates that (1) state

6

certification standards are well-known, (2) there exists a common understanding—shared by

7

Defendants—of the term "full certification" as signifying *completion* of a teacher preparation

8

program and, therefore, (3) candidates still *participating* in alternate routes lack full certification.

9

The best indication that Defendants have always understood that interns in California and

10

alternate route teachers as a general proposition do not have full state certification is *the*

11

*challenged regulation itself.*  The regulation concedes that teachers "participating in alternative

12

route[s]" are only making "progress toward full certification" as prescribed by the various state

13

standards.  34 C.F.R. § 200.56.(a)(2)(ii)(A)(4).[5]

14

Time and again, Defendants' pre-litigation discussions of "full state certification" and

15

alternate route teachers in the Administrative Record and in their guidance echo this conclusion.

16

When comments criticized Defendants for labeling alternate route teachers as "highly qualified,"

17

they responded:  "we do not believe that Congress intended that teachers in alternative route

18

programs would be unable to teach *until they had obtained full State certification,*" (67 Fed. Reg.

19

71764-71765 (Dec. 2, 2002); AR 99) (emphasis added).  As such, Defendants then reasoned,

20

they felt compelled to create "one exception" to the requirements of full state certification and no

21

provisional certification.  *Id*. at AR 99-100.  Thus prior to this case, Defendants have always

22

long-term substitutes are commonly referred to as "uncertified" when, in fact, technically

23

speaking, they are "certified" to teach, just at a low level and bearing various restrictions.

24

Indeed, the record reflects Senate and House Education committee members and staff referring critically to alternate route teachers as "uncertified," which technically is not correct.  AR 110,

25

136.  Whatever the precise original intent of H.R. 1 and S. 1 in merely requiring high quality

26

teachers to have "state certification," it is clear that the Conference Committee amendments were intended to preclude this potential confusion going forward.

27

[5] *See also* Defendants' Draft Guidance (June 6, 2002) at AR 478 Response to Question C-3 (where, at the time shortly before Defendants' initial proposed regulation, Defendants also

28

describe alternate route teachers as "making…progress toward full certification") and *also id.*

Response to Question C-2 (where Defendants did not include alternate route teachers within the definition of "full state certification" but left them for separate treatment under Question C-3).

5

1  acknowledged that alternate route teachers do not fall within the meaning of NCLB's "full state

2  certification" phrase, but rather exist as an exception outside of it.

3      As reflected in the 2002 Secretary's Annual Report on Teacher Quality, *Meeting the*

4  *Highly Qualified Teachers Challenge*, Defendants themselves direct states to utilize certification

5  standards from the National Association of State Directors of Teacher Education and

6  Certification (NASDTEC) as guidance for certain teacher quality reporting to the Secretary.  AR

7  437.  As set forth in these standards, Defendants understand there to be a "level one [of] (initial)

8  certificates" that "are issued to applicants who have *completed* an approved program (*i.e.,* met

9  state educational requirements) but who have not yet completed ancillary requirements" and "a

10  level two certificate" issued after the ancillary requirements have been met.  AR 437 (emphasis

11  added).  This description perfectly captures the "preliminary" and "professional clear"

12  credentials in California.  The preliminary credential is issued after an individual has completed

13  his or her teacher preparation program (whether by traditional or alternate route) but must still

14  fulfill additional ancillary requirements of two years of successful teaching and an "induction"

15  program before receiving the final professional clear credential.  *See* Exh. 17 (summary chart of

16  California's main teaching credentials).  Tellingly, Defendants describe the level one certificate

17  as "a *full* initial…license or certificate."  *Id*. (emphasis added).  As further reflected in the

18  NASDTEC standards endorsed by Defendants, "[t]ypically, states place teachers who have *not*

19  *completed all of their pedagogy courses* or passed all required assessments on emergency or

20  *temporary* licenses," *id*. (emphases added), and that those teaching on emergency, temporary, or

21  provisional licenses are "not on a full initial or higher license or certificate."  *Id*.[6]

22      These same understandings that alternate route teachers lack full certification appear

23  repeatedly in the guidance manuals Defendants issued to states and districts on implementing

---

[6] Of course, if a state chooses to step outside this norm and offer its fullest, most complete level
of certification to those in possession of a B.A., subject matter competence, and mere
participation in an alternate route program, it is free to do so.  Congress, however, in leaving that
decision to the states was explicitly giving the authority to modify the "full *state* certification"
standard to states, not Defendants.

NCLB.[7]  For example, the manual from September 2003 states that "[t]eachers *who are not yet fully certified but participate in an alternative route to certification program* may be considered to meet the certification requirements of the definition of a highly qualified teacher if they [fulfill the requirements of the challenged regulation, 34 C.F.R. § 200.56(a)(2)(ii)]."  Exh. 20 at Response C-7 (emphasis added).  In discussing how states might create an additional route to full state certification by permitting individuals to pass a state teacher licensing exam (*see* 20 U.S.C. § 7801(23)(A)(i)), Defendants acknowledge that "[s]uch non-traditional approaches to full State certification are different from alternative route to certification programs. . .because, *in the former, the candidate is fully certified before he or she starts teaching*."  Exh. 20 at Response C-6 (emphasis added).  By extension, then, Defendants consider candidates in alternative routes as not fully certified before they start teaching.

As demonstrated by Defendants' own understanding of state certification and their own interpretation of NCLB, alternate route *participants* are, by definition, still in the process of completing the pedagogical training program needed to obtain an initial full certification.[8]

### C.  California Certification Law Does Not Accord Interns Full Certification.

In California, for a brand new teacher with no experience, there is no more "full" credential than a "preliminary."  It represents the fact that the holder has completed all preparation requirements established by the State for new teachers.  Although there are additional "ancillary" requirements for a new teacher to yet fulfill (like two years of successful teaching, a mentoring program, an advanced course in health, etc.), *see* Exh. 17, there is no

---

[7] In addition to the Administrative Record, Defendants produced four sets of guidance manuals for states and districts implementing NCLB's teacher quality provisions (dated December 2002, September 2003, January 2004, and August 2005).  All of these manuals, *inter alia*, explain the technical terms of "full state certification" and "highly qualified" alternate route teachers with minor variations not pertinent here.

[8] Among other things, such teachers have not completed training in how to teach their subject matter/grade level, design curricula, manage a classroom, meet the needs of English learners and special education students, and the host of other teacher preparation standards that are required to obtain a preliminary credential in California.  *See* CAL. EDUC. CODE § 44259; *see also* CTC, *Standards for Quality and Effectiveness for Teacher Preparation Programs for Preliminary Multiple Subject and Single Subject Teaching Credentials* (March 2007), *available at* http://www.ctc.ca.gov/educator-prep/standards/AdoptedPreparationStandards.pdf (last visited Mar. 6, 2008).

higher level credential that a new teacher can obtain.  On the other hand, when interns complete their internship program, they earn the preliminary credential.[9]  For those who have completed the additional ancillary requirements of the preliminary, there is no more complete credential than a "professional clear."  *See* Exh. 17.

Rather than acknowledge their consistent history of categorizing alternate route participants (such as those in intern programs) as less than fully-certified, Defendants' Opposition disingenuously suggests that interns are as fully certified as preliminary or professional clear credential holders under California law.  Defs. Opp. 9:20-26; 11:3-13; 18:10-15.  For the reasons already stated, the Court can disregard this argument.  Yet, Plaintiffs feel compelled to point out as well the fallacy of Defendants' assertion that "[n]o…limitation is placed on the hiring of teachers with an internship…credential."  Defs. Opp. 9:21-22.

In fact, intern credentials are highly restricted, in several key respects.  The intern credential—whether for a university or a district-based program—is restricted not only in time (to two years) (*see* CAL. EDUC. CODE §§ 44251, 44325, 44455) but, critically as well, in geographic scope.  *Interns are limited to service in the single school district named on their credential* (*see* CAL. EDUC. CODE §§ 44325, 44463).  On the face of every intern credential is written "Employment Restriction(s)," followed by the name of the school district where the intern is authorized to teach.  *See, e.g.*, Renee Decl., Exh. 1.  In contrast, preliminary and professional clear credential holders have no restrictions on their credentials, *see, e.g.,* Rubio Decl., Exh. 2; they may choose to work in any district in California teaching the grade level/subject authorized on their credential for a period of five years (renewable for professional clear credential holders).  *See* CAL. EDUC. CODE §§ 44259, 44274.2; CAL. CODE REGS. tit. 5, §

---

[9] Defendants err in stating that interns can obtain a professional clear credential upon completion of the internship program (Defs. Opp. 9:5-7).  Although authorized by statute in theory, the California Commission on Teacher Credential ("CTC") no longer issues a professional clear credential until the intern has first obtained the preliminary, taught successfully for two years, and completed an approved teacher induction (*i.e.,* mentoring and support) program.  *See, e.g.*, CTC Leaflet No. CL-709, "District Intern Credential," *available at* http://www.ctc.ca.gov/credentials/leaflets/cl709.pdf (last visited Mar. 6, 2008).

80413).[10]  And, in fact, California itself considers only individuals holding a preliminary or professional clear credential to have full certification.  Interns are considered still to "need additional course work and training to meet state certification requirements for the standard teaching credentials." CAL. CODE REGS. tit. 5, § 13025(i); *see also* CAL. EDUC. CODE §§ 44225.7 (interns are not considered "fully prepared;" only teachers who have completed traditional or alternative teacher preparation programs are).[11]  Defendants' assertion that intern teachers have "full certification" under California law is simply incorrect.

## II.    DEFENDANTS' RED HERRING STANDING ARGUMENT THAT 34 C.F.R. § 200.56(a)(2)(i) ALSO DEFINES ALTERNATIVE ROUTE TEACHERS AS "HIGHLY QUALIFIED" DIRECTLY CONFLICTS WITH THE NCLB STATUTE, WITH § 200.56(a)(2)(ii), AND WITH DEFENDANTS' INTERPRETATIONS OF § 200.56(a)(2)(i) IN THE RECORD.

Defendants assert that even if the Court invalidated 34 C.F.R. § 200.56(a)(2)(ii), alternative route teachers would still qualify as having "full state certification" and as "highly qualified" under 34 C.F.R. § 200.56(a)(2)(i).  Thus, they argue, Plaintiffs lack standing for failure to demonstrate causation and redressability.  Defs. Opp. 1:26-2:2; 11:13-27.  This radically broad reading of sub-section (a)(2)(i), which would accord "full state certification" not only to interns but to substitutes, emergency-credentialed teachers and essentially every other substandard credential holder as well, has emerged from Defendants for the first time in their Opposition brief.  As yet another litigation position developed after the rulemaking itself, it need be accorded no weight by this Court.  More fundamentally, Defendants' new reading conflicts with the NCLB statute, with Defendants' own interpretation of the provision in the Administrative Record, and with Defendants' regulatory scheme read as a whole.  Defendants' red herring standing argument should be entirely disregarded.

---

[10] Permanent Life credentials have not been awarded in California since 1985.  *See* CAL. EDUC. CODE § 44251.  As such, the five-year duration of the validity of preliminary and professional clear credentials is the *maximum* duration of any credential currently issued in the state.  All of the other teaching credentials, which are valid for only one or two years, can legitimately be considered "temporary" by comparison.  *See* Exh. 17.

[11] The California Department of Education's online database also reflects this widespread understanding that interns do not yet have "full" state certification.  *See, e.g.*, Exh. 2(a) (submitted with Plaintiffs' Opening Brief) (listing the types of credentials a teacher may hold as: full, district intern, university intern, preintern, waiver, emergency.

A.    **Defendants' New Reading of Subsection (a)(2)(i) Conflicts with NCLB and Qualifies So Many Credential Holders With "Full State Certification" as to Render the Provision Meaningless.**

The provision at issue states that a teacher meets the requirement of "full state certification" if the teacher "[h]as fulfilled the State's certification and licensure requirements applicable to the years of experience the teacher possesses." 34 C.F.R. § 200.56(a)(2)(i). Defendants assert that interns in California, and by implication, alternate route teachers generally, "may be considered to have full state certification to teach" under this provision. Defs. Opp. 1:26-27; *see also id.* 11:13-16. Defendants erroneously contend that the provision awards "full state certification" status to anyone who has met *any* state certification requirement to teach, appropriate for their years of experience. Defs. Opp. 11:15-16. From this flawed premise, Defendants' shaky logic asserts that, because interns have been authorized by the state to serve as classroom teachers and because interns can have as little as zero years of experience, they qualify for "full state certification" under § 200.56(a)(2)(i).

The fatal flaw in Defendants' post-litigation logic is that this subsection does not—nor could it without directly contradicting NCLB—award "full state certification" status to just *anyone* who has fulfilled just *any* certification requirement authorizing them to teach a classroom. For all the reasons set forth in Section I., *supra*, interns and other sub-standard credentials do not meet the test of full certification. Instead, as will be discussed in greater detail below in Section II.B., the subsection obviously can only award "full state certification" status to teachers who have fulfilled the "full" or most complete set of preparation requirements applicable to a given teacher's years of experience. For brand new teachers, that would mean a preliminary credential in California; for veteran teachers with greater than five years of experience, that would mean a professional clear credential.

Defendants' expansive reading would equally permit essentially all sub-standard credential holders to qualify for "full state certification" under § 200.56(a)(2)(i). In other words, if one accepts Defendants' reading, there would be no principled basis in the language of the subsection itself to avoid according "full state certification" to sub-standard credential holders with even less preparation than interns. Substitute teachers and teachers on emergency permits,

10

provisional intern permits or short term staff permits similarly authorize the holder to serve as the primary classroom teacher and all similarly can be awarded to teachers with no experience. *See* Exh. 17.

"Regulations, like statutes, are interpreted according to canons of construction. Chief among these canons is the mandate that 'constructions which render regulatory provisions superfluous are to be avoided.'" *Black & Decker Corp. v. Commissioner*, 986 F.2d 60, 65 (4th Cir. 1993) (citing *Hart v. McLucas,* 535 F.2d 516, 519 (9th Cir. 1976)). Even worse are constructions of regulations that render *statutory* provisions superfluous. To read 34 C.F.R. § 200.56(a)(2)(i), as Defendants do, to accord "full state certification" status to all comers effectively renders the statute's "full state certification" provision without meaning or purpose.

**B. As Supported by Defendants' Own Pre-Litigation Interpretation, the Only Plausible Reading of Subsection (a)(2)(i) is One that Accords "Full State Certification" *Only* to Teachers Who Have *Fully* Met the Certification Requirements Applicable to Their Years of Experience.**

*All* of Defendants' prior guidance on the definition of "full state certification" supports Plaintiffs' reading of § 200.56(a)(2)(i), not Defendants'. Plaintiffs do not believe that Defendants ever previously informed states and districts that they can use 34 C.F.R. § 200.56(a)(2)(i) to qualify alternate route candidates as having "full state certification" and as "highly qualified." Obviously, if Defendants' new reading were in operation, the Court could also strike it down for the same reasons it should strike down § 200.56(a)(2)(ii)—the irreconcilable conflict created when the regulations accord the "full state certification" demanded by the statute to alternate route candidates who are only making progress toward full state certification.[12]

It is not necessary, however, for the Court to strike down § 200.56(a)(2)(i) for, before that could happen, the Court must first determine whether the provision can be saved by a reading that would harmonize it with the statute. *See La Vallee Northside Civic Assoc. v. Virgin Islands Coastal Zone Mgmt. Comm'n,* 866 F.2d 616, 623 (3d Cir. 1989) (regulations must be construed

---

[12] *See* First Amended Complaint at Relief ¶7 (pleading for such other relief as the Court may deem just and proper).

to avoid conflict with a statute if fairly possible). In fact, the only plausible reading of the subsection that avoids a conflict with the statute's call for "full state certification" is one that reads the verb "has fulfilled" in reference to "the State's certification and licensure requirements applicable to the years of experience the teacher possesses" to mean "fully satisfied," *i.e.*, "satisfied completely" the certification requirements that apply to a teacher with a given number of years of experience. As noted above, there are many different types of teaching authorizations one could obtain with no prior years of experience, but the only certification in California which represents that an individual has met all the preparation requirements that a first year teacher could meet is the preliminary credential.

In stark contrast to Defendants' *post hoc* litigating position, Defendants' pre-litigation guidance to states as set forth in the Administrative Record—as well as subsequent guidance issued to states—perfectly aligns with this reading of subsection (a)(2)(i). In the Draft Guidance issued by Defendants on June 6, 2002 Defendants state, in pertinent part:

> C-2….What is meant by "full State certification?"
> In the context of the definition of a highly qualified teacher, "full State certification" means that the teacher has *fully* met those State requirements that apply to the years of experience the teacher possesses. For example, these requirements may vary for first year teachers and veteran teachers….

AR 478 (emphasis added); *accord* Exh. 20 at Response C-6. As reflected in Defendants' discussion of state certification in the 2002 Secretary's Annual Report on Teacher Quality (which was issued the same month as the Draft Guidance here), Defendants understand that fully meeting State requirements for first year teachers aligns with NASDTEC's "level one" certification standard reflecting completion of the pedagogical preparation program—akin to the preliminary credential in California—and that "level two" certification—which is akin to a professional clear credential in California—represents full completion of certification requirements for veterans. *See* Section I.B., *supra;* AR 437.

What is more, for Defendants to assert that interns can qualify for "full state certification" status without need to rely on the challenged provision in 34 C.F.R. § 200.56(a)(2)(ii) is implausible for the additional reason that it would impermissibly render subsection (a)(2)(ii)

completely superfluous.  If the first subsection were as all-encompassing as Defendants contend, there would be no need for the second.  *See TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001)

In fact, as made clear by Section I., *supra,* the entire *raison d'etre* for subsection (a)(2)(ii) is to qualify alternative route teachers as "highly qualified," a status they would not otherwise enjoy absent the provision.  Defendants' Opposition inadvertently acknowledges the same point in stating that, without the additional substantive requirements of subsection (a)(2)(ii), alternate route programs "might appear to, in effect, impermissibly permit 'certification or licensure requirements waived on an emergency, temporary, or provisional basis.'"  Defs. Opp. 23:23-25, citing 20 U.S.C. § 7801(23)(A)(ii)[*sic*].  In sum, there is no plausible basis to conclude that 34 C.F.R. § 200.56(a)(2)(i) also accords "full state certification" and "highly qualified" status to interns in California and to alternate route program participants generally.

### C. 34 C.F.R. § 200.56(a)(2)(i) is Best Understood as a Legitimate Attempt by Defendants to Determine if "Full State Certification" Should Be Accorded a Relative or an Absolute Meaning.

Defendants' Opposition queries:  "If 'full' literally meant 'complete,' even California teachers with the initial five-year preliminary credential might also not be considered 'highly qualified,' as they must still fulfill certain prescribed requirements to obtain the lifetime credential."  Defs. Opp. 19:8-10.  Defendants raise a legitimate question, but they seem to have forgotten they answered it by promulgating subsection (a)(2)(i).  Congress left open Defendants' question—and only this question—in requiring "highly qualified" teachers to have "full state certification."  In other words, does "full certification" mean relative to one's years of experience or is it an absolute standard that means the fullest, most complete teaching credential a state offers?  If the relative standard, then individuals like preliminary credential holders qualify for "full state certification;" such individuals have completed all training requirements for the preliminary and can achieve no higher level credential as a new teacher.  If the answer is the absolute standard, then *only* those teachers who have completed all possible training and obtained the state's most complete credential—like California's professional clear credential and the "level two" credentials offered in other states (*see* Section I.B., *supra*)—qualify for "full state certification."

13

Defendants chose to fill in the policy gap and answer this question by according "full state certification" status to those with "full initial certification" (*see* AR 437), like preliminary credential holders, through subsection (a)(2)(i).  Whether that decision was legally correct is a topic on which neither Plaintiffs nor the Court need express an opinion as the question is not the subject of this litigation.

Accordingly, if the Court properly reads subsection (a)(2)(i) to encompass only those who have completed the full certification requirements for teachers relative to their years of experience and strikes subsection (a)(2)(ii) as Plaintiffs seek, Plaintiffs' standing should be beyond question.  This case will fully redress Plaintiffs' injuries as alternate route teachers will no longer lawfully qualify as "highly qualified."

## III.    DEFENDANTS' REMAINING ARGUMENTS TO SAVE 34 C.F.R. § 200.56(a)(2)(ii) FAIL.

### A.    Defendants' New Narrow Reading of the "Waiver" Prohibition in NCLB Conflicts With Their Prior Definition of the Term As Set Forth in the Record.

The provision in NCLB excluding from "highly qualified" teacher ("HQT") status any teacher who has had "certification or licensure requirements waived on an emergency, temporary, or provisional basis" (20 U.S.C. § 7801(23)(A)(ii)) provides an independent basis—in addition to the question of "full state certification"—for disqualifying alternate route teachers as "highly qualified."  Pltfs. Op. Br. 14:1-28.  In yet one more example of a new litigation position that conflicts with their prior record, Defendants seek to limit the concept of what it means to have certification requirements "waived" under NCLB.  ED argues that NCLB's prohibition applies only to teachers who hold a state-issued document called a "waiver," rather than to any teacher who has had standard certification requirements excused on a temporary basis while they teach on a sub-standard credential.  Defs. Opp. 17:8-10.  Defendants' narrow reading of Section 7801(23)(A)(ii) directly contradicts ED's prior statements in the appendix to the final rule that Congress' prohibition "encompass[es] any form of a waiver, *by whatever name a State uses,* under which the State permits a teacher to teach without having obtained full certification or licensure," with alternative route participants being the "one exception" to this general rule.  67 Fed. Reg. 71764-71765 (Dec. 2, 2002); AR 99-100 (emphasis added).

14

1    In fact, the waiver definition in NCLB is essentially Defendants' own.  ED was required

2    by Congress to develop a definition of the term "waiver" for purposes of teacher quality

3    reporting by the states under the Higher Education Act of 1998.  *See* 1998 Amendments to

4    Higher Education Act of 1965, P.L. 105-244, Sec. 207(a).  ED's definition, provided in its pre-

5    NCLB guidance to the states in 2001, formed the basis on which the fifty states in October 2001

6    submitted the data compiled in the Secretary's 2002 Annual Report on Teacher Quality (*see* AR

7    437).  ED's pre-NCLB waiver definition went so far as *to explicitly include alternative route*

8    *participants within the category of teachers on waivers.*  It provided: "Teachers without an initial

9    certificate or license from any state should be included in the waiver count if they (1) hold

10   temporary or emergency licenses or permits, (2) *are pursing an alternative route to certification*,

11   [or] (3) are teaching as long-term substitutes."  *See* Exh. 18(a) (emphasis added).  Because

12   Congress had specifically required ED to develop a definition of the term "waiver" applicable to

13   teachers in the HEA legislation, Congress is presumed to know what this definition was when the

14   Conference Committee drafted its "waiver" provision in December 2001.  And, in fact, the

15   NCLB provision aligns remarkably well with ED's 2001 definition.  Post-NCLB, ED maintained

16   the broader understanding of waiver but exempted interns.  *See* Exh. 18(b)  at B-5.  In short,

17   ED's past statements interpret NCLB's provision to exclude any teacher without full certification

18   from the definition of "highly qualified"—with the exception of alternative route participants, for

19   whom ED impermissibly created a special exception in 34 C.F.R. § 200.56(a)(2)(ii).

**B.  Congress' Support for Alternative Route Programs Is Not Inconsistent with its Intent That All Students Have "Fully-Certified," "Highly-Qualified" Teachers.**

22   Defendants contend that Congress' decision to fund alternative route programs—

23   specifically through Troops-to-Teachers, Transition-to-Teaching, and the Improving Teacher

24   Quality State Grants Programs—demonstrates Congressional intent that alternative route

25   participants must be considered "highly qualified."  Defs. Opp. 19:25-28.  Defendants erect a

26   straw man in posing an irreconcilable conflict between Congress' requirement that all core

27   courses be taught by "highly qualified" teachers by the end of the 2005-06 school year and

28   Congress' support for districts hiring alternate route participants under these programs after that

15

time.  Because Congress did not make alternate route teachers in these programs "highly qualified" and because the statute as a whole can be read in harmony, Defendants' argument here fails as well.

First and foremost, the plain language of Title II, Part A of NCLB and the various programs does not support Defendants' assertion.  Congress could easily have stated that participants in these alternative route programs are considered "highly qualified"—but it did not.  If anything, the plain language is consistent with alternative route participants having to complete their full state certification *before* being considered "highly qualified."  *See* 20 U.S.C. § 6613(c)(3) (states may use funds to "establish, expand, or improve alternative certification routes for State certification of teachers. . . for [categories of persons] *who demonstrate the potential to become highly effective teachers* or principals") (emphasis added), § 6623(a)(7) (LEA may use funds to "hir[e] highly qualified teachers, including teachers who *become* highly qualified through State and local alternative routes to certification") (emphasis added).[13]

Secondly, when properly reading the statute and its statutory scheme in its full context—rather than focusing, as Defendants do, solely on the 100% "highly qualified" teacher requirement—it is clear that Congress understood this requirement to be an ambitious goal that likely would not be so quickly met.[14]  Thus, during the approximately six or more year period until the statute is reauthorized, Congress required that states and districts make progress toward the important goal of having all core teachers "highly qualified."  Accordingly, NCLB contains numerous provisions requiring states and local school districts to develop plans to meet the 100% HQT requirement, to ensure the equitable distribution of non-"highly qualified" teachers in the meantime, and to report to the public on progress made towards meeting the HQT requirement.  *See* Pltfs. Op. Br., 4.  In fact, Defendants own pre-litigation interpretation of  NCLB interprets

---

[13] Defendants' regulations also reflect the presumption that Troops-to-Teachers participants are not considered "highly qualified" the day they enter the program, but rather that the program supports candidates "so that [they] can obtain certification or licensing as a[]. . . teacher. . . and *become* a highly qualified teacher."  *See* 34 C.F.R. § 230.1 (emphasis added).

[14] In fact, Congress' HQT definition itself assumes that there may not be sufficient HQTs to staff classrooms and that it may be necessary for districts to hire provisionally or emergency certified teachers who are not "highly qualified."  20 U.S.C. § 7801(23)(A)(ii).

the 100% HQT requirement as a "goal" requiring good faith effort but one that will not be achieved in the near term. Just last summer, Defendants informed states that, if they are "making an adequate effort to reach the [100% HQT] goal," they will not be considered in violation of the statute and subject to sanctions. *See* Letter from Margaret Spellings (July 23, 2007), Pltfs. Op. Br., Exh. 15. *See also* Defs. Opp. 3:23-24 (agreeing that state plan and equitable distribution provisions of NCLB apply while states work towards meeting the 100% HQT goal).

To state the obvious, it is entirely consistent for Congress to support alternative route programs as a means to address the nationwide teaching shortage (particularly in high-need schools where retaining highly-qualified teachers is most challenging) and yet not intend participants in these programs to be deemed "highly qualified" until after they have completed their programs and "obtained" full certification. The requirement that participants in these programs commit to teaching in "high need" schools for three years was meant to ensure that once participants completed their certification and became "highly qualified," they would stay.[15]

Moreover, Congress' decision to fund alternative programs as a pre-"highly qualified" pipeline to increase the supply of "highly qualified" teachers and encourage their retention in high-need schools is entirely consistent with the language of the statute itself, which posits both traditional and alternative preparation routes as the means to achieve full State certification and the "highly qualified" designation. 20 U.S.C. § 7801(23)(A) ("highly qualified" teachers are those who have "obtained full State certification as a teacher (including certification obtained through alternative routes to certification)"). The parenthetical phrase indicates Congress' desire to explicitly support alternative route programs as one of the means of obtaining full state certification—a policy goal also reflected in its authorization of the Transition-to-Teaching Program (20 U.S.C. § 6681). Contrary to Defendants' assertion, such a reading does not render the parenthetical superfluous (Defs. Opp. 17:23-28). Rather, the parenthetical serves to clarify

---

[15] Thus, recognizing that shortages of "highly qualified" teachers would continue, it was perfectly reasonable for Congress to support programs that could replace long-term substitutes and emergency credentialed teachers with alternate route teachers who—though also not yet "highly qualified"—at least would have subject matter competence and who would agree to remain at the school upon completing their preparation program and becoming highly qualified.

that the modified phrase "full state certification" includes, among other things, that which is singled out in the parenthetical. *See, e.g., Mizrahi v. Gonzales*, 492 F.3d 156, 166 (2d Cir. 2007) ("parenthetical. . .need not be assigned a different meaning from the preceding language to avoid being surplusage; it can reasonably be construed to illustrate or explain the broader proposition"). Notably, ED's guidance addressing the parenthetical agrees with Plaintiffs' position that the parenthetical merely clarifies that certification can be obtained through either traditional or alternative routes. *See* AR 478 (clarifying that a "highly qualified" teacher is one "who has obtained full State certification (whether he or she has achieved certification through traditional or alternate routes"); Exh. 18(b) at B-2 (same).

## IV.    THE PLAINTIFFS HAVE STANDING.

### A.    The Individual Plaintiffs Have Standing.

Defendants do not challenge the specific basis for any of the individual Plaintiffs' standing. They challenge all Plaintiffs' standing generally on grounds that have been refuted, as a matter of law, in Sections I and II above. Accordingly, the individual Plaintiffs have standing sufficient to warrant a grant of summary judgment in their favor.

### B.    The Organizational Plaintiffs Have Standing.

#### 1.    CFJ and CA ACORN Meet the Requirements for Article III Organizational Standing.

Because Defendants do not dispute the specific bases for standing for any of the individual plaintiffs, or for the representative CFJ student, CFJ and CA ACORN have representational standing as both groups have identified members who otherwise have standing to sue in their own right (Defs. Opp. 12:22-23). In addition to their representational standing, both CFJ and CA ACORN also have organizational standing to sue on their own behalf. Defendants' arguments to the contrary are without merit.

Defendants misstate the legal standard for Article III organizational standing (Defs. Opp. at 13:6-7). In the Ninth Circuit, "an organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) the frustration of its organizational mission; and (2)

18

diversion of its resources to combat the particular [wrong] in question." *Smith v. Pacific Properties and Development Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). "Direct[] harm to [the organization's] ability to provide its services" (Defs. Opp. 13:7)—especially where, as here, the organization is not a "direct services" organization—is not required.

Here, both CFJ and CA ACORN have specifically alleged that Defendants' regulation permitting intern teachers to be mislabeled as "highly qualified" frustrates their missions of improving educational opportunities in California's public schools, including equal access to fully prepared and certified teachers. Mehrens Decl. ¶¶ 6-7, 9, 11, Exh. 1; Rivera Decl. ¶¶ 5, 7, 10, 11; *see also* 1st Am. Comp. ¶¶ 37-40. Further, both organizations have expended resources in working for stronger enforcement of NCLB's HQT definition (Mehren's Decl. ¶¶ 6, 8; Rivera Decl. ¶ 8) and currently work to counteract the effects of Defendants' regulation by advocating for a more equitable distribution of qualified teachers and educating members and the public about teachers' true qualifications (Mehrens Decl. ¶ 7; Rivera Decl. ¶ 7). Contrary to Defendants' assertion, CFJ and CA ACORN have demonstrated more than "a mere interest in the problem" (*Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)) or "political dispute" (Defs. Opp. 14:2) insufficient to establish standing. Their detailed allegations regarding how Defendants' regulation harms each organization and its members—the veracity of which Defendants do not dispute—are more than sufficient to establish "injury in fact." *Sierra Club,* 405 U.S. at 735.

        2.    <u>CFJ and CA ACORN Meet The Requirements for Prudential Standing Because Their Organizational Interests in Improving Schools and Empowering Parents Directly Fall Within the Zone of Interests That NCLB Seeks to Protect.</u>

To meet the zone of interests test, a plaintiff must show that the "interest sought to be protected by the complainant is *arguably* within the zone of interests to be protected … by the statute." *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co*., 522 U.S. 479, 491 (1998) (citations omitted) (emphasis in original). A reviewing court must "first discern the interests arguably to be protected by the statutory provision at issue, and then inquire whether the plaintiff's interests affected by the agency action in question are among them." *Ctr. for*

19

*Biological Diversity v. Abraham*, 218 F. Supp. 2d 1143, 1158 (N.D. Cal. 2002) (citing *Nat'l Credit*).  The zone of interests test "is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff."  *Clarke v. Securities Industries Ass'n*, 479 U.S. 388, 399-400 (1987).  Moreover, for cases brought under "the generous review provisions of the APA," the zone of interests is broader than in cases brought under other statutes.  *Bennett v. Spear*, 520 U.S. 154, 163 (1997) (citations omitted).

Defendants' zone of interest argument (Defs. Opp. 14:18-24) confuses Article III standing requirements with the more lenient requirements of prudential standing by focusing on *Center for Law and Education v. Department of Education*, a case which addressed Article III requirements, not the zone of interest test.[16]  396 F. 3d 1152 (D.C. Cir. 2005).  Further, Defendants concede that the interests NCLB seeks to protect are those of parents and students (Defs. Opp. 14:22-23), who comprise the membership of CFJ and CA ACORN.

NCLB's purpose is to "ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education" by, *inter alia*, meeting the needs of low-income and limited English proficient students, "holding schools, local educational agencies, and States accountable for improving the academic achievement of all students," and "affording parents substantial and meaningful opportunities to participate in the education of their children."  20 U.S.C. § 6301.  CFJ's and CA ACORN's organizational missions closely align with the overall purpose of NCLB.  Both grassroots membership organizations seek to improve their members' schools and empower parents—through training, education, and outreach—to hold schools, districts, and the state accountable for providing them with a high-quality education, including full and equal access to fully-credentialed, highly-qualified teachers.  1st Am. Compl. ¶¶ 37, 39; Mehrens Decl. ¶¶ 4, 6-7; Rivera Decl. ¶¶ 4-7.  These organizations cannot fulfill their missions without accurate, transparent data on the numbers and distribution of non-HQTs.  Moreover,

---

[16] Defendants' reliance on *INS v. Legalization Asst. Proj. of L.A. County Fed. of Labor* is similarly inapposite.  There, the statute at issue had the narrow purpose of providing amnesty to undocumented immigrants.  510 U.S. 1301, 1305 (1993).  In contrast, NCLB's purpose in ensuring fair and equal access to a high-quality education for all children and widely available teacher quality information to the public is far broader, and thus encompasses grassroots organizations representing parents and students within its "zone of interests."

both organizations are part of the public that is owed this data pursuant to NCLB. *See* 20 U.S.C. §§ 6311(h)(1)(C), 6311(h)(2). Thus, CFJ's and CA ACORN's interest in enforcing the HQT provisions of NCLB "arguably"—indeed, unequivocally—fall within the zone of interests sought to be protected by NCLB. *Nat'l Credit*, 522 U.S. at 491; *see also Ctr. for Biological Diversity*, 218 F. Supp. 2d at 1161-62 (government's failure to issue statutorily-mandated reports fell within zone of interests of environmental organizations, which may use that information in their advocacy and education efforts).

### C. Consideration of Extra-Record Evidence is Appropriate to Establish Plaintiffs' Standing and to Explain Technical Terms.

Plaintiffs are entitled to offer declarations to demonstrate their standing. Because the administrative record cannot possibly contain facts sufficient to establish individual plaintiffs' standing, cases in the Ninth Circuit—including *Great Basin* relied on by Defendants—permit courts to rely on extra-record evidence to determine standing.[17] *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 967 (9th Cir. 2006); *Northwest Envtl. Defense Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997); *Karuk Tribe of Cal. v. United States Forest Serv.*, 379 F. Supp. 2d 1071, 1088 (N.D. Cal. 2005) ("extra-record declarations may be used and, indeed, are required at the summary judgment stage to establish standing"). *See also Ventana Wilderness Alliance v. Bradford*, 2007 U.S. Dist. LEXIS 48366 at *17-*18 (N.D. Cal. 2007).

---

[17] The Ninth Circuit also permits a court to consider extra-record evidence in an APA case in four additional circumstances: (1) where the administrative record is incomplete and judicial review will be frustrated without extra-record material, (2) where the agency has relied on documents not included in the administrative record, (3) where extra-record material is needed to explain technical terms, and (4) where there is a showing that the agency acted in bad faith. *Southwest Ctr. for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996); *Ventana Wilderness Alliance v. Bradford*, 2007 U.S. Dist. LEXIS 48366 at *16. The extra-record materials submitted in support of this brief fall under exceptions two and three. The 2001/2006 Glossary of Terms for Title II Reporting (Exh. 18(a) & (b)) is referred to but not included within the administrative record (*see* AR 437) and needed to explain technical terms, specifically "waiver" and "full state certification." Similarly, Defendants' guidance to states (Exh. 20) defining the term "full state certification" is a later edition of guidance Defendants included in the record (*see* AR 458-AR 545) and is needed to explain Defendants' definitions of "full state certification" and "highly qualified teacher." Finally, the chart summarizing California's teacher credentialing laws and credential leaflets published by the California Commission on Teacher Credentialing (Exh. 17, 19(a)-(g)) are necessary to explain technical and complex subject matter related to full state certification in California.

21

1    Here, the declarations of the individual Plaintiffs as well as leaders of the organizational

2 Plaintiffs appropriately establish their standing.  The declaration of Dr. Patrick Shields supports

3 both the individual and organizational Plaintiffs' claims that Defendants' regulation harms them

4 by allowing NCLB's equitable distribution and public reporting provisions to be thwarted in

5 their schools, districts, and statewide.  *See* Shields Decl. ¶¶ 11-13.

6    Defendants do not dispute the veracity of any of the declarations Plaintiffs have

7 submitted to support Plaintiffs' standing.  Thus, on summary judgment, the facts set forth in

8 these declarations are undisputed and this matter may be decided in the moving party's favor.

9 *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); FED. R. CIV. P. 56(c).

10 **V.    PLAINTIFFS ARE ENTITLED TO NATIONWIDE RELIEF AND ALL THE RELIEF**
11 **REQUESTED.**

12    **A.    Plaintiffs Are Entitled to Nationwide Relief Because the Defendants' Unlawful**
13           **Regulation Is Nationwide in Scope.**

14    Defendants do not dispute that the challenged regulation is nationwide in effect, nor can

15 they dispute that the controlling law of the Ninth Circuit requires nationwide relief in these

16 circumstances.  *See Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007)

17 (affirming a nationwide injunction as "compelled by the text of the [APA]" where a nationally-

18 applied regulation was unlawful), *cert. granted*, 128 S. Ct. 1118, (2008).[18]

19    Defendants argue instead that nationwide relief should be available "only in a nationwide

20 class action" (Defs. Opp. at 29), but this is squarely contrary to the law of this circuit.  *See*

21 *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) ("[T]here is no bar against class-wide,

22 and nationwide relief in federal district or circuit court when it is appropriate. . . . Class-wide

23 relief may be appropriate even in an individual action.").[19]  There is no basis to deny the relief

24 sought, simply because the necessary relief will, by its nature, benefit persons other than the

25 Plaintiffs.  *See, e.g., Blue Cross and Blue Shield Ass'n v. Shalala*, No. 90-1528, 90-1356, 1996

26

27 [18] *See also California Cosmetology Coalition v. Riley*, 110 F.3d 1454, 1456-61 (9th Cir. 1997);
*Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000); *Northwest Envtl. Advocates v. EPA*, NO. C 03-
05760 SI, 2005 WL 756614, *13 (N.D. Cal. Mar. 30, 2005).
28 [19] *See also Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 374 (5th Cir. 1981); *Evans v.
Hartnett County Bd. of Educ.*, 684 F.2d 304, 306 (4th Cir. 1982).

22

1    WL 636131, *3 (D.D.C. Aug. 27, 1996); *American Lands Alliance v. Norton*, No. 00-2339, 2004

2    U.S. Dist. LEXIS 27533 at *11 (D.D.C. June 2, 2004).

3           Defendants then argue, without citing *any* controlling or relevant precedent, that

4    nationwide relief would prevent the issue from being "relitigated in different circuits" or might

5    result in the application of non-mutual collateral estoppel. Defs. Opp. at 29. This Court rejected

6    precisely those arguments in *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, NO. C 05-

7    1144 PJH, C 04-4512 PJH, 2007 WL 1970096, *19 (N.D. Cal. July 3, 2007), in which the Court

8    granted nationwide injunctive relief against a nationally applicable agency rule. Observing that

9    "[i]njunctive relief need not be geographically limited" and recognizing as controlling the

10   holding of *Earth Island Institute*, this Court rejected the agency's argument that it should be

11   permitted to seek "multiple judicial interpretations" of the regulations and laws at issue in order

12   to allow an issue of national import to "percolate" through the judicial system. *Id.* Indeed, the

13   Court based its grant of nationwide injunctive relief on the fact that it was addressing "a

14   *nationwide* rule, affecting all National Forest lands—not just those in this district." *Id.*

15   (emphasis in original).[20] Finally, the Court further rejected the government's collateral estoppel

16   argument, noting that "the doctrine of 'nonmutual collateral estoppel against the government' as

17   recognized by the Supreme Court in [*United States v.*] *Mendoza* does not require that the scope

18   of injunctions be limited." *Id* .[21] Defendants' position has no basis in law.

19

20   [20] It is interesting that Defendants would cite *Califano v. Yamasaki*, 442 U.S. 682, 99 S. Ct. 2545

21   (1979) as suggesting that Plaintiffs' requested relief should be denied. That case involved
     challenges to the social security recoupment procedures of the Department of Health, Education

22   and Welfare (HEW) which were certified as a national class action. The Supreme Court rebuffed
     HEW's challenge to the certification of the class, noting that a nationwide class was consistent

23   with "principles of equity jurisprudence, since the scope of injunctive relief is dictated by the
     extent of the violation established not by the geographical extent of the plaintiff class." *Id.* at

24   702, 99 S. Ct. at 2558. The quotation from *Califano* on which Defendants rely is not the holding
     of that Court, but the Court's paraphrasing of HEW's argument, which the Court rejected.

25   [21] The Ninth Circuit is by no means alone in holding that nationwide injunctions are appropriate
     in addressing unlawful regulations that are national in scope. *See, e.g., Heartwood, Inc. v. U.S.*

26   *Forest Service*, 73 F.Supp.2d 962, 977, 980 (S.D. Ill. 1999) *aff'd*, 230 F.3d 947 (7th Cir. 2000);

27   *Nat'l Mining Assn. v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.D.C. 1998) ("The
     Court rejects defendants' proposal to limit relief solely to members of the plaintiff associations.

28   'When a reviewing court determines that agency regulations are unlawful, the ordinary result is

                                           23

**B. Plaintiffs Are Entitled to All the Injunctive Relief They Seek**

Though taking issue with the geographic reach of relief, Defendants do not dispute that this Court has full authority to invalidate an unlawful regulation. Indeed, the Administrative Procedure Act explicitly directs courts to "hold unlawful and set aside" any "agency action, findings, and conclusions" that are unlawful. 5 U.S.C. § 706(2). Defendants do, however, take issue with Plaintiffs' request that: (1) Defendants be prohibited from submitting a report to Congress that violates the law, that, (2) they inform Congress of the fact that past reports have been submitted in violation of the law, utilizing an unlawful definition of "highly qualified" teachers, and (3) that they be required to notify states to stop using the unlawful definition. Defendants' position—that the Court is powerless to do anything other than invalidate the offending regulation—is inconsistent with controlling law and makes little sense.

The courts routinely require agencies that have violated the law to remediate the effects of their past violations and to take reasonable steps to prevent future violations. *See Northwest Envtl. Defense Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680-81 (9th Cir. 2007) ("court of equity conducting judicial review under the APA has broad powers to order *mandatory affirmative relief*, if such relief is necessary to accomplish complete justice") (internal citations omitted) (emphasis added). S*ee also Sierra Pacific Indus. v. Lyng*, 866 F.2d 1099, 1111 (9th Cir. 1989)); *Bautista-Perez v. Mukasey*, NO. C 07-4192TEH, 2008 WL 314486, *6 (N.D. Cal. Feb. 4, 2008).[22]

The plain language of 5 U.S.C. § 706(2), authorizing courts to "hold unlawful and set aside" any "agency. . .findings, and conclusions" is sufficient by itself to enable this Court to enjoin the transmission to Congress of unlawful data on which it may base future policy. Indeed,

_____

that the rules are vacated—not that their application to the individual petitioners is proscribed.'") (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989)).

[22] Defendants cite *Norton v. Southern Utah Wildlife Alliance*, 542 U.S. 55, 63 (2004), for the inapposite proposition that the judiciary cannot usurp the functions of agencies. *Norton* held simply that courts cannot perform administrative functions by writing regulations for agencies that elect not to act. *Id.* This case, like *Northwest Envtl*, is distinguishable "because *Norton* dealt with the power of courts to 'compel agency action unlawfully withheld' under 5 U.S.C. § 706(1). The [plaintiffs] here do not seek redress for agency inaction under § 706(1), but rather challenge a final agency action under § 706(2)". 477 F.3d at 681 & n.10.

24

the Ninth Circuit has specifically found it appropriate to enjoin reports to Congress until an

agency has complied with a statute.  In *Trustees for Alaska v. Hodel*, 806 F.2d 1378 (9th Cir.

1986), the plaintiffs sought a mandatory injunction to force the agency to include an

environmental impact statement with its report to Congress, as required by NEPA.  The Ninth

Circuit affirmed an injunction prohibiting the Fish and Wildlife Service from submitting a report

to Congress concerning the resources in the Arctic National Wildlife Refuge until the agency

complied with the National Environmental Policy Act (NEPA).  *Id.* at 1378; *see also Ctr. for*

*Biological Diversity v. Brennan*, NO. C 06-7062 SBA, 2007 WL 2408901 at *24 (N.D. Cal.

Aug. 21, 2007) (ordering agency to publish a summary of research plan as statutorily-mandated

and submit both a revised plan and scientific assessment to Congress).  A cornerstone of NCLB's

teacher quality provisions is that agencies must publish accurate information concerning "highly

qualified" teachers.  This Court has ample authority to ensure that ED discharges those duties

itself and that it ensures faithful implementation of similar duties by states and districts.

Defendants' argument that this Court can only invalidate regulations, but cannot order

appropriately tailored remedial relief is illogical and is not the law.  If the requested relief is not

granted, then the effects of the unlawful regulation will persist.  If the Court's invalidation of the

regulation is to have any meaning, it follows necessarily that Defendants must communicate to

those who have relied on its unlawful regulation that the regulation is no longer in effect.

## CONCLUSION

Accordingly, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for

Summary Judgment in all respects and deny Defendants' Cross-Motion for Summary Judgment.


Dated: March 12, 2008                    Respectfully submitted,


                                         _____
                                         JOHN T. AFFELDT
                                         TARA KINI
                                         PUBLIC ADVOCATES, INC.
                                         Attorneys for Plaintiffs

25